**U.S. Department of Labor**     Administrative Review Board
200 Constitution Ave. NW
Washington, DC 20210-0001



IN THE MATTER OF:

GENE SCHAEFER &                           ARB CASE NO.  2022-0050
LUIS BERMEO,

      COMPLAINANTS,                  ALJ CASE NOS. 2018-SOX-00048
                                           2018-SOX-00051
  v.                                  ALJ TIMOTHY J. MCGRATH

NEW YORK COMMUNITY                        DATE:  June 22, 2023
BANCORP, INC.,

      RESPONDENT.

Appearances:

*For the Complainants:*
    Gayle Pollack, Esq. and David B. Saxe, Esq.; *Morrison Cohen LLP*;
    New York, New York

*For the Respondent:*
    Ashley Burkett, Esq.; *Arnold & Porter Kaye Scholer LLP*; Washington,
    District of Columbia

Before PUST, WARREN, and MILTENBERG, Administrative Appeals
Judges

## DECISION AND ORDER

PUST, Administrative Appeals Judge:

      This case arises under the whistleblower protections of Section 806 of the
Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the
Sarbanes-Oxley Act (SOX), as amended, and its implementing regulations.[1] On
June 29, 2022, a U.S. Department of Labor (Department) Administrative Law
Judge (ALJ) issued a Decision and Order Denying Complaints (D. & O.). The ALJ
determined that Gene Schaefer (Schaefer) and Luis Bermeo (Bermeo) (collectively,

---

[1]     18 U.S.C. § 1514A; 29 C.F.R. Part 1980 (2022).

2

Complainants[2]) failed to establish by a preponderance of the evidence that they had engaged in activity protected under SOX, so their whistleblower claims failed.[3] Specifically, the ALJ found that the Complainants' reports of an alleged scheme related to copper salvaging and cash kickbacks involving employees of New York Community Bancorp, Inc. (Respondent or NYCB) did not constitute SOX-protected activity because Complainants failed to demonstrate that they held reasonable beliefs that the scheme they alleged constituted bank fraud under 18 U.S.C. § 1344, one of SOX's predicate statutes.[4] Complainants timely petitioned the Administrative Review Board (ARB or Board) for review. We affirm the ALJ's D. & O.

## BACKGROUND

The ALJ determined the following facts which, with one exception,[5] Complainants do not challenge on appeal.[6]

---

[2]      This litigation originally involved one additional complainant, Fred Fernandez (Fernandez), who was employed by NYCB as a Lead Project Manager from December 2014 until December 2017, when NYCB eliminated his position. D. & O. at 5. Fernandez's claim was dismissed as part of the ALJ's June 30, 2020 Order Granting, In Part, and Denying, In Part, Respondent's Motion for Summary Decision. Fernandez did not appeal that ruling and is no longer a party in this case.

[3]      D. & O. at 34.

[4]      D. & O. at 28-29; *see* 18 U.S.C. § 1514A(a)(1) (which states that no covered company may discriminate against an employee for engaging in "conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.").

[5]      Complainants note that the ALJ made one "significant factual error" in relying on statements made by counsel rather than witness testimony when describing an internal NYCB investigation related to a different NYCB property in 2013. Complainants' (Comp.) Opening Brief (Br.) at 24; *see* D. & O. at 6. NYCB labels this error a "red herring" because the ALJ did not rely on this other investigation as a basis for concluding that Complainants did not reasonably believe they were reporting bank fraud. Respondent's (Resp.) Br. at 45 n.11. We conclude such error is harmless because the ALJ articulated several other sufficient reasons why Complainants failed to establish that they reasonably believed that they engaged in protected activity under SOX. *See Wong v. Sumitomo Mitsui Banking Corp.*, ARB No. 2018-0073, ALJ No. 2016-SOX-00005, slip op. at 6 (ARB Oct. 26, 2020); *Bechtel v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 710 F.3d 443, 449 (2d Cir. 2013).

[6]      Comp. Reply Br. at 7.

3

## 1. Relationship Between the Parties

New York Community Bancorp, Inc. is a publicly traded financial institution headquartered in New York with hundreds of branch banks located in five states.[7] Robert Wann (Wann) is NYCB's Chief Operating Officer.[8]

NYCB operates an internal Corporate Real Estate Services unit (CRES) responsible for managing and maintaining its physical properties.[9] From early 2016 until his termination in 2017, William Curran (Curran) served as the Chief CRES Officer for NYCB.[10] During the relevant timeframe, Fernandez and Richard Grosso (Grosso) served as CRES project managers[11] and Fred Whittaker (Whittaker) was the Director of Facilities for CRES.[12]

Complainant Schaefer worked for NYCB in various roles over two decades; in 2016 he was the CRES Budget Coordination Manager and reported to Curran.[13] Complainant Bermeo became the Director of Construction and Project Management for CRES East after also having worked for NYCB for nearly twenty years.[14] Like Shaefer, Bermeo reported to Curran.[15]

## 2. Renovation of 100 Duffy

In 2016, NYCB purchased a building at 100 Duffy Avenue in Hicksville, New York (100 Duffy),[16] located adjacent to a building that NYCB already owned at 102 Duffy Avenue (102 Duffy). NYCB hired The Martin Group (TMG) as a general contractor to complete a renovation of 100 Duffy.[17]

---

[7]     D. & O. at 4.

[8]     *Id.* at 3.

[9]     *Id.* at 2.

[10]    *Id.* at 2-3.

[11]    *Id.* at 5-6.

[12]    *Id.* at 6.

[13]    *Id.* at 2.

[14]    *Id.* CRES includes two subunits, one of which is CRES East. Trial Exhibit (Ex.) J (Memorandum re: Audit of Corporate Real Estate Services) at 1.

[15]    D. & O. at 2.

[16]    *Id.* at 6.

[17]    *Id.*

4

Inside the basement of 100 Duffy is a room formerly used to house telecommunications equipment (LAN room).[18] The LAN room contained a dropped ceiling made of metal gridwork filled with two-by-four ceiling tiles.[19] Wires and cables ran both above and below the ceiling tiles, and some also ran under the floor in the LAN room.[20] As part of the remodeling project, NYCB's information technology (IT) department requested the removal of several cabinets and racks containing obsolete computer-related cables and wires from the LAN room.[21]

After having inspected the site with Grosso, in September of 2016 Apptel, a telecommunications repair and installation company, submitted a proposal to remove all unused or obsolete equipment and cabling from the LAN room.[22] Grosso generated a purchase order based on Apptel's proposal.[23] Apptel's proposal required NYCB to remove any material it wanted to keep and to take down the ceiling tiles in the LAN room before Apptel began any work.[24] The purchase order totaled $9,400.00, and described the project as follows:

> Remove Any & All Unused Or Obsolete Equipment &
> Cabling From The Level B Telco Room.
> Requires Removal of Any Materials The Client
> Wishes To Keep, Along With The Removal Of All Ceiling
> Tiles Before The Project Can Commence.
> A Space For The Roll Of (sic) Dumpster Is Required
> Directly Near The Freight Location. [25]

The purchase order was approved on September 27, 2016, by Schaefer, Bermeo, Grosso, and Curran.[26]

When Apptel started work in the fall of 2016, the ceiling's gridwork and tiles had already been removed, as provided for in the purchase order.[27] The Apptel crew removed computer-related cables and wires from the LAN room, all of which fit into

---

[18]    *Id.* at 7.

[19]    *Id.*

[20]    *Id.*

[21]    *Id.*

[22]    *Id.*

[23]    *Id.*

[24]    *Id.*

[25]    *Id.*

[26]    *Id.*

[27]    *Id.* at 7-8.

5

one dumpster and generated only $1,179.60 in value as scrap metal.[28]

### 3. Change Order No. 16

Sometime before March 15, 2017, Grosso approved TMG's request to submit a contract change order (CO) for additional work at 100 Duffy, eventually memorialized as Change Order 16 (CO16).[29] CO16 called for the repair of the existing ceiling grid and installation of new ceiling tiles in the LAN room of 100 Duffy, with payment for the work totaling $40,300.05.[30]

On March 30, 2017, Grosso sent CO16 to the project architect for review.[31] A few hours later, and after the architect informed Grosso that the cost of the work was too high,[32] Grosso sent an email to Bermeo, with a copy to Schaefer and others (Grosso email chain), informing all that CO16 was being rejected.[33]

### 4. April 3rd Bermeo/Curran Conversation: Bermeo's Alleged Protected Activity[34]

At approximately 9:00 a.m. on Monday April 3, 2017, Bermeo received and signed CO16, then had it sent to Schaefer for signature.[35] When Schaefer reviewed CO16, he noticed that it called for repairing damage to the LAN room ceiling although no construction had been authorized in the LAN room. He also noted that CO16 totaled over $40,000, making it one of the largest change orders on the project.[36] Schaefer did not sign CO16; instead, he met with Bermeo to discuss the

---

[28]   *Id.* at 8.

[29]   *Id.* Change Order 16 was identified as "CO 16" by the ALJ. *Id.*

[30]   *Id.*

[31]   *Id.*

[32]   *Id.*

[33]   *Id.* at 9.

[34]   Although Bermeo did not author and was not copied on or named in Schaefer's April 6th email to Wann, he alleges that this email also constituted part of his protected activity. For the reasons set forth in the D. & O. at 24, we concur in the ALJ's finding that the April 6th email sent by Schaefer to Wann, who did not supervise Bermeo, does not constitute Bermeo's "aiding in an investigation . . . conducted by . . . a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)." *See* 18 U.S.C. 1514A(a)(1)(C). *See* further relevant discussion *infra* at 16-17.

[35]   D. & O. at 9.

[36]   *Id.*

6

matter.[37]

At 9:15 a.m. on April 3rd, Schaefer replied to the March 30th Grosso email chain and asked who had removed the ceiling tiles and authorized the deconstruction of the LAN room.[38] Within ten minutes and without receiving any response from Grosso or ever having seen the LAN room,[39] Schaefer sent the following email to Wann:

> You need to be made aware of the situation below. It involves a room in 100 Duffy where someone allowed a vendor access to this room to salvage copper wiring from the room for cash. I was informed that there was an exchange of cash envelopes between vendors and our employees resulting from this activity. It was something that had transpired at 102 Duffy[40] and it seems to have occurred again.
>
> * * *
>
> This aggressive salvage operation will cost the company $40,000 in repairs, and may have netted at least that much in copper to whoever removed the wiring.[41]

Also on April 3, 2017, Bermeo replied to Schaefer's email in the Grosso email chain, explaining that NYCB maintenance staff had removed the ceiling tiles and

---

[37]    *Id.*

[38]    *Id.*

[39]    *Id.* at 6.

[40]    The email's reference to 102 Duffy relates to an April 2016 conversation between Fernandez, Schaefer and Bermeo regarding a bid opening meeting that had become contentious between Fernandez and Grosso. At the suggestion of Schaefer and the instruction of Curran, Fernandez had obtained a sealed bid on a project that grossly undercut the bid Grosso had obtained, such that Grosso's preferred vendor lost the bid. *Id.* at 5-6. Explaining why he and Grosso had argued at the meeting, Fernandez told Schaefer and Bermeo that when he worked for a construction company on the 102 Duffy project in 2013 before he joined NYCB, Grosso "ran a scheme" that involved the removal and sale of copper wiring, copper piping and stored oil from the property. *Id.* at 6.

[41]    *Id.* at 9-10. *See also* RX 203 (April 3rd email). Although Schaefer originally relied upon this April 3rd email as part of his claimed protected activity, once the record established that he sent this email prior to being told about a cash envelope exchange during his viewing of the LAN room later that same day, Schaefer conceded that he was no longer claiming this communication was part of his claimed protected activity. *See* D. & O. at 21 n.12.

Apptel had removed the wiring.[42] Schaefer then asked Bermeo, Grosso, and Gerry Newman (Newman), NYCB's property manager at 100 Duffy, for documentation identifying who authorized Apptel to cause $40,000 worth of damage in the LAN room.[43] In response, Bermeo sent Schaefer a copy of the NYCB's IT department work order, which specified what work NYCB was requesting.[44]

That same day, Schaefer, Bermeo, Newman, Fernandez, and NYCB project manager Edgar Hernandez (Hernandez) visited the LAN room.[45] Although their subsequent descriptions of the damage varied considerably,[46] the record indicates that the entire ceiling grid had been removed or damaged such that it was unusable and all wiring was gone except for some hanging light fixtures.[47] When Bermeo asked who caused the damage, Newman told him that they should speak with Grosso who had coordinated the work, which was performed by NYCB personnel during a three-day weekend after hours.[48] Newman then said in a joking manner, "If you give me an hour, I could have a guy here and we'll give you a million dollars."[49]

Upon returning to NYCB's headquarters, Bermeo met with Curran. During their conversation (April 3rd Bermeo/Curran conversation), Bermeo reported to Curran that the LAN room was damaged and that Newman told them that Grosso coordinated the work, all of which was done by NYCB employees after hours during a three-day weekend. Bermeo also told Curran that Newman "made a joke" about a "million-dollar payment."[50] Bermeo did not mention copper wiring removal and did not raise any concerns related to project scope or bid-rigging.[51] During the April 3 Bermeo/Curran conversation, Curran showed Bermeo an envelope of cash that he said he had received from Whittaker.[52] Curran told Bermeo that he was waiting to speak with Grosso before doing anything with the cash and directed

---

[42]     D. & O. at 10.

[43]     *Id.*

[44]     *Id.*

[45]     *Id.*

[46]     *Id.* at 10 n.7.

[47]     *Id.* at 10.

[48]     *Id.* at 11.

[49]     *Id.*

[50]     *Id.*

[51]     *Id.* at 23.

[52]     *Id.* at 11.

8

Bermeo to "stay out of it."[53]

On April 4, 2017, Schaefer and Bermeo visited 100 Duffy again, this time with Hernandez and Apptel's owner, Michael Chludzinski (Chludzinski).[54] Chludzinski told the group that he was not responsible for any of the damage to the LAN room and that the removal was done by NYCB employees.[55] During the same visit, a TMG employee told Schaefer and Bermeo that he had received an envelope of cash from an NYCB employee for the sale of "cold water piping taken from the third floor of 100 Duffy."[56] According to Bermeo, the TMG employee identified Curran as the NYCB employee who gave him the cash envelope; according to Schaefer, the TMG employee did not know the name of the NYCB employee who gave him the envelope.[57]

Later that morning, Schaefer responded to Grosso and Whittaker's email from the previous night, advising that no one should move forward with ceiling repairs in the LAN room until they understood who caused the damage.[58] On the same day, Schaefer, Bermeo, Grosso (by phone), and Whittaker met to discuss the situation.[59] On April 5, 2017, at Curran's instruction Bermeo emailed the project architect advising that NYCB was not proceeding with CO16 as Schaefer and Curran had both denied authorization for the work.[60]

## 5. April 6th Schaefer/Wann Email: Schaefer's Alleged Protected Activity

On Thursday, April 6, 2017, at 10:44 a.m., Schaefer sent a second email to Wann (April 6th Schaefer/Wann email), which read in pertinent part as follows:

> As I inquired further about the damage to the [LAN room], I received information regarding an envelope from a vendor directly. The vendor was given an envelope from an employee and told he was "returning it to the company that should have received it." Unfortunately, for that employee, the vendor didn't even know about the envelope or the job that generated the envelope.

---

[53]     *Id.*

[54]     *Id.* at 12.

[55]     *Id.*

[56]     *Id.*

[57]     *Id.*

[58]     *Id.*

[59]     *Id.* at 13.

[60]     *Id.*

9

The employee was William Curran. He returned the envelope to The Martin Group on the day after I asked if he was "aware of an incident at 100 Duffy where employees were receiving envelopes for salvage work?" His response to me at that moment was "Yea, I heard that." To which I replied that "I told the vendor that if our management is aware of this, I am sure an investigation is under way to identify what happened, and when it happened, and will connect all the dots. This is the first I heard about this, and I don't know who is involved. Either as a recipient of an envelope or in the taking of copper." This was on last Monday. On Tuesday he gave the envelope to The Martin Group who didn't know what to do with it. According to what he told me The Martin Group, he apparently received the envelope for "the removal of an abandoned solid copper cold water pipe on the 3rd floor of 100 Duffy. Which Was done at night without the Martin Group knowing."

Mike the owner of App-Tel, our communications vendor, and I had a conversation. He told me he didn't know anything about the removal of other wiring in the room, but did acknowledge the room had been worked on at night by someone other than his company. He said they were aggressive and left only what was still connected to the equipment he was directed to remove. The rest of the room was cleared of the 15-20 years of copper wiring that had been abandoned by Manufacturers Hanover and Chase Bank.[61] In a conversation with Gerry Newman, he told me "there was ton's upon ton's of wire removed from this [LAN] room. I assume it was done by AppTel." He said "There was so much wire here that you couldn't fit a single wire on the ceiling anymore. On the ceiling, under the floor, there was so much here."

\* \* \*

If you want to confirm this and verify who was directly involved, you might wish to review the building security

---

[61]     In his sworn testimony at hearing, Chludzinski denied telling Schaefer that NYCB employees removed any amount of copper wiring from the LAN room. Contrary to the ALJ's findings related to Schaefer, the ALJ found Chludzinski to be a "very credible" witness. *Id.* at 31-32.

10

> videos of all afterhours work at 100 Duffy between 9/27/16
> through 11/01/16.[62]

Wann called Schaefer and told him to "do no more."[63] At 3:49 p.m., Wann replied to Schaefer's email, advising Schaefer he was not tasked or trained as an investigator and directing him to "please stand down."[64] Schaefer replied to Wann's email at 4:31 p.m., stating he "stood down" and had only been looking to find out who damaged the LAN room and why, and "could not ethically ignore what [he] had been told."[65]

### 6. NYCB's Audit of CRES and the Termination of Complainants' Employment

On March 1, 2017, NYCB's internal audit department announced that it was auditing CRES as part of its regularly scheduled three-year audit cycle.[66] Throughout the month, NYCB's auditors met with members of CRES, including the Complainants, and requested various documentation.[67] On April 6, 2017, NYCB's Chief Audit Executive met with Wann to discuss her growing concerns about the functioning of CRES.[68] On May 1, 2017, a draft audit report was circulated to Wann and Curran, outlining five "High Risk" deficiencies and identifying the employees responsible for the identified functions, including Complainants, Whittaker, and Curran.[69]

The auditors identified the Complainants as not fulfilling their respective job duties in various respects.[70] Specifically, the draft audit report noted that Schaefer "could not provide documentation to support the . . . responsibilities in relation to budgetary controls, the monitoring of the budget versus actual spend[ing], vendor non-performance, reporting of operational and financial analyses, contract performance and periodic management reporting."[71] The auditors also identified areas in which Bermeo's performance was problematic related to improper project

---

[62]   *Id.* at 13-14 (deletion from original noted with ellipses).

[63]   *Id.* at 14.

[64]   *Id.*

[65]   *Id.* at 14-15.

[66]   *Id.* at 15.

[67]   *Id.*

[68]   *Id.*

[69]   *Id.*

[70]   *Id.*

[71]   *Id.* at 14 (quoting Joint Ex. 57).

11

scoping and allowing job estimates to be prepared without sufficient independence from the project team, inadequate leveling procedures, and insufficient change order procedures.[72]

After Wann reviewed the draft audit report, he decided to terminate NYCB's employment of Complainants and Curran.[73] On May 3, 2017, NYCB terminated Complainants' and Curran's employment[74]

On May 5, 2017, Bermeo emailed Wann denying any involvement in Schaefer's investigation into 100 Duffy and stating that he had no knowledge regarding Schaefer's accusations.[75] Also on May 5th, Schaefer emailed NYCB's Chief Executive Officer stating his belief that Complainants were terminated because of their attempts to "blow the whistle" on a "fraudulent scheme" involving the stripping and sale of scrap metal "in massive quantities" resulting in "tax free cash sale of bank property for individual personal gain."[76]

## 7. Procedural History and ALJ Decision

On June 29, 2017, and July 14, 2017, Schaefer and Bermeo, respectively, timely filed SOX whistleblower complaints with the Department's Occupational Safety and Health Administration (OSHA). OSHA dismissed their complaints for lack of any protected activity related to bank fraud.[77] On September 6, 2018, Schaefer filed objections to OSHA's dismissal and requested a formal hearing before the Department's Office of Administrative Law Judges (OALJ). On September 24, 2018, Bermeo filed objections and a request for a hearing.

On December 26, 2018, the assigned ALJ issued an Order Consolidating the Complainants' Cases.[78] On June 30, 2020, the ALJ issued two orders: (1) Order Denying Complainants' Motion for Summary Decision; and (2) Order Granting, In Part, and Denying, In Part, Respondent's Motion for Summary Decision. The ALJ held a virtual hearing in this matter between December 7, 2020, and January 15,

---

[72]    *Id.*

[73]    *Id.* at 16.

[74]    *Id.*

[75]    *Id.* Fifty-one days after his termination, Bermeo again emailed NYCB's CEO asking to be rehired. The email failed to mention the destruction of the LAN room and contained no reference to the sale of copper wire or any alleged scheme. *Id.*

[76]    *Id.*

[77]    *See* Trial Ex. I (Schaefer's Objection to Denial of Claim filed Aug. 30, 2018) at 1.

[78]    The ALJ consolidated the claims of Bermeo, Schaefer, and Fernandez.

12

2021, and the parties gave closing arguments on January 28, 2021.[79]

On June 29, 2022, the ALJ issued a D. & O. in which the ALJ found that the Complainants failed to establish by a preponderance of the evidence that they had engaged in any activity protected under SOX.[80] As grounds for his determination, the ALJ found that neither Bermeo nor Schaefer held reasonable beliefs that the April 3rd Bermeo/Curran conversation or the April 6th Schaefer/Wann email constituted reports of bank fraud cognizable under 18 U.S.C. § 1344 or protected under SOX.[81]

On July 8, 2022, the Complainants appealed the ALJ's decision to the Board. Both parties filed timely briefs.

## JURISDICTION AND STANDARD OF REVIEW

The Secretary of Labor has delegated authority to the Administrative Review Board to review ALJ decisions under SOX.[82] The ARB reviews questions of law de novo but is bound by the ALJ's factual determinations if they are supported by substantial evidence.[83] "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[84] Because an ALJ observes all witnesses throughout a hearing, the Board will defer to an ALJ's credibility determinations unless they are "inherently incredible or patently unreasonable."[85]

---

[79]     D. & O. at 1.

[80]     *Id.* at 34.

[81]     *Id.* at 22, 25, and 29.

[82]     Secretary's Order No. 01-2020 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board (Secretary's discretionary review of ARB decisions)), 85 Fed. Reg. 13,186 (Mar. 6, 2020).

[83]     *Cerny v. Triumph Aerostructures-Vought Aircraft Div.*, ARB No. 2019-0025, ALJ No. 2016-AIR-00003, slip op. at 5 (ARB Oct. 31, 2019) (citing 29 C.F.R. § 1979.110(b) (2022)); *see Leviege v. Vodafone US, Inc.*, ARB No. 2019-0058, ALJ No. 2016-SOX-00001, slip op. at 3 (ARB Mar. 19, 2021) (citations omitted).

[84]     *Cerny,* ARB No. 2019-0025, slip op. at 5 (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation marks and additional citations omitted).

[85]     *Mizusawa v. United Parcel Serv.*, ARB No. 2011-0009, ALJ No. 2010-AIR-00011, slip op. at 3 (ARB June 15, 2012), *aff'd* No. 12-9563 (10th Cir. Apr. 26, 2013) (quoting *Jeter v. Avior Tech. Ops., Inc.*, ARB No. 2006-0035, ALJ No. 2004-AIR-00030, slip op. at 13 (ARB Feb. 29, 2008)); *see also Negron v. Vieques Air Link, Inc.*, ARB No. 2004-0021, ALJ No. 2003-AIR-00010, slip op. at 5 (ARB Dec. 30, 2004), *aff'd* No. 05-1278 (1st Cir. Mar. 7, 2006).

13

## DISCUSSION

SOX prohibits covered employers from discriminating against an employee who provides information or otherwise assists in an investigation regarding conduct "which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . ."[86] A SOX claim is governed by the burdens of proof set out in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21).[87]

To prevail, a SOX complainant must establish by a preponderance of the evidence that: (1) the complainant engaged in protected activity under SOX; (2) the respondent took an unfavorable personnel action against the complainant; and (3) the complainant's protected activity was a contributing factor in the unfavorable personnel action.[88] SOX-protected conduct is limited to the six specified categories of fraud or securities violations set out in the SOX statute.[89] Although "[a] complainant need not cite a specific code provision she believes was violated to engage in protected activity, [a complainant] nonetheless has to complain or provide information about conduct that she reasonably believes concerns one of the six specifically enumerated categories in the statute."[90]

Proof that a complainant has reported conduct that he or she reasonably believed constitutes a SOX violation includes both a subjective and objective component. That is, to establish their claim Complainants have the burden of showing both that: "(1) [they] subjectively believed that the conduct complained of constituted a violation of one of the laws listed in Section 806, and (2) a reasonable person of similar experience, training, and factual knowledge would objectively

---

[86]     18 U.S.C. § 1514A(b)(2)(A) (citing 49 U.S.C. § 42121(b)).

[87]     49 U.S.C. § 42121(b).

[88]     29 C.F.R. § 1980.109(a); *see also* 18 U.S.C. § 1514A(b)(2)(A); 49 U.S.C. § 42121 (b)(2)(B)(iii). If a complainant meets this burden of proof, the employer may avoid liability only if it proves its affirmative defense, which requires demonstrating by clear and convincing evidence that it would have taken the same adverse action against the complainant in the absence of any protected activity. 29 C.F.R. § 1980.109(b).

[89]     *Harvey v. Home Depot U.S.A.*, ARB Nos. 2004-0114, -0115, ALJ Nos. 2004-SOX-00020, -00036, slip op. at 14-15 (ARB June 2, 2006) ("To bring himself under the protection of the act, an employee's complaint must be directly related to the listed categories of fraud or securities violations.")

[90]     *Leviege*, ARB No. 2019-0058, slip op. at 4 (citing *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 n.6 (2d Cir. 2014) (other citations omitted)).

14

believe that a violation had occurred."[91] To demonstrate a reasonable belief that they engaged in protected activity, Complainants need not prove an actual violation of law,[92] but they "must do more than speculate, argue theoretical scenarios, or share mere beliefs that some corporate activity is wrong and may theoretically affect the corporation's financial statements and its shareholders."[93]

At the hearing before the ALJ, Complainants asserted that they engaged in activities protected by SOX when they reported that NYCB employees salvaged copper wire from 100 Duffy and distributed envelopes stuffed with cash.[94] After the record closed and during post-hearing briefing, Complainants first argued that the alleged "illegal salvage operation" was shrouded by the submission of "fictitious scope[s] of work," submissions designed to ensure that "this money-for-copper-scheme [remained] in secrecy."[95] On appeal, Complainants argue that the ALJ erred in considering their allegations too narrowly. Complainants now assert that both the April 3rd Bermeo/Curran conversation and the April 6th Schaefer/Wann email

---

[91]    *Id.* (citation omitted).

[92]    "[A]n employee's communication is protected where based on a reasonable, but mistaken, belief that the employer's conduct constitutes a violation of one of the six enumerated categories of law." *Sylvester v. Parexel Int'l, LLC*, ARB No. 2007-0123, ALJ Nos. 2007-SOX-00039, -00042, slip op. at 16 (ARB May 25, 2011); *see also Ronnie v. Office Depot, Inc.*, ARB No. 2019-0020, ALJ No. 2018-SOX-00006, slip op. at 5 (ARB Sept. 29, 2020) ("A complainant need not cite the code but nonetheless has to complain about conduct that he or she believes would reasonably fall under one of the enumerated categories.").

[93]    *Leviege*, ARB No. 2019-0058, slip op. at 4 (citing *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 355 (4th Cir. 2008)) (other citation omitted).

[94]    D. & O. at 21. More specifically, the ALJ had earlier described Complainants' allegations, in the June 30, 2020 Order Granting, In Part, and Denying, In Part, Respondent's Motion for Summary Decision at 7, as follows:

> Complainants' allegation of protected activity proceeds in three stages. First, Complainants opine that the copper wiring removed from 100 Duffy constitutes "other property" under section 1344. Second, the copper wiring was removed from 100 Duffy "by means of false or fraudulent . . . representations" because it was not specifically authorized and it caused significant damage. Finally, unidentified bank employees and/or vendors profited from this unauthorized removal as evidenced by the surreptitious exchange of cash envelopes. As a result, Respondent was deprived of the funds generated from the sale of the scrap copper wire and Respondent incurred the additional cost of repairing the damage when the scrap copper was removed. According to Complainants, this amounts to a violation of the bank fraud statute.

[95]    *Id.* at 26.

15

constituted SOX-protected activity because both the conversation and the email incorporated reports of a systematic scheme to defraud NYCB. Specifically, Complainants contend that some NYCB employees were working with preferred vendors to rig bids on contracts in order for those vendors to salvage copper from NYCB's properties in exchange for cash kickbacks, all of which they assert constitutes bank fraud, contrary to the findings of the ALJ.[96]

After considering the parties' arguments and having reviewed the evidentiary record, we conclude that the ALJ's decision is supported by substantial evidence in the record and is legally sound. Complainants failed to meet their burden of demonstrating they had subjective beliefs or reasonable objective beliefs that their reports involved bank fraud and so constituted SOX-protected activity.

## 1. Complainants Lacked Good Faith Subjective Beliefs Related to Bank Fraud

Before the ALJ, Complainants bore the burden of establishing that they subjectively believed their reports related to conduct which constituted bank fraud, a violation of one of the laws listed in SOX,[97] and that they held their actual subjective beliefs in good faith.[98] Reporting conduct which one believes violates

---

[96]    Comp. Opening Br. at 1-2.  Specifically, Complainants now argue:

> Working in the unit responsible for real property renovations, Schaefer and Bermeo uncovered what appeared to be a coordinated scheme to strip copper, fuel, and anything else not tied down from building refurbishments. This scheme not only allowed vendors to steal bank materials for kickbacks to bank employees, but also fundamentally impacted the bid process by allowing vendors to bid projects at significantly above-market pricing. This double whammy cost NYCB twice over in increased payments to contractors and misappropriated assets, a portion of which were kicked back to NYCB employees. Further, Schaefer and Bermeo learned about and reported this scheme against the backdrop of Schaefer and Bermeo learning that the bid and contracting scheme was fundamentally flawed in allowing contractors to significantly overbid pricing both for construction and long-term maintenance contracts.

[97]    *Leviege*, ARB No. 2019-0058, slip op. at 4 (citations omitted).

[98]    *Johnson v. The Wellpoint Cos. Inc.*, ARB No. 2011-0035, ALJ No. 2010-SOX-00038, slip op. at 9-10 (ARB Feb. 25, 2013) (Decision and Order of Remand), *aff'd after subsequent orders,* No. 18-10038 (11th Cir. May 18, 2020); *see Bailey v. Koch Foods*, ARB No. 2010-0001, ALJ No. 2008-STA-00061, slip op. at 10 (ARB Sept. 30, 2011) (noting that a survey of cases shows "whether or not the term 'good faith' has been used, the whistleblower has been required to have actually held a belief that there were pertinent statutory violations at the

16

internal business policies or evidences mismanagement, poor decision-making, or miscellaneous actions not in the best interests of an organization is insufficient to establish a SOX claim for bank fraud or any other fraudulent conduct.[99]

The record contains substantial evidence to support the ALJ's conclusion that Complainants failed to establish they subjectively believed that they were reporting bank fraud or any other fraudulent conduct when Bermeo had his April 3rd conversation with Curran or when Schaefer sent the April 6th email to Wann. As such, their engagement in these communications did not constitute protected activity under SOX.

The record lacks any persuasive evidence that Bermeo had a subjective belief that his April 3rd conversation with Curran constituted protected conduct under SOX. Bermeo reported to Curran only that: (1) the LAN room ceiling was damaged; (2) Grosso had coordinated the work on the ceiling; and (3) Newman told a joke about a hypothetical million dollar payment.[100] Although Bermeo's report to Curran suggested that the work in the LAN room might have been mismanaged or perhaps that some sort of wrongdoing occurred regarding the LAN room's deconstruction, Bermeo's statements to Curran lacked any allegation of fraudulent conduct. Bermeo did not mention any copper salvaging, a project scoping issue or bid rigging; he simply noted that the LAN room ceiling was significantly damaged and that Grosso

---

time he or she engaged in the activity subject to whistleblower protection.") (internal citations omitted).

[99]     *Samaroo v. Bank of New York Mellon*, No. 21-CV-02441, 2021 WL 5910603, at *4 (S.D.N.Y. Oct. 5, 2021), *report and recommendation adopted,* No. 21 CIV. 2441, 2021 WL 5910408 (S.D.N.Y. Dec. 13, 2021), and *report and recommendation adopted,* No. 21 CIV. 2441, 2022 WL 4093171 (S.D.N.Y. Sept. 7, 2022), *aff'd,* No. 22-2041-CV, 2023 WL 3487061 (2d Cir. May 17, 2023) ("[Reporting] that various managers were poor managers and mismanaged projects . . . cannot form the basis for a SOX complaint."); *Andaya v. Atlas Air, Inc.,* No. 10 CV 7878, 2012 WL 1871511, at *5 (S.D.N.Y. Apr. 30, 2012) ("Complaints largely related to internal corporate policies concerning corporate waste, personnel matters, and relationships with vendors . . . are not the subjects courts have found covered by SOX."); *Harvey,* ARB Nos. 2004-0114, -0115, slip op. at 14 ("Providing information to management about questionable personnel actions, racially discriminatory practices, executive decisions or corporate expenditures with which the employee disagrees, or even possible violations of other federal laws such as the Fair Labor Standards Act or Family Medical Leave Act, standing alone, is not protected conduct under the SOX.").

[100]     "Bermeo relayed to Curran the damage he observed to the ceiling, that the work done in the LAN room was coordinated by Grosso, and a joke Newman told. Contrary to Bermeo's claims, his conversation with Curran is bereft of any mention of bank fraud, fraud generally, or anything remotely within the realm of SOX. This conversation, as described by Bermeo, appears to merely be a discussion about potential wrongdoing or mismanagement by other NYCB employees." D. & O. at 23 (internal citations omitted).

17

appeared to be responsible for that result.[101] We agree with the ALJ that "[i]f Bermeo [had] actually believed fraud had occurred, it follow[ed] that he would have at least mentioned the missing copper wire which is the foundation of his allegation of bank fraud."[102] Bermeo failed to do so, and so failed to establish that he held an actual, good faith belief that the conduct he reported to Curran constituted bank fraud or any other SOX-protected conduct.

A review of the April 6th Schaefer/Wann email supports the same conclusion regarding Schaefer. Nothing in the April 6th email evidences that Schaefer subjectively believed NYCB employees were orchestrating bids with preferred vendors or otherwise submitting inflated project scope estimates in order to allow NYCB employees to salvage copper or receive cash kickbacks from vendors.[103] The April 6th email only includes Schaefer's report that: (1) Curran allegedly received an envelope of cash related to NYCB employees salvaging "abandoned copper cold water pipe" from the third-floor of the building at 100 Duffy and provided that cash to TMG; and (2) copper wire had allegedly been removed from the LAN room by unidentified individuals, not the contractor.[104] In the email, Schaefer never notes that he believes Curran or other NYCB employees are defrauding the bank or violating any law identified in SOX; he merely insinuates that they are salvaging copper for cash. Lacking any identified link to fraud of any sort, at most this evidence may establish that Schaefer subjectively believed the 100 Duffy renovation project was being mismanaged by Curran and/or Grosso and bank property was being wasted, none of which is sufficient to support his claim of SOX-protected activity.[105]

Interestingly, the argument Schaefer presented at hearing, which the ALJ correctly determined to be lacking in proof that Schaefer actually believed he was reporting bank fraud, is inconsistent with his current theory that some NYCB employees were conspiring with preferred vendors to rig contract bids in order to strip copper from NYCB's properties in exchange for cash kickbacks. Schaefer specifically states in the April 6th email that he only learned about the copper removal and cash payments "this past Monday" (April 3rd), which does not support

---

[101]    *Id.*

[102]    *Id.*

[103]    "The email fails to mention the potential for false scopes of work being submitted to cover-up an unauthorized removal and sale of copper wiring. Given the thoroughness of the April 6th email, it is curious that Schaefer neglected to mention SOX or bank fraud." *Id.* at 21. The ALJ concluded "the April 6 email does not contain any information that a reasonable person would interpret as a whistleblower report." *Id.* at 22 n.13.

[104]    *Id.* at 14.

[105]    *See Samaroo*, No. 21-CV-02441, 2021 WL 5910603, at *4; *Harvey*, ARB Nos. 2004-0114, -0115, slip op. at 14-15.

18

his current argument that his April 6th report somehow communicated a link to bid rigging, which Schaefer allegedly was told about by Fernandez over a year earlier in April 2016.[106] If Schaefer legitimately held a subjective belief that the 2016 bid rigging rumor and the 2017 copper removal and cash payments were related and constituted a scheme to defraud NYCB, it is reasonable to expect that he would have made that clear in his April 6th email to Wann. Instead, the April 6th email makes no mention of a bid-rigging-for-copper-or-cash scheme, nor does it contain any reference or linkage to whistleblowing, SOX, or bank fraud. It was not until one month later, and two days after his termination, that Schaefer first alleged that he had reported "a fraudulent scheme."[107] Schaefer's raising an allegation of fraud post-termination is insufficient to establish that he held, and reported, an actual, good faith subjective belief regarding fraud a month earlier and prior to his termination. All told, substantial evidence in the record supports the ALJ's conclusion that Schaefer failed to establish that he held a good faith belief that he had reported bank fraud to Wann when he sent the April 6th email.

Considered altogether, Complainants' reports to NYCB officials failed to mention or reference bank fraud or to suggest how an alleged bid-rigging and copper-salvaging-for-cash kickback arrangement involving Curran and unnamed NYCB employees constituted bank fraud. Rather than reporting their alleged scheme, or reporting any other type of SOX violation, Complainants merely reported questionable wrongdoing and potential mismanagement of the project at 100 Duffy, all unrelated to the bank fraud statute or any of SOX's other predicate offenses.[108] Such "[g]eneral assertions of wrongdoing untethered from [the SOX] enumerated categories" do not constitute protected activity.[109] Thus, the record sufficiently supports the ALJ's conclusion that, at the time of their reports on April 3rd and April 6th, Complainants did not subjectively believe they were reporting a violation of any of the enumerated provisions in Section 1514A.

---

[106]    *Id.* at 6.

[107]    *Id.* at 22.

[108]    *See Harvey*, ARB Nos. 2004-0114, -0115, slip op. at 14 ("Providing information to management about questionable personnel actions, racially discriminatory practices, executive decisions or corporate expenditures with which the employee disagrees, or even possible violations of other federal laws such as the Fair Labor Standards Act or Family Medical Leave Act, standing alone, is not protected conduct under the SOX.").

[109]    *Leviege,* ARB No. 2019-0058, slip op. at 4 (citing *Welch v. Chao*, 536 F.3d 269, 277 (4th Cir. 2008), *cert. denied*, 556 U.S. 1181 (2009); *Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir. 2009); *Reilly v. GlaxoSmithKline, LLC*, No. 19-2897, 2020 WL 4013118, at *3-4 (3d Cir. 2020)).

19

## 2. Complainants Lacked Objectively Reasonable Beliefs Related to Bank Fraud

Even if Complainants had established that they each held a good faith subjective belief that they had reported bank fraud or even a SOX violation more generally, their claims would still fail because neither Complainant satisfied their burden of establishing that their beliefs were objectively reasonable. Notwithstanding Complainant's insistence, testified to by Bermeo, that "[t]heft is fraud . . . [s]tealing is fraud . . . ,"[110] substantial evidence in the record supports the ALJ's conclusion that Complainants' reports to Curran and Wann were not based on objectively reasonable beliefs regarding bank fraud or any other conduct protected under SOX.[111]

In concluding that neither Bermeo's April 3rd conversation with Curran nor Schaefer's April 6th email to Wann constituted an objectively reasonable report of bank fraud within SOX's scope, the ALJ correctly differentiated between a report of "theft"[112] from a bank and a report of bank fraud. The bank fraud statute, 18 U.S.C. § 1344, does not prohibit theft from a bank[113] but instead prohibits "fraud" being perpetrated against a bank. Section 1344 specifically defines bank fraud as:

> [K]nowingly execut[ing], or attempt[ing] to execute, **a scheme or artifice—**
> (1) **to defraud** a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, **by means of false or fraudulent pretenses, representations, or**

---

[110]     D. & O. at 24 (citation omitted).

[111]     Although the April 3rd Bermeo/Curran conversation and the April 6th Schaefer/Wann email do not constitute protected activity because these reports are not consistent with any of the enumerated statutory and regulatory provisions in Section 1514A, the Board does not reach or consider the issue of whether their reports may have evidenced violations of other federal or state statutes such as theft, misappropriation or embezzlement.

[112]     Theft is "[t]he wrongful taking and removing of another's personal property with the intent of depriving the true owner of it; larceny[.]" *Theft, Black's Law Dictionary* (11th ed. 2019). Under the common law, "fraud" is not "theft" but is instead "a knowing misrepresentation . . . of a material fact made to induce another to act to his or her detriment." *Fraud, Black's Law Dictionary* (11th ed. 2019).

[113]     *See* 18 U.S.C. § 2113 (a) (defining the crime of "bank robbery and incidental related crimes" in reference to the taking of bank property "by force and violence, or by intimidation . . . [or] by extortion . . . .").

**promises**[.]"[114]

For conduct to be considered "bank fraud" under § 1344:

> [I]t is not enough that a fraudster scheme to obtain money from a bank and that he make a false statement. The provision as well includes a relational component: The criminal must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation.['] That phrase typically indicates that the given result (the 'end') is achieved, at least in part, through the specified action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental.[115]

"[T]he conduct that § 1344(2) seeks to regulate, and its focus, is a scheme to obtain property owned or controlled by a bank under false or fraudulent pretenses."[116] As such, to constitute bank fraud under 18 U.S.C. § 1344, it is not enough to simply report the removal of something of value from a bank's property—the report must involve the removal of property "by means of false or fraudulent pretenses, representations or promises."[117] "Put another way, larceny is not the same as fraud."[118]

On appeal, Complainants assert that they met the requirements to establish bank fraud because their reports revealed a scheme by NYCB employees to secure preferred vendors on construction-related contracts in order to receive cash kickbacks from those vendors, all to the detriment of NYCB and its shareholders.[119] In essence, Complainants allege that: (1) the bank's construction contracts resulted from bid-rigging or project scope inflation; (2) the vendors or NYCB employees stripped copper out of NYCB's properties without permission, thereby removing value without compensation to the bank; and (3) the cash payments back to employees were provided as consideration for the employees' involvement in, and presumably their silence about, the bid-rigging. These allegations not only lack sufficient factual support in the record, they are legally insufficient to establish that

---

[114]    18 U.S.C. § 1344 (emphasis added).

[115]    *Loughrin v. United States*, 573 U.S. 351, 362-63 (2014) (citations omitted).

[116]    *Bascuñán v. Elsaca*, 927 F.3d 108, 124 (2d Cir. 2019).

[117]    18 U.S.C. § 1344.

[118]    *Dietz v. Cypress Semiconductor Corp.*, ARB No. 2015-0017, ALJ No. 2014-SOX-00002, slip op. at 10 (ARB Mar. 30, 2016), *vacated*, 711 Fed. Appx. 478 (10th Cir. 2017).

[119]    Comp. Opening Br. at 19.

21

it was objectively reasonable for persons with Complainants' knowledge, skills, education, and experience to believe that such acts were not merely unlawful in some unspecified or general way but rose to a specific violation of 18 U.S.C. § 1344. As such, the ALJ correctly concluded that the Complainants failed to meet their burden of proof under SOX, for the reasons set forth below.

First, the scheme Complainants allege they sought to reveal, at most, would have been an arrangement between NYCB employees and vendors whereby vendors grossly inflated their bids on contract proposals, had their bids accepted by and executed contracts with the bank, did the work and were paid what the contracts required, and then surreptitiously and unlawfully kicked back some part of the payments they had received to bank employees in cash. No credible evidence establishes such an arrangement took place in this instance. To the contrary, the facts in the record establish only that a vendor, Apptel, bid a certain amount on a contract proposal, was awarded the contract at that amount, and then did the work and was paid for it. The ALJ specifically found that Apptel's owner, Chludzinski, was a credible witness.[120] Chludzinski denied having any involvement in the removal of copper from 100 Duffy other than what fit in one dumpster and was valued at $1,179.60, all as allowed by the relevant contract. The record showed that if any other copper was salvaged from 100 Duffy it was recovered by NYCB employees, not by employees of Apptel or any vendor. What the record does not show is any link between the Apptel contract and the unsupported allegations of bid-rigging or cash kickbacks. Even examining the record beyond the Apptel contract, the ALJ correctly concluded that Complainants failed to establish it was objectively reasonable to believe that there was a scheme involving bid-rigging by vendors or employees which led to copper salvaging and cash kickbacks associated with the LAN room or 100 Duffy more broadly, which was the sole context for Complainants' alleged protected activity in this matter. Therefore, Complainants' reports of damage to the LAN room ceiling and rumors about copper salvaging on the third floor of 100 Duffy did not constitute reports of bank fraud and do not satisfy the requirements for SOX protection.[121]

Second, the Complainants provided no evidence that Apptel's bid, or the bid of any other vendor associated with 100 Duffy, was based on a "false or fraudulent representation or promise" intended to and resulting in a loss of property to the

---

[120]    D. & O. at 19.

[121]    *See e.g., Leckner v. Gen. Dynamics Info. Tech., Inc.*, ARB No. 2020-0028, ALJ No. 2019-SOX-00028, slip op. at 7 (ARB Oct. 22, 2020), *aff'd*, No. 21-70284, 2021 WL 4843881 (9th Cir. Oct. 18, 2021), *cert. denied*, 142 S.Ct. 2872 (2022), *reh'g denied*, 143 S.Ct. 63 (2022) (explaining that the ALJ properly dismissed the claim because there was no evidence that complainant had an objectively reasonable belief that "Respondent violated any SEC rule or regulation or otherwise engaged in securities fraud when he communicated his concerns about computer software.").

22

bank. The record does contain a reference to an event that allegedly occurred nearly one year prior involving a submitted bid on a different contract that was alleged to be grossly greater than that of the vendor eventually awarded the contract, all of which related to a different property. The fact that different vendors bid different amounts in an independent instance is completely unrelated to the Complainants' involvement in the April 3rd Bermeo/Curran conversation or the April 6th Schaefer/Wann email related to the LAN room, which is the only conduct in which they engaged for which they claim SOX protection.

Last, Complainants argue that their reports of "envelopes full of cash" was sufficient to establish the objective reasonableness of their beliefs that bank fraud had occurred. The only evidentiary support in the record for this assertion is Complainants' testimony that they were told about NYCB employees receiving cash envelopes, and their newly articulated suspicions that the cash was payback for employees' support of bid-rigging, none of which provides a link to "some form of trickery, of deception, [or of] a 'knowing misrepresentation or concealment of a material fact.'"[122] Given the ALJ's findings regarding Complainants' doubtful credibility, the record wholly lacks persuasive evidence in support of these alleged suspicions.[123] In addition, Complainants' blanket statement that the reported conduct has the potential for exposing the company to financial risk is insufficient to support a shareholder fraud claim under 18 U.S.C. § 1514A.[124]

Nor could Complainants' allegations, even if they had been credibly established, constitute evidence that NYCB had been defrauded "by means of false or fraudulent pretenses, representations, or promises[.]"[125] Complainants failed to establish sufficient facts to support their allegation that NYCB's employees or vendors made false representations to NYCB to induce it to part with valuable copper. Specifically, they failed to establish any "means" (the scheme) by which the NYCB employees and/or vendors achieved the alleged "end" (the award of contracts and/or the payment of cash kickbacks). The only false representations alleged were those of unidentified vendors, accused of grossly overbidding unspecified contract proposals. Complainants are seasoned managers familiar with construction bidding practices and fiscal controls specific to a regulated bank like NYCB, and held

---

[122]    *Dietz*, ARB No. 2015-0017, slip op. at 9.

[123]    The ALJ found that Schaefer was not a credible witness; he found Bermeo's testimony "less than enlightening" and afforded it little weight. D. & O. at 17-19.

[124]    "Other cases where § 1514A claims predicated on shareholder fraud have survived dismissal have included stronger claims regarding either the importance of the challenged conduct to the defendant employer's business or the complicity of the employer in unlawful conduct." *Nielsen*, 762 F.3d at 223 (the court found that the complainant's conclusory statement that another employee's failure to properly review fire safety designs constituted shareholder fraud was "simply too tenuous" to be considered fraud against shareholders).

[125]    18 U.S.C. § 1344 (emphasis added).

23

defined authority within the NYCB contract approval process for years.[126] Despite their protestations to the contrary, the record does not support a conclusion that a reasonable person in their same factual circumstances and with their same training and experience would have objectively believed that a SOX-protected violation had occurred.

Faced with their lack of evidentiary support to establish a violation of any of the six SOX-protected categories, Complainants argue that their reports exposed a scheme which violated NYCB's internal policy defining "theft of and individual profiting from Bank property as fraud."[127] Whether the reported activity did or did not violate NYCB policy is not the determinative inquiry,[128] nor are the Complainants' beliefs that theft is inherently fraudulent determinative of whether their beliefs were objectively reasonable.[129] Complainants' reports of an alleged scheme to steal copper wire does not rise to a SOX violation because theft of physical property from a bank does not constitute bank fraud or other protected conduct under SOX and, at the time of their reports, neither Complainant reasonably believed that it did.

The ALJ determined that the Complainants did not establish that their April 3 and April 6 reports were within the purview of SOX's whistleblower protections. We conclude that this determination is supported by substantial evidence in the record, well-reasoned, and legally correct. Therefore, we affirm the ALJ's finding that the Complainants did not establish by a preponderance of the evidence that they engaged in protected activity under SOX.

---

[126]    D. & O. at 5.

[127]    D. & O. at 22 n.13.

[128]    *See La Belle v. Barclays Cap. Inc.*, No. 19-CV-3800, 2023 WL 2631968, at *13 (S.D.N.Y. Mar. 24, 2023) (differentiating internal policies from legal requirements imposed externally and noting "[w]here plaintiffs complain of violations of internal policies — even where the alleged behavior would be clearly wrongful — courts typically decline to find protection under Section 806."); *Miller v. Stifel, Nicolaus & Co.*, 812 F. Supp. 2d 975, 988 (D. Minn. 2011) (noting "complaints about alleged violations of internal company policies are not protected activities under SOX.") (citing *Wiest v. Lynch,* No. 10-3288, 2011 WL 2923860, at *9 (E.D. Pa. July 21, 2011) (quoting *Marshall v. Northrup Gruman Synoptics,* ALJ No. 2005-SOX-0008, 2005 WL 4889013, at *3-4 (ALJ June 22, 2005)).

[129]    D. & O. at 24 (citation omitted).

24

## CONCLUSION

Accordingly, we **AFFIRM** the ALJ's Decision and Order Denying Complaints.[130]

**SO ORDERED.**

**TAMMY L. PUST**
**Administrative Appeals Judge**

**IVEY S. WARREN**
**Administrative Appeals Judge**

**NED I. MILTENBERG**
**Administrative Appeals Judge**

---

[130]     In any appeal of this Decision and Order, the appropriately named party is the Secretary, Department of Labor, not the Administrative Review Board.

# CERTIFICATE OF SERVICE

ARB-2022-0050 Gene Schaefer and Luis Bermeo v. New York Community Bancorp, Inc. (Case No: 2018-SOX-00048, 2018-SOX-00051)

I certify that the parties below were served this day.

_06/22/2023_
(DATE)

Thomas O. Shepherd, Jr., Esq.
Clerk of the Appellate Boards

Ashley Brook Burkett
601 Massachusetts Ave., NW
Washington, DC 20001
    --Electronic

Assistant Secretary, Occupational Safety and Health
Administration
Occupational Safety and Health Administration -
Room: S2315
200 Constitution Avenue
Washington, DC 20210

Brian Auricchio
250 West 55th Street
New York, NY 10019

David Saxe
909 Third Avenue
27th Floor
New York, NY 10022
    --Electronic

Gayle Pollack
909 Third Avenue
27th Floor
New York, NY 10022
    --Electronic

Gene Schaefer
959 Ripley Lane
Oyster Bay, NY 11771
    --*Certified*

Kathleen Reilly
250 West 55th Street
New York, NY 10019
    --Electronic

Luis Bermeo
29268 Bouris Drive
Menifee, CA 92584
    --*Certified*

Michael  Schissel , Esq.
250 West 55th Street
New York, NY 10019
    --*Certified*

Patrick Johnson
9118 Third Avenue
Brooklyn, NY 11209
    --Electronic

Directorate of Enforcement Programs
U.S. Department of Labor, OSHA
Room N-4618, FPB
200 Constitution Ave., N.W.
Washington, DC 20210

Hon. Stephen R. Henley
Chief Administrative Law Judge
Office of the Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, DC 20001-8002

Office of the Solicitor, Division of Fair Labor
Standards
200 Constitution Ave, NW
Room N-2716
Washington, DC 20210
        --Electronic