# 23-6971

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

——— ◆◆ ———

GENE SCHAEFER, LUIS BERMEO,

*Petitioners-Appellants,*

—against—

UNITED STATES DEPARTMENT OF LABOR,
NEW YORK COMMUNITY BANCORP, INC.,

*Defendants-Respondents.*

ON APPEAL FROM THE DEPARTMENT OF LABOR (EXCEPT OSHA)

## BRIEF AND SPECIAL APPENDIX FOR PETITIONERS-APPELLANTS

DAVID SAXE
MORRISON COHEN LLP
909 Third Avenue, 27th Floor
New York, New York 10022
(212) 735-8600

*Attorneys for Petitioners-Appellants
Gene Schaefer and Luis Bermeo*

## TABLE OF CONTENTS

Page(s)

JURISDICTIONAL STATEMENT ........................................................v

ISSUE OF LAW FOR REVIEW ........................................................ vii

PRELIMINARY STATEMENT .............................................................1

STATEMENT OF THE CASE...............................................................3

  A.  Schaefer and Bermeo are Long-Term NYCB Employees Who Started in Non-Executive Positions and Rose through the Ranks ....................................3

  B.  Schaefer and Bermeo Review Annually NYCB's Anti-Fraud and Whistleblower Policies ..........................................................5

  C.  Schaefer and Bermeo Learn About a History of Insider Fraud at CRES.........7

  D.  Schaefer and Bermeo Each Report Another Instance of the Fraud Plaguing CRES Projects...........................................................8

  F.  Schaefer and Bermeo Are Terminated Within a Month of Reporting the Bank Fraud ...........................................................13

  G.  The ALJ and ARB Panel Decisions............................................14

  SUMMARY OF ARGUMENT ........................................................15

  STANDARD OF REVIEW ...........................................................16

  ARGUMENT .......................................................................18

  A.  It Was Objectively Reasonable for Schaefer and Bermeo to Believe They Reported Bank Fraud.............................................................19

  B.  Schaefer and Bermeo Subjectively Believed They Were Reporting a Bank Fraud.................................................................................25

CONCLUSION.................................................................................30

# TABLE OF AUTHORITIES

Page(s)

Cases

*Erhart v. Bofi Holding, Inc.*,
    269 F. Supp. 3d 1059 (S.D. Cal. 2017)...........................................................21, 28

F*raser v. Fiduciary Tr. Co. Int'l*,
    417 F. Spp. 2d 310 (S.D.N.Y. 2006). ...................................................23

*Galinsky v. U.S. Dep't. of Labor*, Admin. Review Bd.,
    556 Fed. App'x. 31 (2d Cir. 2014) .......................................................18

*Gladitsch v. Neo@ogilvy, Ogilvy, Mather, WPP Grp. USA, Inc.*,
    11 Civ. 919 (DAB), 2012 U.S. Dist. LEXIS 41904
    (S.D.N.Y Mar. 21, 2012) ....................................................................21

*Lawson v. FMR LLC*,
    571 U.S. 429 (2014)............................................................................16

*Leshinsky v. Telvent GIT, S.A.*,
    942 F. Supp. 2d 432 (S.D.N.Y. 2013) ..........................................17, 18

*Rhinehimer v. U.S. Bancorp Invs. Inc.*,
    787 F.3d 797 (6th Cir. 2015) ..............................................................17

*Sharkey v. J.P. Morgan & Chase Co.*,
    805 F. Supp. 2d 45 (S.D.N.Y. 2011) .....................................18, 20, 23

*Sylvester v. Parexel Int'l LLC*,
    ARB Case No. 07-123, 2011 DOLSOX Lexis 39, at *40 (U.S.
    Dep't of Labor, May 25, 2011)1.....................................18, 21, 28, 29

*United States v. Alle*n,
    76 F.3d 1361 (5th Cir. 1996) ..............................................................22

*United States v. Bezmalinovic*,
    962 F. Supp. 435 (S.D.N.Y. 1997) .....................................................20

*United States v. Cihak*,
    137 F.3d 252 (5th Cir. 1998) ........................................2, 15, 22, 23

iii

*United States v. Colton*,
231 F.3d 890 (4th Cir. 2000) ...................................................21

*United States v. Moran*,
312 F.3d 480 (1st Cir. 2002) ...................................................21

*United States v. O'Malley*,
364 F.3d 974 (8th Cir. 2004) ..............................................2, 15, 22

*United States v. Teman*,
465 F. Supp. 3d 277 (S.D.N.Y. 2020) ...................................20

*Wallace v. Tesoro Corp.*,
796 F.3d 468 (5th Cir. 2015) ................................................17

*Wiest v. Lynch*,
710 F.3d 121 (3d Cir. 2013) .............................................17, 22

Statutes

18 U.S.C. § 1344 ...............................................................passim

18 U.S.C. § 1344(1)-(2) .........................................................20

18 U.S.C. § 1514A(a)(1) .........................................................17

49 U.S.C. § 42121(b)(4)(A) .......................................................1

Appellate Procedure, Administrative Procedure Act,
5 U.S.C. §§ 701-06 ................................................................1

Sarbanes Oxley Act, 18 U.S.C. § 1514A .........................................1, 17

Other Authorities

Federal Rules Rule 15 .............................................................1

iv

## JURISDICTIONAL STATEMENT

Appellants Luis Bermeo and Gene Schaefer take this appeal from a Decision and Order (the "Decision") of the United States Department of Labor Administrative Review Board ("ARB"), ARB Case No. 2022-0050 (ALJ Case Nos. 2018-SOX-00048 and 2018-SOX-00051), dated June 22, 2023. The Decision affirmed the decision and order of Administrative Law Judge Timothy McGrath, dated June 29, 2022, dismissing Appellants' whistleblower complaint against their former employer Intervenor New York Community Bank ("NYCB") under the Sarbanes Oxley Act ("SOX"), 18 U.S.C. § 1514A.

This Court has jurisdiction over this appeal pursuant to the rules and procedures set forth in Rule 15 of the Federal Rules of Appellate Procedure, Administrative Procedure Act, 5 U.S.C. §§ 701-06, and 49 U.S.C. § 42121(b)(4)(A).

Appellants have timely taken this appeal. The ARB issued the Decision on June 22, 2023. Appellants filed their Notice of Appeal on August 21, 2023 (the 30-day filing period expired on a Sunday, and Appellants filed the following Monday) [ECF Dkt. No. 1], and they filed their Form C-A on September 5, 2023 [ECF Dkt. No. 7]. After obtaining an extension, the United States filed the Certified List of the Record on November 3, 2023 [ECF Dkt. No. 34]. On November 13, 2023, Appellants proposed to the Court via letter that they would perfect their appeal

no later than February 1, 2024 [ECF Dkt. No. 35].  This Court so ordered Appellants'

proposed schedule on November 17, 2023 [ECF Dkt. No. 36].

## ISSUE OF LAW FOR REVIEW

Is a scheme between NYCB employees and outside vendors to strip valuable materials from NYCB properties in exchange for cash kickbacks to the NYCB employees potentially a bank fraud under 18 U.S.C. § 1344, and thus could Appellants each have held a reasonable belief that their report of this bank fraud to senior NYCB management was a protected activity under the broad reach of SOX whistleblower protections?

## PRELIMINARY STATEMENT

Long-term NYCB employees Luis Bermeo and Gene Schaefer were fired in violation of SOX whistleblower protections after reporting what they believed to be a scheme in which outside contractors paid kickbacks to NYCB employees to strip materials from NYCB properties during renovation projects. Bermeo and Schaefer had started at NYCB in low-level positions, in maintenance and as a clerk respectively, and they had risen to positions in the unit responsible for renovating bank properties. Over approximately a year, they heard about repeated thefts from renovation projects at the same time that they learned about other contracting issues involving long-term vendors, including deviations in the sealed bid process and above-market pricing for long-term service contracts. When Bermeo and Schaefer believed that they had uncovered yet another instance in which materials were stripped from a bank renovation project in coordination with a bank project manager, they reported the scheme and were fired within a month.

When asked to describe the fraud he reported, Bermeo stated his understanding, "Theft is fraud . . . Stealing is fraud" (A-37, Tr. 320:8-10 (Bermeo)). Schaefer confirmed NYCB corporate policy indicated "any theft in the bank will be considered fraud" (A-37, Tr. 370:2-4 (Schaefer)). Their beliefs conformed to NYCB's whistleblower policy, which defined "fraudulent behavior" to include "theft, misappropriation, or misuse of assets for personal gain" and "payment or receipt of bribes, kickbacks or other inappropriate payments" (JX2 at NYCB-00077

1

n.3). In dismissing Appellants' claims, the ARB nonetheless held that neither Appellant could have objectively or subjectively reasonably believed that he was reporting a fraud, and that neither was entitled to SOX's whistleblower protections.

Fundamentally, the ARB's holding was based on the misunderstanding that the reported misconduct could not as a matter of law constitute bank fraud under 18 U.S.C. § 1344. Under that statute, it is a federal crime for anyone to "knowingly execute or attempt to execute a scheme or artifice to defraud a financial institution or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." A scheme for someone to take bank property in exchange for kickbacks to a bank employee constitutes bank fraud. *See United States v. Cihak*, 137 F.3d 252 (5th Cir. 1998) (affirming bank fraud conviction of bank executive for entering into consulting agreement for bank, accepting inflated bills, and taking kickbacks from consultant); *see also United States v. O'Malley*, 364 F.3d 974 (8th Cir. 2004) (affirming bank fraud conviction when purchasing manager arranged for its employer to make wholesale purchases at above-market prices in exchange for kickbacks).

The ARB's misunderstanding of the law filtered through the Decision. The ARB held that Bermeo and Schaefer could not objectively have believed that they were reporting a fraud rather than garden variety mismanagement because a salvage-for-kickback scheme could not constitute bank fraud under 18 U.S.C. §

2

1344. The ARB also allowed this misunderstanding to color its determination that Bermeo and Schaefer could not subjectively have believed that they were reporting a bank fraud, and then took a parsing read of each man's report to determine that neither had reported enough facts to report bank fraud. The rationale behind the ARB's ruling, though, was its fundamental belief that Appellants had reported a one-off project mismanagement and not a fraud. Looking at whether the ARB acted in accordance with the law, the standard for this review, this Court should correct the ARB's error of law, hold that Bermeo and Schaefer had objectively and subjectively reasonable belief they were reporting fraud, and remand for further proceedings.

## STATEMENT OF THE CASE[1]

### A. Schaefer and Bermeo are Long-Term NYCB Employees Who Started in Non-Executive Positions and Rose through the Ranks

Schaefer and Bermeo were long-term employees who had risen to executive positions in the Corporate Real Estate Services ("CRES") group, which oversees the physical plant of NYCB offices and branches. Schaefer was first hired as a clerk at NYCB in 1986 (A-37, Tr. 347: 7-14 (Schaefer)). He worked his way up for the next 18 years, until 2004, when he left as part of a merger (Tr. 347:15-349:1 (Schaefer)). He rejoined NYCB briefly in 2010 as a consult, and then again in 2014 as coordination manager for CRES (A-184; A-37, Tr. 349:12-350:16,

---

[1] An appendix of evidentiary materials is submitted herewith, and is referred to as "A-__." Cites to "Tr." within a cite refer to the 10 days of hearing testimony, which are consecutively paginated, and include a parenthetical indicating the witness testifying.

352:12-23 (Schaefer)). Over the next two years, he rose to the newly created position of CRES Budget Coordination Manager by 2016 (Decision at p. 2; -A-184; A-145, Tr. 2311:23-25 (Wann)).

Schaefer took his responsibilities to manage project budgets seriously; no projects came in over budget on his watch (A-37, Tr. 356:13-357:1 (Schaefer)). In addition, Schaefer looked at CRES procedures to insure appropriate contract pricing. For example, Schaefer discovered one "preferred" vendor had a long-term service contract that was at least $100,000 a year above market (A-177 at NYCB-00159; A-37, Tr. 358:4-360:16, 363:1-366:20 (Schaefer)). In another instance, when an NYCB employee expressed concern about the sealed bid procedure for a parking garage refurbishment project, Schaefer participated in NYCB obtaining one more bid from an outside vendor, which bid came in $2.6 million lower than the next lowest bid, triggering an altercation between Grosso and Fernandez (A-37, Tr. 398:7-402:25 (Schaefer), A-104, 1397:25-1400:21 (Fernandez)).[2]

In Schaefer's annual reviews in 2014-2016, Schaefer rated highly. For example, in Schaefer's 2015 evaluation, NYCB COO Robert Wann noted Schaefer "has a good attitude and works well with others" (A-175 at NYCB-00156), and Schaefer's 2016 evaluation stated that Schaefer "works well with his peers" and was a "champion for the Bank with its best interests at the core of his being" (A-177 at

---

[2]     Though Schaefer had identified significant savings to NYCB in his review and was working on reducing the pricing of another long-term vendor, Wann pulled Schaefer from the review without explanation (A-37, Tr. 363:22-366:20 (Schaefer)).

NYCB-00160 & NYCB-00162). Based on performance, Schaefer was awarded stock options and discretionary bonuses in 2016 and 2017 (A-175; A-177; A-256).

Luis Bermeo joined NYCB in 1998, as a maintenance mechanic in the CRES Department (A-198). Over the years, Bermeo progressed, ultimately landing as the Director of Construction and Project Management for CRES in 2016 (A-198; A-16, Tr. 48:18-49:6, 50:19-22, 94:7-95:9 (Bermeo)). At NYCB, Bermeo received only two warnings, one for not properly declaring financial gifts intended to help him care for his chronically ill son and the other for allegedly discussing an affair between two employees. Bermeo's annual reviews between 2013 and 2017 show that Bermeo consistently exceeded expectations and that he was awarded stock options and salary bonuses each year (A-185-A-191; A-252; A-37, Tr. 310:11-14 (Bermeo)). Bermeo's manager opined that Bermeo was "dedicated and works hard to achieve his goals" (A-189 at NYCB-00178), and that he "is a professional, with solid skills related to construction, project management and facilities matters" (A-191 at NYCB-00183).

**B. Schaefer and Bermeo Review Annually NYCB's Anti-Fraud and Whistleblower Policies**

As a federally regulated bank and publicly traded company, NYCB maintained stringent anti-fraud policies. Both Schaefer and Bermeo were required to annually review NYCB's antifraud and whistleblower policies (A-152; A-162; A-

37, Tr. 103:15-104:6 (Bermeo); 369:5-370:17 (Schaefer); *see also* Tr. A-124, 1858:25-1859:21).

The antifraud policy provides that federal law "makes it a crime . . . for anyone to corruptly give anything of value to a director, officer, employee or agent with the intent to influence that person" (A-152 at NYCB-00088). The policy compels that "[a]ll Directors officers, and employees are expected to protect all Company property, both tangible and intangible, and to ensure their efficient use for legitimate business purposes. Theft or waste of Company property, or carelessness in its use, shall not be permitted" (A-152 at NYCB-00091).

The NYCB Whistleblower policy objectives include identifying and setting channels to report "fraudulent behavior," which include: (i) theft, misappropriation, or misuse of assets for personal gain; (ii) payment or receipt of bribes, kickbacks or other inappropriate payments; … (v) participation in illegal or fraudulent transactions; … (xi) other fraudulent behaviors causing any kind of loss to the Company." (A-162 at NYCB-00077) n.3; A-124, Tr. 1863:9-20 (Allen)). The policy further "provide[s] assurances to employees that management does not condone retaliation in any form against those who bring Whistleblower Complaints" (A-162 at NYCB-00078).

Both the antifraud and whistleblower policies thus clearly define that both theft and receipt of kickbacks are fraudulent behaviors. Indeed, a bank employee stealing bank money and/or property would by definition be doing so by

deception or under false pretenses, thus engaging in a fraud on the bank. Based on his review of the bank's anti-fraud policies, which addressed issues such as bribery and taking anything of value from the bank, Schaefer understood that "any theft in the bank will be considered fraud" (A-37, Tr. 370:2-17 (Schaefer)).

## C. Schaefer and Bermeo Learn About a History of Insider Fraud at CRES

At CRES, Schaefer and Bermeo each learned about a history of what appeared to be coordinated fraud within CRES under which NYCB employees received kickbacks for rigging bids and abetting thefts from NYCB properties. Among other things, CRES was responsible for renovating acquired properties. In 2012, NYCB purchased a commercial office building at 102 Duffy Avenue in Hicksville (A-118, Tr. 1669:3-10 (Newman)). In 2013, while 102 Duffy was closed for asbestos abatement, almost 4,000 gallons of fuel oil were stolen from the building's generators (A-104, Tr. 1434:2-1435:18 (Fernandez); *see also* A-133, Tr. 2111:2-7 (Grosso)). Richard Grosso, a project manager within CRES, asked Freddy Fernandez, who at that time worked for the renovating contractor, to help him siphon the oil; though Fernandez refused, the oil was siphoned off (A-104, Tr. 1384:3-1387:4, 1435:3-18 (Fernandez)). Grosso also asked Fernandez for help stripping wire from 102 Duffy that was still needed for building operations to sell for a split of the proceeds; Fernandez refused but the wire was removed (A-104, Tr. 1388:14-1391:9, 1438:14-1439:20 (Fernandez)). NYCB contractor Mike Chludzinski

confirmed that he had taped copper wiring to preserve in 102 Duffy but even that copper was taken. (A-68, Tr. 711:21-712:3, 748:10-750:3 (Chludzinski); *see also* A-16, Tr. 148:8-149:14 (Bermeo), A-37, 434:24-435:15 (Schaefer)). After a heated argument with Grosso in April 2016, Fernandez told Bermeo and Schaefer about Grosso's requests (A-16, Tr. 72:6-9, 74:16-77:2 (Bermeo), A-37, 407:16-408:5, A-68, 637:15-24 (Schaefer), A-104, 1404:6-1405:21 (Fernandez); *see also* A-92, Tr. 1120:2-1121:19 (Hernandez)). Though NYCB never confirmed the culprit, Wann told Bermeo to keep an eye on Grosso (A-16, Tr. 59:13-60:5 (Bermeo)).

Schaefer and Bermeo also learned that in 2015, copper and other valuables (including an operating boiler) had been stripped from an NYCB property in Eltingville, Staten Island (A-37, Tr. 408:6-25, A-68, 576:6-577:2 (Schaefer)), and that Grosso had been given an envelope from a vendor with $5,000 in cash in 2016 (A-37, Tr. 321:3-322:10 (Bermeo), 395:4-14 (Schaefer)). Grosso's conduct was confirmed by other bank employees, adding to Schaefer's and Bermeo's concerns (A-92, Tr. 1133:13-1134:11, 1136:13-1137:19 (Hernandez), A-104,1394:9-1395:16, 1405:7-14 (Fernandez)).

**D.     Schaefer and Bermeo Each Report Another Instance of the Fraud Plaguing CRES Projects**

In 2016, NYCB purchased 100 Duffy Avenue, the neighbor to 102 Duffy. Prior to the purchase, Bermeo walked through 100 Duffy. The basement included a large room with an elevated floor and a dropped ceiling that housed

telecommunications equipment (the "LAN Room"). In his walk through, Bermeo noted that the drop ceiling and floor in the LAN Room concealed a large amount of copper wiring (A-16, Tr. 63:1-65:23, A-37, 279:24-281:23 (Bermeo)). The volume of wires in the LAN Room ceiling was verified by a former NYCB employee and a current NYCB employee, Fred Fernandez and Gerry Newman, each of whom had worked at 100 Duffy (A-104, Tr. 1410:23-1412:22, 1440:18-1441:15, 1455:16-1456:1 (Fernandez), A-118, 1681:2-6, 1682:7-19, 1697:13-15 (Newman)).

NYCB retained The Martin Group as the general contractor on the renovation (A-16, Tr. 122:22-23 (Bermeo), A-37, 488:12-13 (Schaefer)). To remove equipment and wiring in the LAN Room, NYCB separately contracted with the Apptel Group; the contract was limited and cost $9,200 (A-282 at NYCB0017; A-16, Tr. 135:21-136:3 (Bermeo)). According to NYCB project manager Grosso, Apptel requested that the ceiling tiles in the LAN Room be removed to allow for access, and Grosso agreed to remove the tiles but leave the ceiling grid (the slats holding the tiles) using in-house staff (A-133, Tr. 2170:4-13, 2210:12-2211:3 (Grosso)). But Grosso's testimony makes little sense. Apptel owner Michael Chludzinski testified that there was little above the ceiling when he bid the job, so there was no need to remove all the ceiling tiles, nevermind damage the ceiling grid holding the tiles.

In early April 2017, Schaefer received notice of a proposed change order ("CO#16") for $40,000 to repair damage to the LAN Room ceiling (A-274 at

p. 7).  Schaefer was concerned about CO#16 because it was such a significant sum for the project, and also because it stated it was for "repair" work (A-37, Tr. 387:12-389:12 (Schaefer)).  When Schaefer and Bermeo investigated at 100 Duffy, they found that the ceiling grid had been substantially removed and the wiring in the floor and ceiling had been stripped out, just like in 102 Duffy.  (A-37, Tr. 284:8-23 (Bermeo), 393:1-13 (Schaefer), *see also* A-68, Tr. 743:2-4 (Chludzinski), A-92, 1108:21-1111:11 (Hernandez), A-104, 1414:6-1417:15 (Fernandez)).

Schaefer was concerned that the illegal salvage and kickback scheme at CRES continued.  He accordingly emailed NYCB COO Robert Wann with his concerns (A-222 at NYCB-01026; A-37, Tr. 394:8-10 (Schaefer)).  The email stated:

> You need to be made aware of the situation below.  It involves a room in 100 Duffy where someone allowed a vendor access to this room to salvage copper wiring from the room for cash.  I was informed that there was an exchange of cash envelopes between vendors and our employees resulting from this activity.  It was something that had transpired at 102 Duffy and it seems to have occurred again.
>
> This matter was brought to Bill [Curran]'s attention and I believe Gerald Newman is aware and I was told Gerry is not comfortable with what occurred.  You might get more information by talking with him. . .

In emailing Wann, Schaefer not only disclosed the potential kickback scheme in which a contractor paid an NYCB employee to be permitted to salvage copper wiring from the LAN Room, but also tied that scheme to prior misconduct on another NYCB project (A-222).  As described above, Wann already was aware

10

that Schaefer had uncovered a potential bid-rigging issue in the CRES unit (relating to the parking garage), and that Schaefer had been digging into long-term vendor overpricing (A-37, Tr. 363:22-366:20 (Schaefer)).

Contemporaneously with Schaefer emailing Wann, Bermeo informed CRES head William Curran about these findings. Specifically, Bermeo reported that he had met on-site with the property manager, Gerry Newman, and discovered the damage to the LAN room. Newman told Bermeo that Grosso had performed the work over a three-day weekend with NYCB personnel, joking, "If you give me an hour, I could have a guy here and we'll give you a million dollars." When no one laughed, Newman refused to answer questions and directed them to Grosso. Curran confirmed that he was aware of the situation. Curran further told Bermeo that he had received an envelope of cash from Fred Whittaker and would discuss that with Grosso, and Curran placed the envelope of cash into his jacket pocket in front of Bermeo. Curran also told Bermeo to stay out of the situation and that Curran would "handle it." Bermeo responded that if management was aware, he was "sure an investigation is under way to identify what happened, and when it happened, and will connect all the dots." (A-16, Tr. 141:6-143:14, A-37, 279:1-9 (Bermeo)).

The next day, April 4, 2017, at another on site walk through, Schaefer confirmed with Apptel that it had removed the wire attached to equipment in the LAN Room, but had not removed wire from the ceiling (A-16, Tr. 144:19-145:10 (Bermeo), A-37, 427:2-433:5, A-68, 631:12-20 (Schaefer), A-68, 701:21-702:23

11

(Chludzinski)). Apptel's former owner Mike Chludzinski confirmed that for the equipment his company was removing, there were nubs of wire coming off the equipment that had been cut previously (Tr. 702:7-17 (Chludzinski)). After Schaefer and Bermeo spoke further, Schaefer drafted an email to Wann that Bermeo reviewed (A-222; A-16, Tr. 121:3-9, 150:16-151:12 (Bermeo)). In his email, Schaefer wrote:

> As I inquired further about the damage to the [LAN] room, I received information regarding an envelope from a vendor directly. The vendor was given an envelope from an employee and told he was "returning it to the company that should have received it." Unfortunately, for that employee, the vendor didn't even know about the envelope or the job that generated the envelope.
>
> The employee was William Curran. He returned the envelope to The Martin Group on the day after I asked if he was "aware of an incident at 100 Duffy where employees were receiving envelop[e]s for salvage work?" His response to me at that moment was "Yea, I heard that." To which I replied that "I told the vendor that if our management is aware of this, I am sure an investigation is under way to identify what happened, and when it happened, and will connect all the dots. This is the first I heard about this, and I don't know who is involved. Either as a recipient of an envelope or in the taking of copper." This was on last Monday. On Tuesday he gave the envelope to The Martin Group who didn't know what to do with it. According to what he told me The Martin Group, he apparently received the envelope for "the removal of an abandoned solid copper cold water pipe on the 3rd floor of 100 Duffy. Which was done at night without the Martin Group knowing."
>
> Mike the owner of App-Tel, our communications vendor, and I had a conversation. He told me he didn't know anything about the removal of other wiring in the room, but did acknowledge the room had been worked on at night by someone other than his company. He said they were aggressive and left only what was still connected to the equipment he was directed to remove. The

12

rest of the room was cleared of the 15-20 years of copper wiring that had been abandoned by Manufacturers Hanover and Chase Bank. In a conversation with Gerry Newman, he told me "there was ton's upon ton's of wire removed from this [LAN] room. I assume it was done by AppTel." He said "There was so much wire here that you couldn't fit a single wire on the ceiling anymore. On the ceiling, under the floor, there was so much here."

\* \* \*

If you want to confirm this and verify who was directly involved, you might wish to review the building security videos of all afterhours work at 100 Duffy between 9/27/16 through 11/01/16.

(A-222).

Wann did not tell Schaefer and Bermeo what he was doing with the information, such as whether he was investigating it or asking someone else to do so. Neither did Wann confirm that he would check building video to confirm who had removed materials. Rather, Wann simply replied, "again, you are not tasked or trained as an investigator, and please stand down" (A-222). Schaefer replied that he would not investigate further (A-222).

### F. Schaefer and Bermeo Are Terminated Within a Month of Reporting the Bank Fraud

Wann terminated Schaefer and Bermeo without any warning on May 3, 2017 (A-242-A-245; A-37, Tr. 333:1-5 (Bermeo)). As a regulated financial institution, NYCB regularly audits certain departments. NYCB was undertaking a purportedly routine audit of CRES during the spring of 2017 (A-200; A-87, Tr. 821:18-822:1, 1041:4-11 (Larson)), but evidence suggested that Wann interceded to

13

focus the lead auditor on Schaefer (A-16, Tr. 174:4-175:4 (Bermeo), A-37, 461:8-10, 463:24-464:3 (Schaefer), A-87, 871:1-17 (Larson), A-145, 2375:13-2376:17 (Wann)). Though Wann testified that his decision to terminate Schaefer and Bermeo was driven primarily by the bank audit, he admitted that Schaefer's investigation into the LAN Room damage and Schaefer's work with Bermeo to get to the bottom of a potential fraud also influenced his decision. (Tr. A-145, 2330:4-14, 2335:22-2336:19 (Wann)).

## G.     The ALJ and ARB Panel Decisions

In a decision and order dated June 29, 2022, the ALJ denied Schaefer's and Bermeo's complaints, holding that they had neither an objective nor subjective belief that they were reporting conduct constituting a bank fraud.

On appeal, the ARB affirmed the ALJ's decision. Looking first at the subjective belief prong, the ARB held that Bermeo's April 3 discussion with Curran did not lay out purportedly fraudulent conduct, and the ARB did not credit Bermeo with contributing to Schaefer's emails to Wann. (Decision at 16). Turning to Schaefer, the ARB found that his April 6 email with Wann at most suggested that the 100 Duffy project was being mismanaged or that bank property was being wasted, but that the email did not unpack a pattern of cash kickbacks to NYCB employees or otherwise assert a fraudulent scheme. (A-296 at 17).

The ARB next determined that neither Schaefer nor Bermeo could have held an objectively reasonable belief that they were reporting a bank fraud because

14

they did not provide evidence of a fraudulent scheme, but at most reported a single incident of waste relating to a single property renovation. (A-296 at 21-22). The ARB further held that they could not, in light of their knowledge, skills, education, and experience, believe they were reporting the type of fraud covered by SOX rather than just merely unlawful conduct. (A-296 at 20-21).

## <u>SUMMARY OF ARGUMENT</u>

The ARB affirmed the ALJ's determination that Appellants did not have either an objectively or subjectively reasonable belief that they were reporting a bank fraud, as covered by SOX whistleblower protections. This determination was based on two related errors, which collectively led the ARB to issue a decision that was contrary to established law.

<u>First</u>, the ARB did not believe that the conduct Appellants reported – contractors paying kickbacks to bank employees in exchange for employees allowing the contractors to strip bank properties – could constitute bank fraud under 18 U.S.C. § 1344. Circuit-level case law shows this was error. *See*, *e.g.*, *Cihak*, 137 F.3d 252; *see also O'Malley*, 364 F.3d 974. The ARB's failure to appreciate that the conduct Appellants reported could constitute bank fraud led the ARB to hold that Appellants could not objectively reasonably believe that they were reporting fraud.

<u>Second</u>, the ARB decontextualized Appellants' whistleblower report by taking a parsing read of a single email and ignoring surrounding circumstances. Over the months prior to the instant whistleblower reports, Schaefer had identified

a gardening contract that was significantly above market pricing, and Schaefer and Bermeo had exposed an issue in sealed bid processes that saved the bank millions of dollars on a parking garage project similarly managed by 100 Duffy project manager Grosso. Wann also had learned about the theft of a boiler and fuel oil from a bank property managed by Grosso. And in his April 3 email, Schaefer noted a prior theft of copper wire. Schaefer and Bermeo had climbed the ranks, but both had started in relatively menial positions, and neither had legal or similar training. Both relied heavily on the NYCB anti-fraud policy and the NYCB Employee Whistleblower Complaint Policy and Procedures (A-162) to understand their reporting obligations. The ARB was required not only to look at the specific report, but also the surrounding circumstances and Appellants' backgrounds, in evaluating whether they could have reasonably believed they were reporting a bank fraud, rather than a one-off theft. The ARB's failure to do so, combined with the ARB's mistaken determination that the reported scheme could not constitute bank fraud, led the ARB to incorrectly determine that Schaefer and Bermeo could not hold a reasonable subjective belief that they were reporting a bank fraud.

## STANDARD OF REVIEW

Congress passed SOX in 2002 "[t]o safeguard investors in public companies and restore trust in the financial markets." *Lawson v. FMR LLC*, 571 U.S. 429, 432 (2014). SOX prohibits public companies from retaliating against employees who make certain disclosures. To meet this purpose, courts construe

Section 806 broadly.  *See Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 440 (S.D.N.Y. 2013) (citing *Mahony v. KeySpan Corp.*, No. 04 Civ. 554 (SJ), 2007 U.S. Dist. LEXIS 22042, 13-14 (E.D.N.Y. Mar. 12, 2007).  Under section 1514A, SOX provides whistleblower protection for "[A]ny lawful act done by [an] employee – (1) to provide information . . . which the employee reasonably believes constitutes a violation of section . . . 1344 [bank fraud], . . . when the information or assistance is provided to . . . (C) a person with supervisory authority over the employee."

To prevail on a retaliation claim, a complainant must prove that he engaged in a protected activity.  *See Wiest v. Lynch*, 710 F.3d 121, 129 (3d Cir. 2013) (reinstating whistleblower claims); *see also Leshinsky*, 942 F. Supp. 2d at 444.  An employee engages in protected activity when he provides information regarding an activity that he "reasonably believes constitutes a violation of" the enumerated statutory and regulatory provisions in section 1514A.  18 U.S.C. § 1514A(a)(1); *see Wallace v. Tesoro Corp.*, 796 F.3d 468, 474 (5th Cir. 2015) (employee must "provide information or assist in an investigation that he reasonably believes relates" to bank fraud).  A reasonable belief has both subjective and objective components. *Id*.  That is, a complainant must show that: (1) he had a subjective belief that the complained-of conduct constitutes a violation of law; and (2) that the belief was objectively reasonable.  An employee's reasonable but mistaken belief an employer engaged in conduct that constitutes a violation of a law identified in SOX is protected.  *Rhinehimer v. U.S. Bancorp Invs. Inc.*, 787 F.3d 797, 812 (6th Cir. 2015)

("[C]ourts universally recognize that [SOX] protects employees who reasonably but mistakenly believe that the conduct at issue constitutes a violation of relevant law.").

This threshold showing "is intended to include all good faith and reasonable reporting of fraud." *Sharkey v. J.P. Morgan & Chase Co.*, 805 F. Supp. 2d 45, 55 (S.D.N.Y. 2011) (internal citation omitted). A complainant fulfills his duty under Sarbanes-Oxley when he "'identif[ies] conduct that falls within the ample bounds of the anti-fraud laws . . . .'" *Leshinsky*, 942 F. Supp. 2d at 443 (quoting *Wiest*, 710 F.3d at 132)). The SOX whistleblower statute "protects 'all good faith and reasonable reporting of fraud,'" even if the reporter ultimately was mistaken. *Sylvester v. Parexel Int'l LLC*, ARB CASE NO. 07-123, 2011 DOLSOX Lexis 39, at *40 (U.S. Dep't of Labor, May 25, 2011) (quoting 148 Cong. Rec. S7418-01, S7420 (ARB July 26, 2002)).

In reviewing the Decision, this Court must consider whether the ARB's determinations are "unsupported by substantial evidence" or are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Galinsky v. U.S. Dep't. of Labor, Admin. Review Bd.*, 556 Fed. App'x. 31, 31 (2d Cir. 2014) (internal citation omitted).

## **ARGUMENT**

### **THE FRAUD SCHAEFER AND BERMEO BELIEVED THEY IDENTIFIED WAS A BANK FRAUD UNDER THE BROAD SWEEP OF SOX**

The hearing evidence showed that Schaefer and Bermeo thought they were disclosing a scheme within CRES in which employees rigged bids and stripped

18

assets from bank properties for kickbacks. The scheme occurred, to Schaefer's and Bermeo's knowledge, across several properties. In his April 6 email, Schaefer referenced salvage stripping at two properties, 100 Duffy and 102 Duffy. Further, Schaefer and Bermeo reported the theft from 100 Duffy in the context of Wann knowing about prior incidents, including the removal of a boiler and heating oil at another property, and Wann's knowledge that Schaefer was uncovering evidence that long-term vendors were being overpaid and tipped on bidding. The ARB nonetheless held that Schaefer and Bermeo did not detail the scheme in their reports to management. From there, the ARB determined that Schaefer and Bermeo did not have a reasonable belief that they were reporting bank fraud, as opposed to garden variety theft. At bottom, the ARB held that the type of salvage scheme Schaefer and Bermeo reported was not, as a matter of law, bank fraud. This decontextualized parsing of a report by relatively unsophisticated employees is unfair and contrary to law. More importantly, the ARB's fundamental error of law – determining that an insider kickback scheme could not be a bank fraud – underpinned the ARB's determination. This Court should recognize that a long-term insider bid-rigging scheme is a fraud and not just a theft and should reverse the ARB's determination.

A.    **It Was Objectively Reasonable for Schaefer and Bermeo to Believe They Reported Bank Fraud**

To prove their whistleblower claims, Schaefer and Bermeo must show that they had an objectively reasonable belief they were reporting a bank fraud. The

objective prong focuses on the "basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience." *Sharkey*, 805 F. Supp. 2d at 55 (affirming liability judgment for complainant). The bank fraud statute, which is encompassed in SOX protections, broadly criminalizes whoever "knowingly executes, or attempts to execute, a scheme or artifice- (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises[.]" 18 U.S.C. § 1344(1)-(2); *see also United States v. Teman*, 465 F. Supp. 3d 277, 303 (S.D.N.Y. 2020) (rejecting narrow interpretation of 18 U.S.C. § 1344); *United States v. Zarrab*, 15 Cr. 867 (RMB), 2016 U.S. Dist. LEXIS 153533, at *38-39 (S.D.N.Y. Oct. 17, 2016) (recognizing that the "scheme to defraud" clause of the bank fraud statute requires only that the "defendant engage in or attempt to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss"); *United States v. Bezmalinovic*, 962 F. Supp. 435, 437 (S.D.N.Y. 1997) ("Defendant correctly notes that 18 U.S.C. § 1344 is violated whenever a person devises and executes or attempts to execute a scheme to defraud a financial institution . . .").

Bank fraud does not require an affirmative false representation, but rather it "extends to active concealment even in the absence of a fiduciary, statutory,

or other independent legal duty of disclosure where the defendant acts with the requisite intent to mislead or deceive." *United States v. Moran*, 312 F.3d 480, 489 n.10 (1st Cir. 2002); *see also United States v. Colton*, 231 F.3d 890, 894 (4th Cir. 2000) (holding that "misleading or deceitful conduct designed to conceal material information from a financial institution" violated bank fraud statute).

Interpreting the bank fraud statute broadly in the whistleblower context is critical to forward the purpose of the statute; indeed, other panels have recognized that a reporter need not actually satisfy the elements of a fraud, but rather need only approximate a fraud. *See Sylvester*, 2011 DOLSOX Lexis 39, at *53-54; *see also Erhart v. Bofi Holding, Inc.*, 269 F. Supp. 3d 1059 (S.D. Cal. 2017) (allowing SOX whistleblower claim to proceed on basis of reported bank fraud, even though complainant did not specify the bank fraud, when he alleged that bank CEO engaged in series of unusual deposits into personal account at bank). Further, the whistleblower need not articulate a scheme to deceive shareholders, but only must describe a violation of the statute. *See Gladitsch v. Neo@ogilvy, Ogilvy, Mather, WPP Grp. USA, Inc.*, 11 Civ. 919 (DAB), 2012 U.S. Dist. LEXIS 41904, at *20 (S.D.N.Y Mar. 21, 2012) (recognizing that protected activity under SOX need not relate to fraud against shareholder). A determination of whether an employee has reported a covered scheme "should be based upon all the attendant circumstances, and not be limited to the facts conveyed by a whistleblower to the employer." *Wiest v. Lynch*, 710 F.3d 121, 134 (3d Cir. 2013).

Other courts have found conduct similar to the reported conduct here to constitute bank fraud. For example, in *O'Malley*, 364 F.3d 974, defendant sales managers at Sam's Club were convicted of bank fraud under 18 U.S.C. § 1344 for arranging for Sam's Club to purchase freon from suppliers at above-market prices in exchange for kickbacks. Even more analogous, in *Cihak*, 137 F.3d 252, the defendant, a bank executive, was convicted of bank fraud for entering into a consulting agreement on behalf of the bank, accepting inflated bills for subcontracted work from the consultant, and taking a kickback from the consultant. *Cf. United States v. Allen*, 76 F.3d 1361 (5th Cir. 1996) (finding that scheme in which bank officer approved false consultant invoices in exchange for kickbacks constituted money laundering because consultants could be convicted of bank fraud under 18 U.S.C. § 1344).

Under this law, ARB's determination that the reported scheme did not constitute a bank fraud as a matter of law, and thus that Schaefer and Bermeo could not have had an objectively reasonable belief that they were reporting a covered activity, cannot stand. The ARB's determination was unsupportable in two regards.

First, a kickback scheme between a bank employee and an outside contractor, which results in a financial institution being defrauded into overpaying for services, is a bank fraud under 18 U.S.C. § 1344. Here, even construed narrowly, Bermeo reported to Curran, and Schaefer in writing described to Wann, their belief that NYCB employees had allowed an outside vendor to take supplies from the bank

22

in exchange for cash-filled envelopes.  This is analogous to the actions constituting bank fraud in *Cihak*.  The ARB's erroneous belief that the reports did not as a matter of law describe a bank fraud are fatal to its determination that Schaefer and Bermeo could not objectively believe they were engaged in protected reporting activity.

Second, the ARB focused too narrowly on the language in the April 6 email, and ignored the surrounding circumstances and prior reports to Wann.  *See Sharkey*, 805 F. Supp. 2d at 55 (holding that objective reasonable belief test considers not just the specific report, but the circumstances in which the report is occurring); *Fraser v. Fiduciary Tr. Co. Int'l*, 417 F. Spp. 2d 310, 323 (S.D.N.Y. 2006) (finding email sufficient report when viewed in "the context of the . . . circumstances giving rise to the communication").  Though the ARB was required to consider the circumstances" surrounding the report, and not just a single email, the ARB resorted to a parsing read of the April 6 email.  In doing so, the ARB ignored critical circumstances surrounding the report, which both Schaefer and Wann were aware of, including:

- During his review of service contracts with "preferred vendors," Schaefer discovered one vendor had a long-term service contract that was at least $100,000 a year above market pricing (A-177 at NYCB-00159; A-37, Tr. 358:4-361:9, 363:1-366:20 (Schaefer)).  Wann pulled Schaefer from the project despite the cost savings to NYCB (A-37, Tr. 363:22-366:20 (Schaefer)).

- When an NYCB employee expressed concern about the procedure in which purportedly sealed bids had been submitted by preferred vendors for a parking garage

23

refurbishment project, Schaefer helped obtain an
additional bid from an outside vendor, which bid came in
$2.6 million lower than the next lowest bid, enraging
CRES project Richard Grosso and potentially NYCB
COO Robert Wann (A-37, Tr. 398:7-402:25 (Schaefer),
A-104, 1397:25-1400:21 (Fernandez)).

• In 2015, copper and other valuables (including an
operating boiler) had been stripped from an NYCB
property in Eltingville, Staten Island (A-37, Tr. 408:6-25,
A-68, 576:6-25 (Schaefer)). The same employee involved
in the Duffy matter, Grosso, had been given an envelope
from a vendor with $5,000 in cash in 2016 (A-37, Tr.
321:3-322:10 (Bermeo), 395:4-14 (Schaefer)).

• In 2013, while 102 Duffy was closed for asbestos
abatement, almost 4,000 gallons of fuel oil were stolen and
wire was stripped from the building (A-104, Tr. 1388:14-
1391:9, 1434:2-1435:18, 1438:14-1439:20 (Fernandez);
*see also* A-133, Tr. 2111:2-7 (Grosso)). Based on these
incidents, which Schaefer alluded to in his email, Wann
previously had asked Bermeo to keep an eye on Grosso
going forward (A-16, Tr. 59:13-60:5 (Bermeo)).

Cumulatively, these factors, which Schaefer, Bermeo, and Wann all
knew, show that Schaefer and Bermeo believed they were reporting a bank fraud.
The ARB blinkered views of both the specific fraud Schaefer and Bermeo identified
and the scope of the bank fraud statute led them to the incorrect conclusion that
Schaefer and Bermeo could not have objectively believed, in reporting a one-off
scheme to steal piping from 100 Duffy, that they were reporting a fraud. Further,
the misconduct Schaefer and Bermeo identified and reported fit directly into
NYCB's definition of a whistleblower offense, which included "payment or receipt

24

of bribes, kickbacks or other inappropriate payments," and "other fraudulent behaviors causing any kind of loss to the Company" (A-162 at NYCB-00077 n.3).

Given the facts at their disposal, NYCB's written policies, and the relative lack of sophistication of Schaefer and Bermeo (each of whom had climbed the ranks from relatively junior positions at NYCB), it was objectively reasonable for each to believe that they were reporting a bank fraud. Because the ARB relied on an erroneously narrow definition of bank fraud, its determination that it was not objectively reasonable is "not in accordance with law," and should be reversed.

**B.    Schaefer and Bermeo Subjectively Believed They Were Reporting a Bank Fraud**

As described above, when Schaefer began working at CRES, he reviewed CRES's long-term maintenance contracts and promptly identified a contract with a preferred vendor under which NYCB was overpaying. Similarly, Schaefer and Freddy Fernandez identified an issue with bid procedure, raising questions about whether preferred vendors were obtaining advance bid information. These issues could not have been less surprising, given how intertwined certain CRES staff were with preferred vendors. For example, when Fred Whittaker wanted to get his son a job, he called a preferred vendor and asked them to hire his son, without disclosing this to NYCB. When Whittaker wanted to get his son a different job, Whittaker called another preferred vendor.  (A-124, Tr. 1725:13-1726:2, 1777:18-1778:9 (Whittaker); *see also* A-92, Tr. 1157:17-18 (Hernandez)).

Schaefer and Bermeo also were aware of a history of at least three NYCB properties being stripped. At 102 Duffy, wiring, piping and conduits were removed over the objection of NYCB contractor Apptel (A-68, Tr. 711:21-712:3, 748:10-750:3 (Chludzinski), A-104, 1388:14-1391:9, 1438:14-1439:20 (Fernandez)). Also at 102 Duffy, fuel oil was siphoned from the building's generators (A-104, Tr. 1434:2-1435:18 (Fernandez); *see also* A-133, Tr. 2111:2-7 (Grosso)). In Eltingville, Staten Island, metals and a boiler were swiped (A-92, Tr. 1133:13-1134:11 (Hernandez), A-104, 1394:9-1395:16, 1405:7-14 (Fernandez)). And at 100 Duffy, Schaefer and Bermeo learned that again wiring had been removed, and that a contractor on the site had provided cash to a CRES employee (A-16, Tr. 141:3-143:14 (Bermeo)). Given this history, Schaefer and Bermeo had good reason to subjectively believe they were reporting a scheme to transfer millions of dollars from NYCB to its contractors for employee kickbacks. That belief was further supported when Bermeo spoke with CRES head William Curran, who showed Bermeo an envelope of cash purportedly from a vendor relating to 100 Duffy and told Bermeo to "stay out of it" (A-16, Tr. 141:3-143:14 (Bermeo)). Wann's response to Schaefer, to "stand down," was no more reassuring (A-222).

The ARB nonetheless affirmed the ALJ determination that Schaefer and Bermeo did not prove that they each had a subjectively reasonable belief they were reporting a bank fraud. The ARB dismissed Bermeo's subjective belief in a paragraph. It held that Bermeo had reported to Curran only that the LAN room had

26

been significantly damaged, Grosso appeared to be responsible for that outcome, and Newman had joked about it, but that Bermeo had not mentioned missing copper wire. Based on this summary, the ARB held that Bermeo had at most suggested mismanagement or wrong-doing, but not fraudulent conduct. (A-296 at 16-17).

The ARB's summary of Bermeo's testimony ignores critical issues. After Bermeo reported his discussion with Newman, Curran told Bermeo he was aware of the situation, showed Bermeo an envelope of cash allegedly related to the project, and told Bermeo that he would "handle" the situation. (A-16, Tr. 141:6-143:14, A-37, 279:1-9 (Bermeo)). Particularly in light of the envelope Curran flashed, suggesting a kickback, Bermeo had good reason to believe that Curran understood his concerns. The ARB's determination that Bermeo could not have subjectively believed he was reporting a fraud on the bank because he did not specifically mention the copper stripping derives from the ARB's mistaken conclusion that the kickback scheme itself could not, as a matter of law, constitute a bank fraud under 18 U.S.C. § 1344. While the ARB's determination admittedly was supported by some evidence, that determination nonetheless is undermined by the ARB's incorrect evaluation of what may constitute a bank fraud as a matter of law.

The ARB's determination as to Schaefer's subjective belief is similarly faulty. The ARB summarized Schaefer's April 6 email to Wann to report that NYCB employees were salvaging bank property for cash, at most reporting mismanagement or waste. (A-296 at 17). The ARB goes further in discounting Schaefer's claim,

stating that Schaefer's claim has morphed from a report of improper salvage to one of bank fraud to one that NYCB employees were "conspiring" with vendors to rig contract bids. The ARB also notes that Schaefer learned about the bid rigging in the year prior to his April 6 email. According to the ARB, Schaefer should have tied together the entire scheme in his April 6 email. (A-296 at 17-18).

Here, the ARB made two errors. First, as described above, the ARB misunderstood that the improper salvage scheme could itself be a bank fraud, and thus that Schaefer could subjectively reasonably have believed that his April 6 email was a whistleblower report. Second, the ARB segmented Schaefer's report, refusing to consider the background information shared by Wann and Schaefer, including Schaefer's prior identification of an above-market contract with a long-term vendor and Wann's subsequent prompt redirection of Schaefer away from contract review.

To be clear, in evaluating each of Bermeo's and Schaefer's reports, the ARB also set too high a bar by requiring each to carefully detail a collusive fraud scheme. Bermeo and Schaefer were mid-level employees. Despite their backgrounds, the ARB expected each to provide a parsing review. The ARB also faulted each for not using terminology like "fraud," even though each described an accretion of acts that led them to believe that there was a fraudulent scheme. *See Sylvester*, 2011 DOLSOX Lexis 39, at *53-54; *see also Erhart*, 269 F. Supp. 3d at 1076 (allowing whistleblower claim even though complainant did not term report as of a fraud). The ARB ignored the NYCB antifraud and whistleblower policies,

which Schaefer and Bermeo relied on. Curran and Wann told Bermeo and Schaefer to stop poking, Curran saying he would "handle" the situation and Wann telling Schaefer to "stand down." And though Bermeo and Schaefer each knew that Curran and Wann had background information suggesting a fraud – Curran based on his receipt of cash and Wann based on his knowledge of prior improper salvages, the garage overbid, and the over-market contracts – the ARB chose not to consider that information in evaluating the reasonableness of whether Bermeo and Schaefer subjectively believed they were reporting a fraud.

Again, though Bermeo's and Schaefer's reports did not contain the word fraud or the level of detail subsequently unpacked in litigation, there is no question that Bermeo and Schaefer believed they were reporting the systemic theft of bank property supported by kickbacks to insiders, and that they were doing so in the context of Schaefer's and Bermeo's previous discovery and disclosure of vendor contracting issues in CRES. The ARB's blinkered approach to the reports, which in part derived from the ARB's not understanding that an improper salvage and kickback scheme could itself be a bank fraud under 18 U.S.C. § 1344.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellants Gene Schaefer and Luis Bermeo respectfully request that the Court reverse the ARB, find that they had objectively and subjectively reasonable beliefs that they were reporting bank fraud, and remand this matter to the ALJ for further proceedings.

Dated:      New York, New York
            January 31, 2024

                            MORRISON COHEN LLP

                            */s/David B. Saxe*
                            David B. Saxe
                            909 Third Avenue
                            New York, New York  10022
                            Tel:  (212) 735-8600
                            dsaxe@morrisoncohen.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Local Rule 32.1(a)(4)(A) because it contains 7,624 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: January 31, 2024            Respectfully submitted,


                                   <u>/s/ David B. Saxe</u>
                                   David B. Saxe

SPECIAL APPENDIX

**TABLE OF CONTENTS**

PAGE

Decision and Order of the Administrative Review Board,
    dated June 22, 2023..............................................  SPA-1

Decision and Order Denying Complaints of the United States
    Department of Labor, dated June 29, 2022 ......................  SPA-27

# SPA-1

**U.S. Department of Labor**   Administrative Review Board
200 Constitution Ave. NW
Washington, DC 20210-0001



IN THE MATTER OF:

GENE SCHAEFER &
LUIS BERMEO,

      COMPLAINANTS,

  v.

NEW YORK COMMUNITY
BANCORP, INC.,

      RESPONDENT.

ARB CASE NO.  2022-0050

ALJ CASE NOS. 2018-SOX-00048
                2018-SOX-00051
ALJ TIMOTHY J. MCGRATH

DATE:  June 22, 2023

Appearances:

*For the Complainants:*
    Gayle Pollack, Esq. and David B. Saxe, Esq.; *Morrison Cohen LLP*;
    New York, New York

*For the Respondent:*
    Ashley Burkett, Esq.; *Arnold & Porter Kaye Scholer LLP*; Washington,
    District of Columbia

Before PUST, WARREN, and MILTENBERG, Administrative Appeals
Judges

## DECISION AND ORDER

PUST, Administrative Appeals Judge:

    This case arises under the whistleblower protections of Section 806 of the
Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the
Sarbanes-Oxley Act (SOX), as amended, and its implementing regulations.[1] On
June 29, 2022, a U.S. Department of Labor (Department) Administrative Law
Judge (ALJ) issued a Decision and Order Denying Complaints (D. & O.). The ALJ
determined that Gene Schaefer (Schaefer) and Luis Bermeo (Bermeo) (collectively,

---

[1]      18 U.S.C. § 1514A; 29 C.F.R. Part 1980 (2022).

# SPA-2

2

Complainants[2]) failed to establish by a preponderance of the evidence that they had engaged in activity protected under SOX, so their whistleblower claims failed.[3] Specifically, the ALJ found that the Complainants' reports of an alleged scheme related to copper salvaging and cash kickbacks involving employees of New York Community Bancorp, Inc. (Respondent or NYCB) did not constitute SOX-protected activity because Complainants failed to demonstrate that they held reasonable beliefs that the scheme they alleged constituted bank fraud under 18 U.S.C. § 1344, one of SOX's predicate statutes.[4] Complainants timely petitioned the Administrative Review Board (ARB or Board) for review. We affirm the ALJ's D. & O.

## BACKGROUND

The ALJ determined the following facts which, with one exception,[5] Complainants do not challenge on appeal.[6]

---

[2]    This litigation originally involved one additional complainant, Fred Fernandez (Fernandez), who was employed by NYCB as a Lead Project Manager from December 2014 until December 2017, when NYCB eliminated his position. D. & O. at 5. Fernandez's claim was dismissed as part of the ALJ's June 30, 2020 Order Granting, In Part, and Denying, In Part, Respondent's Motion for Summary Decision. Fernandez did not appeal that ruling and is no longer a party in this case.

[3]    D. & O. at 34.

[4]    D. & O. at 28-29; *see* 18 U.S.C. § 1514A(a)(1) (which states that no covered company may discriminate against an employee for engaging in "conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.").

[5]    Complainants note that the ALJ made one "significant factual error" in relying on statements made by counsel rather than witness testimony when describing an internal NYCB investigation related to a different NYCB property in 2013. Complainants' (Comp.) Opening Brief (Br.) at 24; *see* D. & O. at 6. NYCB labels this error a "red herring" because the ALJ did not rely on this other investigation as a basis for concluding that Complainants did not reasonably believe they were reporting bank fraud. Respondent's (Resp.) Br. at 45 n.11. We conclude such error is harmless because the ALJ articulated several other sufficient reasons why Complainants failed to establish that they reasonably believed that they engaged in protected activity under SOX. *See Wong v. Sumitomo Mitsui Banking Corp.*, ARB No. 2018-0073, ALJ No. 2016-SOX-00005, slip op. at 6 (ARB Oct. 26, 2020); *Bechtel v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 710 F.3d 443, 449 (2d Cir. 2013).

[6]    Comp. Reply Br. at 7.

**SPA-3**

3

## 1. Relationship Between the Parties

New York Community Bancorp, Inc. is a publicly traded financial institution headquartered in New York with hundreds of branch banks located in five states.[7] Robert Wann (Wann) is NYCB's Chief Operating Officer.[8]

NYCB operates an internal Corporate Real Estate Services unit (CRES) responsible for managing and maintaining its physical properties.[9] From early 2016 until his termination in 2017, William Curran (Curran) served as the Chief CRES Officer for NYCB.[10] During the relevant timeframe, Fernandez and Richard Grosso (Grosso) served as CRES project managers[11] and Fred Whittaker (Whittaker) was the Director of Facilities for CRES.[12]

Complainant Schaefer worked for NYCB in various roles over two decades; in 2016 he was the CRES Budget Coordination Manager and reported to Curran.[13] Complainant Bermeo became the Director of Construction and Project Management for CRES East after also having worked for NYCB for nearly twenty years.[14] Like Schaefer, Bermeo reported to Curran.[15]

## 2. Renovation of 100 Duffy

In 2016, NYCB purchased a building at 100 Duffy Avenue in Hicksville, New York (100 Duffy),[16] located adjacent to a building that NYCB already owned at 102 Duffy Avenue (102 Duffy). NYCB hired The Martin Group (TMG) as a general contractor to complete a renovation of 100 Duffy.[17]

---

[7]      D. & O. at 4.

[8]      *Id.* at 3.

[9]      *Id.* at 2.

[10]     *Id.* at 2-3.

[11]     *Id.* at 5-6.

[12]     *Id.* at 6.

[13]     *Id.* at 2.

[14]     *Id.* CRES includes two subunits, one of which is CRES East. Trial Exhibit (Ex.) J (Memorandum re: Audit of Corporate Real Estate Services) at 1.

[15]     D. & O. at 2.

[16]     *Id.* at 6.

[17]     *Id.*

## SPA-4

4

Inside the basement of 100 Duffy is a room formerly used to house telecommunications equipment (LAN room).[18] The LAN room contained a dropped ceiling made of metal gridwork filled with two-by-four ceiling tiles.[19] Wires and cables ran both above and below the ceiling tiles, and some also ran under the floor in the LAN room.[20] As part of the remodeling project, NYCB's information technology (IT) department requested the removal of several cabinets and racks containing obsolete computer-related cables and wires from the LAN room.[21]

After having inspected the site with Grosso, in September of 2016 Apptel, a telecommunications repair and installation company, submitted a proposal to remove all unused or obsolete equipment and cabling from the LAN room.[22] Grosso generated a purchase order based on Apptel's proposal.[23] Apptel's proposal required NYCB to remove any material it wanted to keep and to take down the ceiling tiles in the LAN room before Apptel began any work.[24] The purchase order totaled $9,400.00, and described the project as follows:

> Remove Any & All Unused Or Obsolete Equipment &
> Cabling From The Level B Telco Room.
> Requires Removal of Any Materials The Client
> Wishes To Keep, Along With The Removal Of All Ceiling
> Tiles Before The Project Can Commence.
> A Space For The Roll Of (sic) Dumpster Is Required
> Directly Near The Freight Location. [25]

The purchase order was approved on September 27, 2016, by Schaefer, Bermeo, Grosso, and Curran.[26]

When Apptel started work in the fall of 2016, the ceiling's gridwork and tiles had already been removed, as provided for in the purchase order.[27] The Apptel crew removed computer-related cables and wires from the LAN room, all of which fit into

---

[18]   *Id.* at 7.

[19]   *Id.*

[20]   *Id.*

[21]   *Id.*

[22]   *Id.*

[23]   *Id.*

[24]   *Id.*

[25]   *Id.*

[26]   *Id.*

[27]   *Id.* at 7-8.

one dumpster and generated only $1,179.60 in value as scrap metal.[28]

### 3. Change Order No. 16

Sometime before March 15, 2017, Grosso approved TMG's request to submit a contract change order (CO) for additional work at 100 Duffy, eventually memorialized as Change Order 16 (CO16).[29] CO16 called for the repair of the existing ceiling grid and installation of new ceiling tiles in the LAN room of 100 Duffy, with payment for the work totaling $40,300.05.[30]

On March 30, 2017, Grosso sent CO16 to the project architect for review.[31] A few hours later, and after the architect informed Grosso that the cost of the work was too high,[32] Grosso sent an email to Bermeo, with a copy to Schaefer and others (Grosso email chain), informing all that CO16 was being rejected.[33]

### 4. April 3rd Bermeo/Curran Conversation: Bermeo's Alleged Protected Activity[34]

At approximately 9:00 a.m. on Monday April 3, 2017, Bermeo received and signed CO16, then had it sent to Schaefer for signature.[35] When Schaefer reviewed CO16, he noticed that it called for repairing damage to the LAN room ceiling although no construction had been authorized in the LAN room. He also noted that CO16 totaled over $40,000, making it one of the largest change orders on the project.[36] Schaefer did not sign CO16; instead, he met with Bermeo to discuss the

---

[28]     *Id.* at 8.

[29]     *Id.* Change Order 16 was identified as "CO 16" by the ALJ. *Id.*

[30]     *Id.*

[31]     *Id.*

[32]     *Id.*

[33]     *Id.* at 9.

[34]     Although Bermeo did not author and was not copied on or named in Schaefer's April 6th email to Wann, he alleges that this email also constituted part of his protected activity. For the reasons set forth in the D. & O. at 24, we concur in the ALJ's finding that the April 6th email sent by Schaefer to Wann, who did not supervise Bermeo, does not constitute Bermeo's "aiding in an investigation . . . conducted by . . . a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)." *See* 18 U.S.C. 1514A(a)(1)(C). *See* further relevant discussion *infra* at 16-17.

[35]     D. & O. at 9.

[36]     *Id.*

matter.[37]

At 9:15 a.m. on April 3rd, Schaefer replied to the March 30th Grosso email chain and asked who had removed the ceiling tiles and authorized the deconstruction of the LAN room.[38] Within ten minutes and without receiving any response from Grosso or ever having seen the LAN room,[39] Schaefer sent the following email to Wann:

> You need to be made aware of the situation below. It involves a room in 100 Duffy where someone allowed a vendor access to this room to salvage copper wiring from the room for cash. I was informed that there was an exchange of cash envelopes between vendors and our employees resulting from this activity. It was something that had transpired at 102 Duffy[40] and it seems to have occurred again.
>
> * * *
>
> This aggressive salvage operation will cost the company $40,000 in repairs, and may have netted at least that much in copper to whoever removed the wiring.[41]

Also on April 3, 2017, Bermeo replied to Schaefer's email in the Grosso email chain, explaining that NYCB maintenance staff had removed the ceiling tiles and

---

[37]   *Id.*

[38]   *Id.*

[39]   *Id.* at 6.

[40]   The email's reference to 102 Duffy relates to an April 2016 conversation between Fernandez, Schaefer and Bermeo regarding a bid opening meeting that had become contentious between Fernandez and Grosso. At the suggestion of Schaefer and the instruction of Curran, Fernandez had obtained a sealed bid on a project that grossly undercut the bid Grosso had obtained, such that Grosso's preferred vendor lost the bid. *Id.* at 5-6. Explaining why he and Grosso had argued at the meeting, Fernandez told Schaefer and Bermeo that when he worked for a construction company on the 102 Duffy project in 2013 before he joined NYCB, Grosso "ran a scheme" that involved the removal and sale of copper wiring, copper piping and stored oil from the property. *Id.* at 6.

[41]   *Id.* at 9-10. *See also* RX 203 (April 3rd email). Although Schaefer originally relied upon this April 3rd email as part of his claimed protected activity, once the record established that he sent this email prior to being told about a cash envelope exchange during his viewing of the LAN room later that same day, Schaefer conceded that he was no longer claiming this communication was part of his claimed protected activity. *See* D. & O. at 21 n.12.

7

Apptel had removed the wiring.[42] Schaefer then asked Bermeo, Grosso, and Gerry Newman (Newman), NYCB's property manager at 100 Duffy, for documentation identifying who authorized Apptel to cause $40,000 worth of damage in the LAN room.[43] In response, Bermeo sent Schaefer a copy of the NYCB's IT department work order, which specified what work NYCB was requesting.[44]

That same day, Schaefer, Bermeo, Newman, Fernandez, and NYCB project manager Edgar Hernandez (Hernandez) visited the LAN room.[45] Although their subsequent descriptions of the damage varied considerably,[46] the record indicates that the entire ceiling grid had been removed or damaged such that it was unusable and all wiring was gone except for some hanging light fixtures.[47] When Bermeo asked who caused the damage, Newman told him that they should speak with Grosso who had coordinated the work, which was performed by NYCB personnel during a three-day weekend after hours.[48] Newman then said in a joking manner, "If you give me an hour, I could have a guy here and we'll give you a million dollars."[49]

Upon returning to NYCB's headquarters, Bermeo met with Curran. During their conversation (April 3rd Bermeo/Curran conversation), Bermeo reported to Curran that the LAN room was damaged and that Newman told them that Grosso coordinated the work, all of which was done by NYCB employees after hours during a three-day weekend. Bermeo also told Curran that Newman "made a joke" about a "million-dollar payment."[50] Bermeo did not mention copper wiring removal and did not raise any concerns related to project scope or bid-rigging.[51] During the April 3 Bermeo/Curran conversation, Curran showed Bermeo an envelope of cash that he said he had received from Whittaker.[52] Curran told Bermeo that he was waiting to speak with Grosso before doing anything with the cash and directed

---

[42]    D. & O. at 10.

[43]    *Id.*

[44]    *Id.*

[45]    *Id.*

[46]    *Id.* at 10 n.7.

[47]    *Id.* at 10.

[48]    *Id.* at 11.

[49]    *Id.*

[50]    *Id.*

[51]    *Id.* at 23.

[52]    *Id.* at 11.

# SPA-8

8

Bermeo to "stay out of it."[53]

On April 4, 2017, Schaefer and Bermeo visited 100 Duffy again, this time with Hernandez and Apptel's owner, Michael Chludzinski (Chludzinski).[54] Chludzinski told the group that he was not responsible for any of the damage to the LAN room and that the removal was done by NYCB employees.[55] During the same visit, a TMG employee told Schaefer and Bermeo that he had received an envelope of cash from an NYCB employee for the sale of "cold water piping taken from the third floor of 100 Duffy."[56] According to Bermeo, the TMG employee identified Curran as the NYCB employee who gave him the cash envelope; according to Schaefer, the TMG employee did not know the name of the NYCB employee who gave him the envelope.[57]

Later that morning, Schaefer responded to Grosso and Whittaker's email from the previous night, advising that no one should move forward with ceiling repairs in the LAN room until they understood who caused the damage.[58] On the same day, Schaefer, Bermeo, Grosso (by phone), and Whittaker met to discuss the situation.[59] On April 5, 2017, at Curran's instruction Bermeo emailed the project architect advising that NYCB was not proceeding with CO16 as Schaefer and Curran had both denied authorization for the work.[60]

## 5. April 6th Schaefer/Wann Email: Schaefer's Alleged Protected Activity

On Thursday, April 6, 2017, at 10:44 a.m., Schaefer sent a second email to Wann (April 6th Schaefer/Wann email), which read in pertinent part as follows:

> As I inquired further about the damage to the [LAN room], I received information regarding an envelope from a vendor directly. The vendor was given an envelope from an employee and told he was "returning it to the company that should have received it." Unfortunately, for that employee, the vendor didn't even know about the envelope or the job that generated the envelope.

---

[53]   *Id.*

[54]   *Id.* at 12.

[55]   *Id.*

[56]   *Id.*

[57]   *Id.*

[58]   *Id.*

[59]   *Id.* at 13.

[60]   *Id.*

**SPA-9**

9

The employee was William Curran. He returned the envelope to The Martin Group on the day after I asked if he was "aware of an incident at 100 Duffy where employees were receiving envelopes for salvage work?" His response to me at that moment was "Yea, I heard that." To which I replied that "I told the vendor that if our management is aware of this, I am sure an investigation is under way to identify what happened, and when it happened, and will connect all the dots. This is the first I heard about this, and I don't know who is involved. Either as a recipient of an envelope or in the taking of copper." This was on last Monday. On Tuesday he gave the envelope to The Martin Group who didn't know what to do with it. According to what he told me The Martin Group, he apparently received the envelope for "the removal of an abandoned solid copper cold water pipe on the 3rd floor of 100 Duffy. Which Was done at night without the Martin Group knowing."

Mike the owner of App-Tel, our communications vendor, and I had a conversation. He told me he didn't know anything about the removal of other wiring in the room, but did acknowledge the room had been worked on at night by someone other than his company. He said they were aggressive and left only what was still connected to the equipment he was directed to remove. The rest of the room was cleared of the 15-20 years of copper wiring that had been abandoned by Manufacturers Hanover and Chase Bank.[61] In a conversation with Gerry Newman, he told me "there was ton's upon ton's of wire removed from this [LAN] room. I assume it was done by AppTel." He said "There was so much wire here that you couldn't fit a single wire on the ceiling anymore. On the ceiling, under the floor, there was so much here."

\* \* \*

If you want to confirm this and verify who was directly involved, you might wish to review the building security

---

[61] In his sworn testimony at hearing, Chludzinski denied telling Schaefer that NYCB employees removed any amount of copper wiring from the LAN room. Contrary to the ALJ's findings related to Schaefer, the ALJ found Chludzinski to be a "very credible" witness. *Id.* at 31-32.

SPA-10

10

videos of all afterhours work at 100 Duffy between 9/27/16 through 11/01/16.[62]

Wann called Schaefer and told him to "do no more."[63] At 3:49 p.m., Wann replied to Schaefer's email, advising Schaefer he was not tasked or trained as an investigator and directing him to "please stand down."[64] Schaefer replied to Wann's email at 4:31 p.m., stating he "stood down" and had only been looking to find out who damaged the LAN room and why, and "could not ethically ignore what [he] had been told."[65]

## 6. NYCB's Audit of CRES and the Termination of Complainants' Employment

On March 1, 2017, NYCB's internal audit department announced that it was auditing CRES as part of its regularly scheduled three-year audit cycle.[66] Throughout the month, NYCB's auditors met with members of CRES, including the Complainants, and requested various documentation.[67] On April 6, 2017, NYCB's Chief Audit Executive met with Wann to discuss her growing concerns about the functioning of CRES.[68] On May 1, 2017, a draft audit report was circulated to Wann and Curran, outlining five "High Risk" deficiencies and identifying the employees responsible for the identified functions, including Complainants, Whittaker, and Curran.[69]

The auditors identified the Complainants as not fulfilling their respective job duties in various respects.[70] Specifically, the draft audit report noted that Schaefer "could not provide documentation to support the . . . responsibilities in relation to budgetary controls, the monitoring of the budget versus actual spend[ing], vendor non-performance, reporting of operational and financial analyses, contract performance and periodic management reporting."[71] The auditors also identified areas in which Bermeo's performance was problematic related to improper project

---

[62]   *Id.* at 13-14 (deletion from original noted with ellipses).

[63]   *Id.* at 14.

[64]   *Id.*

[65]   *Id.* at 14-15.

[66]   *Id.* at 15.

[67]   *Id.*

[68]   *Id.*

[69]   *Id.*

[70]   *Id.*

[71]   *Id.* at 14 (quoting Joint Ex. 57).

scoping and allowing job estimates to be prepared without sufficient independence from the project team, inadequate leveling procedures, and insufficient change order procedures.[72]

After Wann reviewed the draft audit report, he decided to terminate NYCB's employment of Complainants and Curran.[73] On May 3, 2017, NYCB terminated Complainants' and Curran's employment[74]

On May 5, 2017, Bermeo emailed Wann denying any involvement in Schaefer's investigation into 100 Duffy and stating that he had no knowledge regarding Schaefer's accusations.[75] Also on May 5th, Schaefer emailed NYCB's Chief Executive Officer stating his belief that Complainants were terminated because of their attempts to "blow the whistle" on a "fraudulent scheme" involving the stripping and sale of scrap metal "in massive quantities" resulting in "tax free cash sale of bank property for individual personal gain."[76]

## 7. Procedural History and ALJ Decision

On June 29, 2017, and July 14, 2017, Schaefer and Bermeo, respectively, timely filed SOX whistleblower complaints with the Department's Occupational Safety and Health Administration (OSHA). OSHA dismissed their complaints for lack of any protected activity related to bank fraud.[77] On September 6, 2018, Schaefer filed objections to OSHA's dismissal and requested a formal hearing before the Department's Office of Administrative Law Judges (OALJ). On September 24, 2018, Bermeo filed objections and a request for a hearing.

On December 26, 2018, the assigned ALJ issued an Order Consolidating the Complainants' Cases.[78] On June 30, 2020, the ALJ issued two orders: (1) Order Denying Complainants' Motion for Summary Decision; and (2) Order Granting, In Part, and Denying, In Part, Respondent's Motion for Summary Decision. The ALJ held a virtual hearing in this matter between December 7, 2020, and January 15,

---

[72] *Id.*

[73] *Id.* at 16.

[74] *Id.*

[75] *Id.* Fifty-one days after his termination, Bermeo again emailed NYCB's CEO asking to be rehired. The email failed to mention the destruction of the LAN room and contained no reference to the sale of copper wire or any alleged scheme. *Id.*

[76] *Id.*

[77] *See* Trial Ex. I (Schaefer's Objection to Denial of Claim filed Aug. 30, 2018) at 1.

[78] The ALJ consolidated the claims of Bermeo, Schaefer, and Fernandez.

12

2021, and the parties gave closing arguments on January 28, 2021.[79]

On June 29, 2022, the ALJ issued a D. & O. in which the ALJ found that the Complainants failed to establish by a preponderance of the evidence that they had engaged in any activity protected under SOX.[80] As grounds for his determination, the ALJ found that neither Bermeo nor Schaefer held reasonable beliefs that the April 3rd Bermeo/Curran conversation or the April 6th Schaefer/Wann email constituted reports of bank fraud cognizable under 18 U.S.C. § 1344 or protected under SOX.[81]

On July 8, 2022, the Complainants appealed the ALJ's decision to the Board. Both parties filed timely briefs.

### JURISDICTION AND STANDARD OF REVIEW

The Secretary of Labor has delegated authority to the Administrative Review Board to review ALJ decisions under SOX.[82] The ARB reviews questions of law de novo but is bound by the ALJ's factual determinations if they are supported by substantial evidence.[83] "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[84] Because an ALJ observes all witnesses throughout a hearing, the Board will defer to an ALJ's credibility determinations unless they are "inherently incredible or patently unreasonable."[85]

---

[79]   D. & O. at 1.

[80]   *Id.* at 34.

[81]   *Id.* at 22, 25, and 29.

[82]   Secretary's Order No. 01-2020 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board (Secretary's discretionary review of ARB decisions)), 85 Fed. Reg. 13,186 (Mar. 6, 2020).

[83]   *Cerny v. Triumph Aerostructures-Vought Aircraft Div.*, ARB No. 2019-0025, ALJ No. 2016-AIR-00003, slip op. at 5 (ARB Oct. 31, 2019) (citing 29 C.F.R. § 1979.110(b) (2022)); *see Leviege v. Vodafone US, Inc.*, ARB No. 2019-0058, ALJ No. 2016-SOX-00001, slip op. at 3 (ARB Mar. 19, 2021) (citations omitted).

[84]   *Cerny,* ARB No. 2019-0025, slip op. at 5 (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation marks and additional citations omitted).

[85]   *Mizusawa v. United Parcel Serv.*, ARB No. 2011-0009, ALJ No. 2010-AIR-00011, slip op. at 3 (ARB June 15, 2012), *aff'd* No. 12-9563 (10th Cir. Apr. 26, 2013) (quoting *Jeter v. Avior Tech. Ops., Inc.*, ARB No. 2006-0035, ALJ No. 2004-AIR-00030, slip op. at 13 (ARB Feb. 29, 2008)); *see also Negron v. Vieques Air Link, Inc.*, ARB No. 2004-0021, ALJ No. 2003-AIR-00010, slip op. at 5 (ARB Dec. 30, 2004), *aff'd* No. 05-1278 (1st Cir. Mar. 7, 2006).

13

## DISCUSSION

SOX prohibits covered employers from discriminating against an employee who provides information or otherwise assists in an investigation regarding conduct "which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . ."[86] A SOX claim is governed by the burdens of proof set out in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21).[87]

To prevail, a SOX complainant must establish by a preponderance of the evidence that: (1) the complainant engaged in protected activity under SOX; (2) the respondent took an unfavorable personnel action against the complainant; and (3) the complainant's protected activity was a contributing factor in the unfavorable personnel action.[88] SOX-protected conduct is limited to the six specified categories of fraud or securities violations set out in the SOX statute.[89] Although "[a] complainant need not cite a specific code provision she believes was violated to engage in protected activity, [a complainant] nonetheless has to complain or provide information about conduct that she reasonably believes concerns one of the six specifically enumerated categories in the statute."[90]

Proof that a complainant has reported conduct that he or she reasonably believed constitutes a SOX violation includes both a subjective and objective component. That is, to establish their claim Complainants have the burden of showing both that: "(1) [they] subjectively believed that the conduct complained of constituted a violation of one of the laws listed in Section 806, and (2) a reasonable person of similar experience, training, and factual knowledge would objectively

---

[86]  18 U.S.C. § 1514A(b)(2)(A) (citing 49 U.S.C. § 42121(b)).

[87]  49 U.S.C. § 42121(b).

[88]  29 C.F.R. § 1980.109(a); *see also* 18 U.S.C. § 1514A(b)(2)(A); 49 U.S.C. § 42121 (b)(2)(B)(iii). If a complainant meets this burden of proof, the employer may avoid liability only if it proves its affirmative defense, which requires demonstrating by clear and convincing evidence that it would have taken the same adverse action against the complainant in the absence of any protected activity. 29 C.F.R. § 1980.109(b).

[89]  *Harvey v. Home Depot U.S.A.*, ARB Nos. 2004-0114, -0115, ALJ Nos. 2004-SOX-00020, -00036, slip op. at 14-15 (ARB June 2, 2006) ("To bring himself under the protection of the act, an employee's complaint must be directly related to the listed categories of fraud or securities violations.")

[90]  *Leviege*, ARB No. 2019-0058, slip op. at 4 (citing *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 n.6 (2d Cir. 2014) (other citations omitted)).

believe that a violation had occurred."[91] To demonstrate a reasonable belief that they engaged in protected activity, Complainants need not prove an actual violation of law,[92] but they "must do more than speculate, argue theoretical scenarios, or share mere beliefs that some corporate activity is wrong and may theoretically affect the corporation's financial statements and its shareholders."[93]

At the hearing before the ALJ, Complainants asserted that they engaged in activities protected by SOX when they reported that NYCB employees salvaged copper wire from 100 Duffy and distributed envelopes stuffed with cash.[94] After the record closed and during post-hearing briefing, Complainants first argued that the alleged "illegal salvage operation" was shrouded by the submission of "fictitious scope[s] of work," submissions designed to ensure that "this money-for-copper-scheme [remained] in secrecy."[95] On appeal, Complainants argue that the ALJ erred in considering their allegations too narrowly. Complainants now assert that both the April 3rd Bermeo/Curran conversation and the April 6th Schaefer/Wann email

---

[91]     *Id.* (citation omitted).

[92]     "[A]n employee's communication is protected where based on a reasonable, but mistaken, belief that the employer's conduct constitutes a violation of one of the six enumerated categories of law." *Sylvester v. Parexel Int'l, LLC*, ARB No. 2007-0123, ALJ Nos. 2007-SOX-00039, -00042, slip op. at 16 (ARB May 25, 2011); *see also Ronnie v. Office Depot, Inc.*, ARB No. 2019-0020, ALJ No. 2018-SOX-00006, slip op. at 5 (ARB Sept. 29, 2020) ("A complainant need not cite the code but nonetheless has to complain about conduct that he or she believes would reasonably fall under one of the enumerated categories.").

[93]     *Leviege*, ARB No. 2019-0058, slip op. at 4 (citing *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 355 (4th Cir. 2008)) (other citation omitted).

[94]     D. & O. at 21. More specifically, the ALJ had earlier described Complainants' allegations, in the June 30, 2020 Order Granting, In Part, and Denying, In Part, Respondent's Motion for Summary Decision at 7, as follows:

> Complainants' allegation of protected activity proceeds in three stages. First, Complainants opine that the copper wiring removed from 100 Duffy constitutes "other property" under section 1344. Second, the copper wiring was removed from 100 Duffy "by means of false or fraudulent . . . representations" because it was not specifically authorized and it caused significant damage. Finally, unidentified bank employees and/or vendors profited from this unauthorized removal as evidenced by the surreptitious exchange of cash envelopes. As a result, Respondent was deprived of the funds generated from the sale of the scrap copper wire and Respondent incurred the additional cost of repairing the damage when the scrap copper was removed. According to Complainants, this amounts to a violation of the bank fraud statute.

[95]     *Id.* at 26.

## SPA-15

15

constituted SOX-protected activity because both the conversation and the email incorporated reports of a systematic scheme to defraud NYCB. Specifically, Complainants contend that some NYCB employees were working with preferred vendors to rig bids on contracts in order for those vendors to salvage copper from NYCB's properties in exchange for cash kickbacks, all of which they assert constitutes bank fraud, contrary to the findings of the ALJ.[96]

After considering the parties' arguments and having reviewed the evidentiary record, we conclude that the ALJ's decision is supported by substantial evidence in the record and is legally sound. Complainants failed to meet their burden of demonstrating they had subjective beliefs or reasonable objective beliefs that their reports involved bank fraud and so constituted SOX-protected activity.

## 1. Complainants Lacked Good Faith Subjective Beliefs Related to Bank Fraud

Before the ALJ, Complainants bore the burden of establishing that they subjectively believed their reports related to conduct which constituted bank fraud, a violation of one of the laws listed in SOX,[97] and that they held their actual subjective beliefs in good faith.[98] Reporting conduct which one believes violates

---

[96]    Comp. Opening Br. at 1-2.  Specifically, Complainants now argue:

> Working in the unit responsible for real property renovations, Schaefer and Bermeo uncovered what appeared to be a coordinated scheme to strip copper, fuel, and anything else not tied down from building refurbishments. This scheme not only allowed vendors to steal bank materials for kickbacks to bank employees, but also fundamentally impacted the bid process by allowing vendors to bid projects at significantly above-market pricing. This double whammy cost NYCB twice over in increased payments to contractors and misappropriated assets, a portion of which were kicked back to NYCB employees. Further, Schaefer and Bermeo learned about and reported this scheme against the backdrop of Schaefer and Bermeo learning that the bid and contracting scheme was fundamentally flawed in allowing contractors to significantly overbid pricing both for construction and long-term maintenance contracts.

[97]    *Leviege*, ARB No. 2019-0058, slip op. at 4 (citations omitted).

[98]    *Johnson v. The Wellpoint Cos. Inc.*, ARB No. 2011-0035, ALJ No. 2010-SOX-00038, slip op. at 9-10 (ARB Feb. 25, 2013) (Decision and Order of Remand), *aff'd after subsequent orders,* No. 18-10038 (11th Cir. May 18, 2020); *see Bailey v. Koch Foods*, ARB No. 2010-0001, ALJ No. 2008-STA-00061, slip op. at 10 (ARB Sept. 30, 2011) (noting that a survey of cases shows "whether or not the term 'good faith' has been used, the whistleblower has been required to have actually held a belief that there were pertinent statutory violations at the

# SPA-16

16

internal business policies or evidences mismanagement, poor decision-making, or miscellaneous actions not in the best interests of an organization is insufficient to establish a SOX claim for bank fraud or any other fraudulent conduct.[99]

The record contains substantial evidence to support the ALJ's conclusion that Complainants failed to establish they subjectively believed that they were reporting bank fraud or any other fraudulent conduct when Bermeo had his April 3rd conversation with Curran or when Schaefer sent the April 6th email to Wann. As such, their engagement in these communications did not constitute protected activity under SOX.

The record lacks any persuasive evidence that Bermeo had a subjective belief that his April 3rd conversation with Curran constituted protected conduct under SOX. Bermeo reported to Curran only that: (1) the LAN room ceiling was damaged; (2) Grosso had coordinated the work on the ceiling; and (3) Newman told a joke about a hypothetical million dollar payment.[100] Although Bermeo's report to Curran suggested that the work in the LAN room might have been mismanaged or perhaps that some sort of wrongdoing occurred regarding the LAN room's deconstruction, Bermeo's statements to Curran lacked any allegation of fraudulent conduct. Bermeo did not mention any copper salvaging, a project scoping issue or bid rigging; he simply noted that the LAN room ceiling was significantly damaged and that Grosso

---

time he or she engaged in the activity subject to whistleblower protection.") (internal citations omitted).

[99] *Samaroo v. Bank of New York Mellon*, No. 21-CV-02441, 2021 WL 5910603, at *4 (S.D.N.Y. Oct. 5, 2021), *report and recommendation adopted*, No. 21 CIV. 2441, 2021 WL 5910408 (S.D.N.Y. Dec. 13, 2021), and *report and recommendation adopted*, No. 21 CIV. 2441, 2022 WL 4093171 (S.D.N.Y. Sept. 7, 2022), *aff'd*, No. 22-2041-CV, 2023 WL 3487061 (2d Cir. May 17, 2023) ("[Reporting] that various managers were poor managers and mismanaged projects . . . cannot form the basis for a SOX complaint."); *Andaya v. Atlas Air, Inc.*, No. 10 CV 7878, 2012 WL 1871511, at *5 (S.D.N.Y. Apr. 30, 2012) ("Complaints largely related to internal corporate policies concerning corporate waste, personnel matters, and relationships with vendors . . . are not the subjects courts have found covered by SOX."); *Harvey*, ARB Nos. 2004-0114, -0115, slip op. at 14 ("Providing information to management about questionable personnel actions, racially discriminatory practices, executive decisions or corporate expenditures with which the employee disagrees, or even possible violations of other federal laws such as the Fair Labor Standards Act or Family Medical Leave Act, standing alone, is not protected conduct under the SOX.").

[100] "Bermeo relayed to Curran the damage he observed to the ceiling, that the work done in the LAN room was coordinated by Grosso, and a joke Newman told. Contrary to Bermeo's claims, his conversation with Curran is bereft of any mention of bank fraud, fraud generally, or anything remotely within the realm of SOX. This conversation, as described by Bermeo, appears to merely be a discussion about potential wrongdoing or mismanagement by other NYCB employees." D. & O. at 23 (internal citations omitted).

appeared to be responsible for that result.[101] We agree with the ALJ that "[i]f Bermeo [had] actually believed fraud had occurred, it follow[ed] that he would have at least mentioned the missing copper wire which is the foundation of his allegation of bank fraud."[102] Bermeo failed to do so, and so failed to establish that he held an actual, good faith belief that the conduct he reported to Curran constituted bank fraud or any other SOX-protected conduct.

A review of the April 6th Schaefer/Wann email supports the same conclusion regarding Schaefer. Nothing in the April 6th email evidences that Schaefer subjectively believed NYCB employees were orchestrating bids with preferred vendors or otherwise submitting inflated project scope estimates in order to allow NYCB employees to salvage copper or receive cash kickbacks from vendors.[103] The April 6th email only includes Schaefer's report that: (1) Curran allegedly received an envelope of cash related to NYCB employees salvaging "abandoned copper cold water pipe" from the third-floor of the building at 100 Duffy and provided that cash to TMG; and (2) copper wire had allegedly been removed from the LAN room by unidentified individuals, not the contractor.[104] In the email, Schaefer never notes that he believes Curran or other NYCB employees are defrauding the bank or violating any law identified in SOX; he merely insinuates that they are salvaging copper for cash. Lacking any identified link to fraud of any sort, at most this evidence may establish that Schaefer subjectively believed the 100 Duffy renovation project was being mismanaged by Curran and/or Grosso and bank property was being wasted, none of which is sufficient to support his claim of SOX-protected activity.[105]

Interestingly, the argument Schaefer presented at hearing, which the ALJ correctly determined to be lacking in proof that Schaefer actually believed he was reporting bank fraud, is inconsistent with his current theory that some NYCB employees were conspiring with preferred vendors to rig contract bids in order to strip copper from NYCB's properties in exchange for cash kickbacks. Schaefer specifically states in the April 6th email that he only learned about the copper removal and cash payments "this past Monday" (April 3rd), which does not support

---

[101]    *Id.*

[102]    *Id.*

[103]    "The email fails to mention the potential for false scopes of work being submitted to cover-up an unauthorized removal and sale of copper wiring. Given the thoroughness of the April 6th email, it is curious that Schaefer neglected to mention SOX or bank fraud." *Id.* at 21. The ALJ concluded "the April 6 email does not contain any information that a reasonable person would interpret as a whistleblower report." *Id.* at 22 n.13.

[104]    *Id.* at 14.

[105]    *See Samaroo*, No. 21-CV-02441, 2021 WL 5910603, at *4; *Harvey*, ARB Nos. 2004-0114, -0115, slip op. at 14-15.

## SPA-18

18

his current argument that his April 6th report somehow communicated a link to bid rigging, which Schaefer allegedly was told about by Fernandez over a year earlier in April 2016.[106] If Schaefer legitimately held a subjective belief that the 2016 bid rigging rumor and the 2017 copper removal and cash payments were related and constituted a scheme to defraud NYCB, it is reasonable to expect that he would have made that clear in his April 6th email to Wann. Instead, the April 6th email makes no mention of a bid-rigging-for-copper-or-cash scheme, nor does it contain any reference or linkage to whistleblowing, SOX, or bank fraud. It was not until one month later, and two days after his termination, that Schaefer first alleged that he had reported "a fraudulent scheme."[107] Schaefer's raising an allegation of fraud post-termination is insufficient to establish that he held, and reported, an actual, good faith subjective belief regarding fraud a month earlier and prior to his termination. All told, substantial evidence in the record supports the ALJ's conclusion that Schaefer failed to establish that he held a good faith belief that he had reported bank fraud to Wann when he sent the April 6th email.

Considered altogether, Complainants' reports to NYCB officials failed to mention or reference bank fraud or to suggest how an alleged bid-rigging and copper-salvaging-for-cash kickback arrangement involving Curran and unnamed NYCB employees constituted bank fraud. Rather than reporting their alleged scheme, or reporting any other type of SOX violation, Complainants merely reported questionable wrongdoing and potential mismanagement of the project at 100 Duffy, all unrelated to the bank fraud statute or any of SOX's other predicate offenses.[108] Such "[g]eneral assertions of wrongdoing untethered from [the SOX] enumerated categories" do not constitute protected activity.[109] Thus, the record sufficiently supports the ALJ's conclusion that, at the time of their reports on April 3rd and April 6th, Complainants did not subjectively believe they were reporting a violation of any of the enumerated provisions in Section 1514A.

---

[106]     *Id.* at 6.

[107]     *Id.* at 22.

[108]     *See Harvey*, ARB Nos. 2004-0114, -0115, slip op. at 14 ("Providing information to management about questionable personnel actions, racially discriminatory practices, executive decisions or corporate expenditures with which the employee disagrees, or even possible violations of other federal laws such as the Fair Labor Standards Act or Family Medical Leave Act, standing alone, is not protected conduct under the SOX.").

[109]     *Leviege,* ARB No. 2019-0058, slip op. at 4 (citing *Welch v. Chao*, 536 F.3d 269, 277 (4th Cir. 2008), *cert. denied*, 556 U.S. 1181 (2009); *Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir. 2009); *Reilly v. GlaxoSmithKline, LLC*, No. 19-2897, 2020 WL 4013118, at *3-4 (3d Cir. 2020)).

19

## 2. Complainants Lacked Objectively Reasonable Beliefs Related to Bank Fraud

Even if Complainants had established that they each held a good faith subjective belief that they had reported bank fraud or even a SOX violation more generally, their claims would still fail because neither Complainant satisfied their burden of establishing that their beliefs were objectively reasonable. Notwithstanding Complainant's insistence, testified to by Bermeo, that "[t]heft is fraud . . . [s]tealing is fraud . . . ,"[110] substantial evidence in the record supports the ALJ's conclusion that Complainants' reports to Curran and Wann were not based on objectively reasonable beliefs regarding bank fraud or any other conduct protected under SOX.[111]

In concluding that neither Bermeo's April 3rd conversation with Curran nor Schaefer's April 6th email to Wann constituted an objectively reasonable report of bank fraud within SOX's scope, the ALJ correctly differentiated between a report of "theft"[112] from a bank and a report of bank fraud. The bank fraud statute, 18 U.S.C. § 1344, does not prohibit theft from a bank[113] but instead prohibits "fraud" being perpetrated against a bank. Section 1344 specifically defines bank fraud as:

> [K]nowingly execut[ing], or attempt[ing] to execute, **a scheme or artifice—**
> (1) **to defraud** a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, **by means of false or fraudulent pretenses, representations, or**

---

[110]    D. & O. at 24 (citation omitted).

[111]    Although the April 3rd Bermeo/Curran conversation and the April 6th Schaefer/Wann email do not constitute protected activity because these reports are not consistent with any of the enumerated statutory and regulatory provisions in Section 1514A, the Board does not reach or consider the issue of whether their reports may have evidenced violations of other federal or state statutes such as theft, misappropriation or embezzlement.

[112]    Theft is "[t]he wrongful taking and removing of another's personal property with the intent of depriving the true owner of it; larceny[.]" *Theft*, *Black's Law Dictionary* (11th ed. 2019). Under the common law, "fraud" is not "theft" but is instead "a knowing misrepresentation . . . of a material fact made to induce another to act to his or her detriment." *Fraud*, *Black's Law Dictionary* (11th ed. 2019).

[113]    *See* 18 U.S.C. § 2113 (a) (defining the crime of "bank robbery and incidental related crimes" in reference to the taking of bank property "by force and violence, or by intimidation . . . [or] by extortion . . . .").

## SPA-20

20

**promises**[.]"[114]

For conduct to be considered "bank fraud" under § 1344:

> [I]t is not enough that a fraudster scheme to obtain money from a bank and that he make a false statement. The provision as well includes a relational component: The criminal must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation.['] That phrase typically indicates that the given result (the 'end') is achieved, at least in part, through the specified action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental.[115]

"[T]he conduct that § 1344(2) seeks to regulate, and its focus, is a scheme to obtain property owned or controlled by a bank under false or fraudulent pretenses."[116] As such, to constitute bank fraud under 18 U.S.C. § 1344, it is not enough to simply report the removal of something of value from a bank's property—the report must involve the removal of property "by means of false or fraudulent pretenses, representations or promises."[117] "Put another way, larceny is not the same as fraud."[118]

On appeal, Complainants assert that they met the requirements to establish bank fraud because their reports revealed a scheme by NYCB employees to secure preferred vendors on construction-related contracts in order to receive cash kickbacks from those vendors, all to the detriment of NYCB and its shareholders.[119] In essence, Complainants allege that: (1) the bank's construction contracts resulted from bid-rigging or project scope inflation; (2) the vendors or NYCB employees stripped copper out of NYCB's properties without permission, thereby removing value without compensation to the bank; and (3) the cash payments back to employees were provided as consideration for the employees' involvement in, and presumably their silence about, the bid-rigging. These allegations not only lack sufficient factual support in the record, they are legally insufficient to establish that

---

[114]    18 U.S.C. § 1344 (emphasis added).

[115]    *Loughrin v. United States*, 573 U.S. 351, 362-63 (2014) (citations omitted).

[116]    *Bascuñán v. Elsaca*, 927 F.3d 108, 124 (2d Cir. 2019).

[117]    18 U.S.C. § 1344.

[118]    *Dietz v. Cypress Semiconductor Corp.*, ARB No. 2015-0017, ALJ No. 2014-SOX-00002, slip op. at 10 (ARB Mar. 30, 2016), *vacated*, 711 Fed. Appx. 478 (10th Cir. 2017).

[119]    Comp. Opening Br. at 19.

## SPA-21

21

it was objectively reasonable for persons with Complainants' knowledge, skills, education, and experience to believe that such acts were not merely unlawful in some unspecified or general way but rose to a specific violation of 18 U.S.C. § 1344. As such, the ALJ correctly concluded that the Complainants failed to meet their burden of proof under SOX, for the reasons set forth below.

First, the scheme Complainants allege they sought to reveal, at most, would have been an arrangement between NYCB employees and vendors whereby vendors grossly inflated their bids on contract proposals, had their bids accepted by and executed contracts with the bank, did the work and were paid what the contracts required, and then surreptitiously and unlawfully kicked back some part of the payments they had received to bank employees in cash. No credible evidence establishes such an arrangement took place in this instance. To the contrary, the facts in the record establish only that a vendor, Apptel, bid a certain amount on a contract proposal, was awarded the contract at that amount, and then did the work and was paid for it. The ALJ specifically found that Apptel's owner, Chludzinski, was a credible witness.[120] Chludzinski denied having any involvement in the removal of copper from 100 Duffy other than what fit in one dumpster and was valued at $1,179.60, all as allowed by the relevant contract. The record showed that if any other copper was salvaged from 100 Duffy it was recovered by NYCB employees, not by employees of Apptel or any other vendor. What the record does not show is any link between the Apptel contract and the unsupported allegations of bid-rigging or cash kickbacks. Even examining the record beyond the Apptel contract, the ALJ correctly concluded that Complainants failed to establish it was objectively reasonable to believe that there was a scheme involving bid-rigging by vendors or employees which led to copper salvaging and cash kickbacks associated with the LAN room or 100 Duffy more broadly, which was the sole context for Complainants' alleged protected activity in this matter. Therefore, Complainants' reports of damage to the LAN room ceiling and rumors about copper salvaging on the third floor of 100 Duffy did not constitute reports of bank fraud and do not satisfy the requirements for SOX protection.[121]

Second, the Complainants provided no evidence that Apptel's bid, or the bid of any other vendor associated with 100 Duffy, was based on a "false or fraudulent representation or promise" intended to and resulting in a loss of property to the

---

[120]    D. & O. at 19.

[121]    *See e.g., Leckner v. Gen. Dynamics Info. Tech., Inc.*, ARB No. 2020-0028, ALJ No. 2019-SOX-00028, slip op. at 7 (ARB Oct. 22, 2020), *aff'd*, No. 21-70284, 2021 WL 4843881 (9th Cir. Oct. 18, 2021), *cert. denied*, 142 S.Ct. 2872 (2022), *reh'g denied*, 143 S.Ct. 63 (2022) (explaining that the ALJ properly dismissed the claim because there was no evidence that complainant had an objectively reasonable belief that "Respondent violated any SEC rule or regulation or otherwise engaged in securities fraud when he communicated his concerns about computer software.").

# SPA-22

22

bank. The record does contain a reference to an event that allegedly occurred nearly one year prior involving a submitted bid on a different contract that was alleged to be grossly greater than that of the vendor eventually awarded the contract, all of which related to a different property. The fact that different vendors bid different amounts in an independent instance is completely unrelated to the Complainants' involvement in the April 3rd Bermeo/Curran conversation or the April 6th Schaefer/Wann email related to the LAN room, which is the only conduct in which they engaged for which they claim SOX protection.

Last, Complainants argue that their reports of "envelopes full of cash" was sufficient to establish the objective reasonableness of their beliefs that bank fraud had occurred. The only evidentiary support in the record for this assertion is Complainants' testimony that they were told about NYCB employees receiving cash envelopes, and their newly articulated suspicions that the cash was payback for employees' support of bid-rigging, none of which provides a link to "some form of trickery, of deception, [or of] a 'knowing misrepresentation or concealment of a material fact.'"[122] Given the ALJ's findings regarding Complainants' doubtful credibility, the record wholly lacks persuasive evidence in support of these alleged suspicions.[123] In addition, Complainants' blanket statement that the reported conduct has the potential for exposing the company to financial risk is insufficient to support a shareholder fraud claim under 18 U.S.C. § 1514A.[124]

Nor could Complainants' allegations, even if they had been credibly established, constitute evidence that NYCB had been defrauded "by means of false or fraudulent pretenses, representations, or promises[.]"[125] Complainants failed to establish sufficient facts to support their allegation that NYCB's employees or vendors made false representations to NYCB to induce it to part with valuable copper. Specifically, they failed to establish any "means" (the scheme) by which the NYCB employees and/or vendors achieved the alleged "end" (the award of contracts and/or the payment of cash kickbacks). The only false representations alleged were those of unidentified vendors, accused of grossly overbidding unspecified contract proposals. Complainants are seasoned managers familiar with construction bidding practices and fiscal controls specific to a regulated bank like NYCB, and held

---

[122]   *Dietz*, ARB No. 2015-0017, slip op. at 9.

[123]   The ALJ found that Schaefer was not a credible witness; he found Bermeo's testimony "less than enlightening" and afforded it little weight. D. & O. at 17-19.

[124]   "Other cases where § 1514A claims predicated on shareholder fraud have survived dismissal have included stronger claims regarding either the importance of the challenged conduct to the defendant employer's business or the complicity of the employer in unlawful conduct." *Nielsen*, 762 F.3d at 223 (the court found that the complainant's conclusory statement that another employee's failure to properly review fire safety designs constituted shareholder fraud was "simply too tenuous" to be considered fraud against shareholders).

[125]   18 U.S.C. § 1344 (emphasis added).

defined authority within the NYCB contract approval process for years.[126] Despite their protestations to the contrary, the record does not support a conclusion that a reasonable person in their same factual circumstances and with their same training and experience would have objectively believed that a SOX-protected violation had occurred.

Faced with their lack of evidentiary support to establish a violation of any of the six SOX-protected categories, Complainants argue that their reports exposed a scheme which violated NYCB's internal policy defining "theft of and individual profiting from Bank property as fraud."[127] Whether the reported activity did or did not violate NYCB policy is not the determinative inquiry,[128] nor are the Complainants' beliefs that theft is inherently fraudulent determinative of whether their beliefs were objectively reasonable.[129] Complainants' reports of an alleged scheme to steal copper wire does not rise to a SOX violation because theft of physical property from a bank does not constitute bank fraud or other protected conduct under SOX and, at the time of their reports, neither Complainant reasonably believed that it did.

The ALJ determined that the Complainants did not establish that their April 3 and April 6 reports were within the purview of SOX's whistleblower protections. We conclude that this determination is supported by substantial evidence in the record, well-reasoned, and legally correct. Therefore, we affirm the ALJ's finding that the Complainants did not establish by a preponderance of the evidence that they engaged in protected activity under SOX.

---

[126]    D. & O. at 5.

[127]    D. & O. at 22 n.13.

[128]    *See La Belle v. Barclays Cap. Inc.*, No. 19-CV-3800, 2023 WL 2631968, at *13 (S.D.N.Y. Mar. 24, 2023) (differentiating internal policies from legal requirements imposed externally and noting "[w]here plaintiffs complain of violations of internal policies — even where the alleged behavior would be clearly wrongful — courts typically decline to find protection under Section 806."); *Miller v. Stifel, Nicolaus & Co.*, 812 F. Supp. 2d 975, 988 (D. Minn. 2011) (noting "complaints about alleged violations of internal company policies are not protected activities under SOX.") (citing *Wiest v. Lynch*, No. 10-3288, 2011 WL 2923860, at *9 (E.D. Pa. July 21, 2011) (quoting *Marshall v. Northrup Gruman Synoptics*, ALJ No. 2005-SOX-0008, 2005 WL 4889013, at *3-4 (ALJ June 22, 2005)).

[129]    D. & O. at 24 (citation omitted).

SPA-24

24

### CONCLUSION

Accordingly, we **AFFIRM** the ALJ's Decision and Order Denying Complaints.[130]

**SO ORDERED.**

**TAMMY L. PUST**
**Administrative Appeals Judge**

**IVEY S. WARREN**
**Administrative Appeals Judge**

**NED I. MILTENBERG**
**Administrative Appeals Judge**

---

[130]     In any appeal of this Decision and Order, the appropriately named party is the Secretary, Department of Labor, not the Administrative Review Board.

# SPA-25

## CERTIFICATE OF SERVICE

ARB-2022-0050 Gene Schaefer and Luis Bermeo v. New York Community Bancorp, Inc. (Case No: 2018-SOX-00048, 2018-SOX-00051)

I certify that the parties below were served this day.

_06/22/2023_
(DATE)

Thomas O. Shepherd, Jr., Esq.
Clerk of the Appellate Boards

Ashley Brook Burkett
601 Massachusetts Ave., NW
Washington, DC 20001
--Electronic

Assistant Secretary, Occupational Safety and Health
Administration
Occupational Safety and Health Administration -
Room: S2315
200 Constitution Avenue
Washington, DC 20210

Brian Auricchio
250 West 55th Street
New York, NY 10019

David Saxe
909 Third Avenue
27th Floor
New York, NY 10022
--Electronic

Gayle Pollack
909 Third Avenue
27th Floor
New York, NY 10022
--Electronic

Gene Schaefer
959 Ripley Lane
Oyster Bay, NY 11771
--*Certified*

Kathleen Reilly
250 West 55th Street
New York, NY 10019
--Electronic

Luis Bermeo
29268 Bouris Drive
Menifee, CA 92584
--*Certified*

Michael Schissel , Esq.
250 West 55th Street
New York, NY 10019
--*Certified*

Patrick Johnson
9118 Third Avenue
Brooklyn, NY 11209
--Electronic

Directorate of Enforcement Programs
U.S. Department of Labor, OSHA
Room N-4618, FPB
200 Constitution Ave., N.W.
Washington, DC 20210

Hon. Stephen R. Henley
Chief Administrative Law Judge
Office of the Administrative Law Judges
800 K Street, N.W., Suite 400
Washington, DC 20001-8002

# SPA-26

Office of the Solicitor, Division of Fair Labor
Standards
200 Constitution Ave, NW
Room N-2716
Washington, DC 20210
    --Electronic

UNITED STATES DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES
BOSTON, MASSACHUSETTS

**Issue Date: 29 June 2022**

CASE NOS.:  2018-SOX-00048; 2018-SOX-00051

––––––––––––––––––

*In the Matters of:*

GENE SCHAEFER,
LUIS BERMEO,
*Complainants*,

*v.*

NEW YORK COMMUNITY BANCORP, INC.,
*Respondent*.

––––––––––––––––––

Before:         Timothy J. McGrath
                Administrative Law Judge

Appearances:

Patrick Johnson and Robert Johnson, The Johnson Law Office, P.C., Brooklyn, New York, *Counsel for Complainants*

Michael Schissel, Kathleen Reilly, and Brian Auricchio, Arnold & Porter Kaye Scholer LLP, New York, New York, *Counsel for Respondent*

## DECISION AND ORDER DENYING COMPLAINTS

      The matters before me arise from complaints of discrimination filed under section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of The Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX") and the procedural regulations found at 29 C.F.R. Part 1980.  Gene Schaefer ("Schaefer") and Luis Bermeo ("Bermeo") (collectively, "Complainants") each filed a complaint alleging New York Community Bank ("Respondent" or "NYCB") took adverse employment actions against them because they acted as whistleblowers.

      The hearing was conducted virtually via the Microsoft Teams Meeting platform beginning on December 7, 2020, and concluding on January 15, 2021.  Over the course of those ten days, I heard the testimony of 13 witnesses.  On January 28, 2021, the parties gave their respective closing statements.  Post-hearing the parties each submitted an initial brief ("Compl. Initial" and "Resp't Initial") and a rebuttal brief ("Compl. Rebuttal" and "Resp't Rebuttal").

# SPA-28

At hearing, the following exhibits were admitted into evidence: Trial Exhibits A-J; Joint Exhibits ("JX") 1-6, 8-61, 69-83, 85, 88-97, 101-04, 106, 108-10; Complainants' Exhibits ("CX") 1-5, 7-10, 12-13, 17-19, 22-28, 31-33, 37-41, 44, 67-69, 77-78; and Respondent's Exhibits ("RX") 3-5, 7, 10, 19-20, 23-27, 30, 32, 34-35, 168, 198, 202-04, 206-11, 213, 216-18, 224-26, 229, 234, 266-70. *See generally* Hearing Transcript ("TR").[1]

## I. Stipulations

The parties entered into the following stipulations, as outlined in the Joint Prehearing Statement:

(1) The Corporate Real Estate Services ("CRES") Unit is a department within NYCB responsible for managing and maintaining Bank properties, including corporate offices and bank branches, in five states: New York, New Jersey, Ohio, Florida, and Arizona;

(2) CRES was reorganized in September 2016;

(3) William Curran ("Curran") was hired by NYCB in February 2016 as the Chief CRES Officer;

(4) Gene Schaefer was initially employed by NYCB from 1986 to 2004;

(5) Schaefer was re-hired by NYCB in December 2014 as Coordination Manager for the CRES East and Corporate Support departments. In 2016, Gene Schaefer's title became CRES Budget Coordination Manager;

(6) Upon Curran's hiring, he became Schaefer's immediate supervisor;

(7) Schaefer's job description for his role as CRES Budget Coordination Manager, JX 3, sets forth a job summary and his essential functions;

(8) Schaefer's 2015 and 2016 employee evaluations are JX 4 and JX 5, respectively;

(9) Luis Bermeo was hired by NYCB in 1998;

(10) Bermeo became the Director of Construction and Project Management for CRES East in 2016;

(11) Upon Curran's hiring, he became Bermeo's immediate supervisor;

(12) Bermeo's job description for his role as Director of Construction and Project Management, JX 7, sets forth a job summary and his essential functions;

(13) Bermeo's 2015 and 2016 performance evaluations are JX 10 and JX 11, respectively;

---

[1] The record in this case is hybrid, consisting of both paper and electronic filings. All filings received after May 13, 2020, are electronic.

# SPA-29

(14)   In 2016, NYCB purchased a building at 100 Duffy Avenue, Hicksville, New York ("100 Duffy");

(15)   The Martin Group ("TMG") was hired by NYCB in 2016 as the general contractor for the renovation of 100 Duffy;

(16)   Robert Wann ("Wann") is the Chief Operating Officer of NYCB;

(17)   Schaefer sent an email to Wann on April 3, 2017;

(18)   Schaefer sent an email to Wann on April 6, 2017;

(19)   Wann responded to Schaefer's April 6, 2017 email;

(20)   Joyce Larson was NYCB's Chief Audit Executive in 2017;

(21)   NYCB's Internal Audit Department conducted an audit of the CRES Unit as of February 28, 2017, and sent an announcement letter regarding the audit on March 1, 2017, which is JX 54. A draft audit report was circulated on May 1, 2017, which is JX 57. A final audit report was issued on June 16, 2017, which is JX 59;

(22)   Schaefer's employment with NYCB was terminated on May 3, 2017. His termination notice is JX 60;

(23)   Bermeo's employment with NYCB was terminated on May 3, 2017. His termination notice is JX 61;

(24)   Curran's employment with NYCB was terminated on May 3, 2017;

(25)   Schaefer filed a whistleblower claim pursuant to 18 U.S.C. § 1514A ("SOX") with the US DOL/OSHA on June 29, 2017;

(26)   Bermeo filed a whistleblower claim pursuant to SOX with the US DOL/OSHA on July 14, 2017.

Trial Exh. A.  I find these stipulations to be supported by the record and adopt them as part of my findings.

## II.  Relevant Facts[2]

### A.  Background

NYCB is a publicly traded financial institution headquartered in Westbury, New York with about 225 branches in New York, New Jersey, Ohio, Florida, and Arizona.

Gene Schaefer began working at NYCB in 1986 as a clerk in the insurance department. TR 347.  Schaefer's grandfather, an officer of the bank at that time, was instrumental in getting him this position.  TR 761.  In the early 1990s, Schaefer ran the insurance department before moving to products and services, and then to marketing.  TR 347.  Schaefer eventually became senior vice president, director of business development where he oversaw "products and services development of our offers to customers."  TR 348.  Schaefer accepted a severance package and left the bank in 2004 after it merged with Roslyn Savings Bank. *Id.*; TR 761.

Schaefer returned to NYCB in 2010 as a consultant on a six-month contract.  TR 348. NYCB's Chief Operating Officer, Robert Wann found him this position at the direction of the Chief Executive Officer Joseph Ficalora ("Ficalora"), a close friend and former coworker of Schaefer's grandfather. TR 764, 2414-15.

Schaefer's previous two stints with NYCB were not without controversy.  Throughout his time with NYCB, he often clashed with colleagues and management.  His decision to leave the bank and take a severance package in 2004 was influenced by the substantial increase in workload that would come with the merger and disagreements with his future boss.  TR 762-63.  In 2010, Schaefer's six-month consultant contract was not renewed due to his apparent lack of interpersonal skills. TR 2415.  According to Wann, employees in retail and investment sales told him: "If Mr. Schaefer continue[s] to be here, we['ll] have a major problem, okay? We are not going to do [the] thing[s] Mr. Schaefer [is] telling us."  TR 2415-16 (internal quotation marks omitted).  Schaefer was then removed from that department and sent to assist newly acquired banks in Cleveland, Ohio.  TR 2416.  A few days later, Wann received a phone call from the Ohio office during which employees threatened to quit if Schaefer remained.  *Id.*  After discussion with Ficalora, the decision was made to let Schaefer's consultant contract expire.  TR 2417.

In 2014, after experiencing some financial difficulties, Schaefer once again reached out to Ficalora for a job.  TR 765.  Wann, at the direction of Ficalora, TR 2417, offered Schaefer a position of coordination manager for Corporate Real Estate Services (CRES)-East, which managed and maintained NYCB's properties.  TR 765.  Because Schaefer did not have any previous experience in real estate, Wann instructed him to "[o]bserve, learn, take no action, say nothing,

---

[2] In *Austin v. BNSF Ry. Co.*, ARB No. 17-024, ALJ No. 2016-FRS-13, slip op. at 2 n.3 (ARB Mar. 11, 2019) (per curiam), the Administrative Review Board ("ARB") noted that an administrative law judge ("ALJ") need not include a summary of the entire record in the Decision and Order, as it is assumed that the ALJ reviewed and considered the entire record in making his or her decision.  The ARB stated that what is more helpful for its review of whether the ALJ's findings of fact are supported by substantial evidence of record is a tightly focused set of findings of fact. Accordingly, in this Decision and Order I focus specifically on findings of fact pertinent to the issues in dispute and those facts relevant to my analysis.  I have, however, reviewed and considered the entire record in rendering this decision.  *See Vincent ex rel Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (stating ALJ "need not discuss all evidence presented" and only must explain why "significant probative evidence has been rejected.").

unless you've got something real." TR 352-53, 766; CX 1. Schaefer understood this to mean that Wann did not want him "to make any observations, either positive or negative, to anyone but him." TR 353.

In early 2016, Schaefer was named CRES budget coordination manager, a senior vice president level position. Schaefer reported directly to the Chief CRES Officer, William Curran. Curran was hired in February 2016. Schaefer's position change seems to have occurred concurrently with the hiring of Curran. In this role, Schaefer was tasked with reviewing budget expenditures, monitoring budgetary guidelines, and preparing budget performance reports among other functions. JX 3. He explained that his job description was written to give him "as much access as possible to be involved in all areas of CRES" and ensure tasks were being completed efficiently. TR 384.

Luis Bermeo began working for NYCB in 1998 as a maintenance specialist for CRES-East. TR 48-49; *see* JX 36. Over the years, Bermeo consistently moved up the ranks culminating in being named the CRES director of construction and project management in September 2016. TR 50, 94. As the director of construction, he reported to Curran. *Id.*

Prior to being named director of construction, Bermeo was the acting director of CRES-East. Wann testified that he considered making this role permanent but was ultimately dissuaded by personnel problems involving Bermeo. TR 2305. The specific details are not relevant except that Bermeo allegedly spread rumors about two other CRES employees. Bermeo was given a written warning and counseled by human resources for violating NYCB's sexual harassment policy and code of professional conduct. *See* JX 92. According to Wann, this conduct made Bermeo unfit for the director role, leading to the hiring of Curran.

Bermeo was issued a written warning on one other occasion. According to the February 2014 disciplinary notice, Bermeo deposited "significant amounts of cash" into NYCB accounts over the course of several years. JX 12. "When questioned by Security about these deposits, Mr. Bermeo's answers were inconsistent and the documentation he did provide failed to contain a rational explanation for such large cash deposits at NYCB." *Id.* At hearing, Bermeo explained that the cash he deposited was given to him by friends and family to help with his son's medical treatment in California that he undergoes every summer. TR 81.

### B. Events Preceding April 2017

Prior to the events giving rise to this action, there were several incidents that informed Complainants' reporting in April 2017. Each will be addressed in chronological order.

In April 2016, the parking lot of an NYCB property located at 615 Merrick Avenue, Westbury, New York was refurbished. TR 397-98. Prior to the contract bid opening meeting, Schaefer met with Curran to discuss the current blind bidding procedure. Schaefer explained that he believed the bidding process was compromised resulting in "extremely excessive" pricing. TR 398. Based on Schaefer's concerns, Curran asked CRES-East's lead project manager, Freddy Fernandez ("Fernandez") to request a specialty vendor to submit a sealed bid for the 615 Merrick Avenue project. TR 399. No one else was informed of this additional sealed bid. TR 399-400.

The bid opening meeting was held sometime thereafter. Present at the meeting were Schaefer, Bermeo, Curran, Fernandez, project manager Richard Grosso ("Grosso"), CRES director of facilities, Fred Whittaker ("Whittaker"), and Marquita Guerra[3]. Toward the end of the meeting, Curran announced an additional sealed bid was procured "to see if it's in line with everything else that's been submitted so far." TR 401. The additional sealed bid was for $2.6 million, which was "half [the amount] of the lowest bid" opened previously. *Id.* According to Schaefer, when this bid was opened, Grosso was "irate" and stated that the bid had already been awarded to a vendor called JVS Construction. *Id.* The JVS Construction bid totaled $5.8 million. TR 402. Ultimately, despite Grosso's apparent proclamation that the bid had already been awarded, Wann decided to go with the lowest bid to complete the project. TR 405-06.

At the end of that meeting, an argument started between Grosso and Fernandez. TR 403. Grosso allegedly directed "chicken sounds" and profanity toward Fernandez. *Id.* Grosso described Fernandez as the aggressor stating Fernandez "had a little outburst and I kind of laughed at it." TR 2121. As to not involve himself in this argument, Schaefer returned to his office.

About an hour after this meeting, Fernandez came to Schaefer's office with Bermeo to explain why he was arguing with Grosso. TR 407. Fernandez told Schaefer and Bermeo that while he was working for Adventis Construction on the 102 Duffy[4] project, Grosso "ran a scheme to take all the copper wiring, copper piping, anything that wasn't nailed down from 102 Duffy, using the abatement project as cover." TR 407-08; *see* TR 1124-25 (Edgar Hernandez, an NYCB project manager, confirming this story as told to him by Fernandez). This "scheme" allegedly took place in 2013 and consisted of Grosso coordinating the siphoning of oil from two fuel tanks and the sale of scrap metal. TR 1435, 1438-40. NYCB later conducted an investigation of this incident and determined an Adventis employee, not Grosso, was responsible for the siphoning of oil. TR 1435; *see* TR 2109-10 (Grosso denying involvement in the removal of oil from 102 Duffy). Schaefer and Bermeo were not aware of this investigation.

Finally, about a month prior to the operative events, Schaefer testified he became aware of the dissemination of envelopes of cash among other NYCB employees. According to Schaefer, in March 2017, he was told a story by another NYCB employee, Rosario Levy. Levy was supposedly told by Yesenia Baez, Grosso's executive assistant, that she was left an envelope containing $5,000 intended for Grosso. TR 395; *see* TR 1133-34. Schaefer claimed he told Levy to tell Baez to come speak directly with him about the incident. TR 395-96. Rather than speak with Schaefer, Baez allegedly quit because she "was afraid to talk to anyone." TR 396, 406-07; *see* TR 1136-37. Baez, however, left NYCB in June 2016, nine months prior to when Schaefer claimed to have learned of the envelope of cash. TR 639-40, 2042.

**C. 100 Duffy Project**

In May 2016, NYCB purchased 100 Duffy, a five-story, 267,000 square-foot building located in Hicksville, New York. Stipulations ¶ 15; TR 282. The Martin Group (TMG) was hired to complete the renovation of 100 Duffy, which had a budget of about $8 million. Stipulations ¶

---

[3] Ms. Guerra worked in the contract administration group.
[4] 102 Duffy is a building adjacent to 100 Duffy, the building at issue in the present case.

15; TR 356. Inside the basement of this building is the telecommunications room, often referred to as the LAN room or telco room, which is an approximately 150-by-30 foot room used to store servers and other computer equipment for the bank. TR 1110.

The LAN room had a dropped ceiling consisting of metal gridwork filled in with two-by-four ceiling tiles. TR 289-90, 1410. When NYCB first purchased the building in May 2016, Bermeo conducted a walk-through where he looked into the ceiling and saw "tons of wires" above the ceiling. TR 281. On cross-examination, he admitted that he did not take down all of the tiles. *Id.* While Schaefer had been inside 100 Duffy multiple times since its purchase, he had never been in the LAN room prior to April 2017. TR 622.

### D. The LAN Room Purchase Order

NYCB's IT department requested several cabinets and racks containing wire be removed from the LAN room. RX 3. On September 6, 2016, Apptel, a telecommunications repair and installation company owned by Michael Chludzinski ("Chludzinski"), submitted a proposal to NYCB for work to be done in the LAN room. RX 202. Chludzinski generated this proposal following a walk-through of the LAN room with Grosso. TR 2114. Grosso opened about six ceiling tiles at that time and saw low-voltage data wire. *Id.* According to Grosso, "most of the wire [in the LAN room] is run below the ceiling." TR 2116. When Chludzinski removed the ceiling tiles and looked using a flashlight he saw "some loose cabling" but it "wasn't a whole lot." TR 696. He also inspected underneath the floor where he observed "mostly dirt and paperclips and cigarette butts" but not a whole lot" of wire or cable. TR 697.

Apptel's proposal called for the removal of all unused or obsolete equipment and cabling from the LAN room. It also required NYCB to remove any material it wanted to keep and to take down the ceiling tiles before project commencement. *Id.* On September 22, 2016, NYCB project manager Richard Grosso generated a purchase order totaling $9,400.00 based on Apptel's proposal. RX 202. The description of the project reads in its entirety:

> Remove Any & All Unused Or Obsolete Equipment &
> Cabling From The Level B Telco Room.
> Requires Removal of Any Materials The Client
> Wishes To Keep, Along With The Removal Of All Ceiling
> Tiles Before The Project Can Commence.
> A Space For The Roll Of (sic) Dumpster Is Required Directly
> Near The Freight Location.

*Id.* (capitalization in original); *see* TR 2116 ("[I]n the ceiling, there wasn't much. Below the ceiling on the ladder rack, there was fine, low-voltage wire that was removed by the vendor. In his scope of work, everything is all dictated to him to remove it and get rid of it and clean."). This purchase order was approved and signed by Grosso, Bermeo, Schaefer, and Curran on September 27, 2016. *Id.*

The project commenced sometime in the fall of 2016. *See* TR 623. The work in the LAN room required three workers and 110 man-hours. TR 702. When the job began, the ceiling tiles

had been removed as per the purchase order. TR 700-02. The Apptel crew removed 25-pair cables which are used "to attach to different devices," and single-pair and three-pair wire from the telecommunications rack, which "is the connection point between the vendors, like Verizon . . ., and the customer's equipment." TR 703. Chludzinski explained that the "bulk of the cable that went in the garbage bags" for disposal was "thousands of feet" of these several types of fine low-voltage wire. TR 705.

Chludzinski stated he ordered one dumpster[5] "because that's what [he] thought . . . would be enough for the entire job." TR 712. If there had been tons of wire, he explained, "many dumpsters" would have been required. *Id.* Once the dumpster was filled with material, the recycling company takes it away to weigh the contents and "tell you how much it was worth." TR 731. Typically, the proceeds from any scrap metal are distributed among the on-site workers. However, the proceeds from this job, totaling $1,179.60, were given to "Joe," a former Apptel worker who was out on disability at the time. Chludzinski testified that Joe "could really use some money" and the other workers agreed. TR 708, 735, Trial Exh. C.

**E. Change Order 16**

Sometime prior to March 15, 2017, Grosso approved a request for information and scope of work that would eventually become Change Order ("CO") 16. TR 2107; JX 40. The change order submitted by TMG called for the "[r]epair [of the] existing 2x4 ceiling grid" and installation of new ceiling tiles in the LAN room. *Id.* The project as proposed by TMG totaled $40,300.05. *Id.*

I will briefly interject with a word about the change order process at NYCB. That process was described by numerous witnesses all possessing a slightly different understanding. Even Schaefer and Bermeo were at times inconsistent in their descriptions of the approval process. From the testimony, I can glean that a request for information is generated and sent out to contractors. In response, contractors submit proposals, which include a scope of work and the projected cost. That proposal is reviewed by Grosso who can accept or deny the change order. If accepted, the change order is sent to Bermeo then Schaefer and finally Curran for their approval. If Bermeo or Schaefer do not sign the change order, it does not immediately stop it from moving forward. The lack of their signature only signals to subsequent reviewers that they disagree with the change order. According to Schaefer and Bermeo, Grosso does not have the authority to reject a change order once he has accepted it. *See* TR 56, 58-59, 258-59. Grosso contradicted this assertion, stating that there is "no investigation when the project manager says 'cancel the change order.' It's not approved." TR 2126.

On March 30, 2017, Grosso sent the architect CO 16 for its review. JX 102 at 5. At 4:20PM that afternoon, the architect responded, informing Grosso that the "cost that TMG is submitting to complete this work does not appear to be something NYCB or [the architect] would approve" and suggested "NYCB personnel perform [the work]." *Id.* Shortly thereafter, at

---

[5] The dumpster was provided to Apptel without charge so long as it was filled up with recycling materials. TR 731.

5:39PM,[6] Grosso responded stating CO 16 was being rejected. *Id.*; *see* TR 2107 ("When the proposal came out, the dollar amount wasn't to my liking, . . . and we weren't going to approve. Very costly. And that's why the change order was denied."), 2125 ("[L]ike my email stated, I denied this change order because there was no damage."). This email was sent directly to Bermeo, and Schaefer was carbon copied. *Id.*

### F. April 3, 2017

Around 9AM on April 3, 2017, Joe Buser, the project manager coordinator in CRES, brought CO 16 to Bermeo for his review and signature. TR 132. After signing, Bermeo instructed Buser to provide the change order to Schaefer for his signature. *Id.*

Upon arriving at work, Schaefer reviewed an email from Grosso which stated, "option two is the way to go" and an email from Bermeo asking a question of the architect. TR 387. Despite being copied on the email, Schaefer testified he did not receive Grosso's email from the night before which rejected CO 16. TR 478.

Buser provided Schaefer with a folder labeled CO 16, which required his signature. TR 388. When he reviewed CO 16, Schaefer determined "that there's something wrong." *Id.* First, he noticed the change order was to "repair . . . damage in the LAN room." *Id.* Second, the damage was supposedly done to the ceiling, and he knew there was not supposed to be construction in the LAN room. Third, Schaefer saw the change order totaled $40,000. TR 388-89. This would have been one of the largest change orders on the project to date. *Id.* Based on this brief review, Schaefer decided he was not going to sign CO 16 and Buser returned the document unsigned to Bermeo. Shaefer then met with Bermeo in his office to further discuss the change order. TR 134, 391. Schaefer expressed that he did not think the bank should be "responsible for paying for the [repair] work when a vendor was there previously." TR 134.

At 9:15AM, Schaefer replied to the email chain stating: "In reading this string, I would like to know why this is a change order? Who removed the ceiling tiles? Who authorized the deconstruction of this room to begin with?" JX 102 at 2.

Without waiting for a response, Schaefer sent his first email to NYCB's Chief Operating Officer Wann at 9:23AM ("April 3 email"). He wrote:

> You need to be made aware of the situation below. It involves a room in 100 Duffy where someone allowed a vendor access to this room to salvage copper wiring from the room for cash. I was informed that there was an exchange of cash envelopes between vendors and our employees resulting from this activity. It was something that had transpired at 102 Duffy and it seems to have occurred again.

***

---

[6] Leading up to and at the hearing much was made about the order of these emails. Complainants point to the emails from Grosso that appear out of time order. Specially, the 5:39PM email appears before the 10:33AM email. As outlined here, I am able to read those emails in the correct order based on the time stamp. *See* TR 236 ("[I]t appears that they are out of order, but nothing else changed.").

This aggressive salvage operation will cost the company $40,000 in repairs, and may have netted at least that much in copper to whoever removed the wiring.

RX 203.

After Schaefer sent this email, Bermeo answered Schaefer's questions at 12:38PM, informing him that the change order was "requested by the Infrastructure Group of IT" and that the "removal of the ceiling tiles were (sic) done by the Maintenance Staff and wiring was removed by Apptel." *Id.* At 2:43PM, property manager Gerry Newman ("Newman") added, "IT needed the wiring removed by Apptel and the wiring could not be removed with the ceiling tile in place." *Id.*

In short order, at 2:47PM, Schaefer replied asking Bermeo, Newman, and Grosso to provide "documentation as to who authorized Apptel to do $40,000 worth of damage." *Id.* at 1; *see* TR 393. Bermeo quickly replied to Schaefer with a copy of the work IT requested to be done in the LAN room. RX 203.

Skeptical of these explanations, Schaefer determined he needed to see the LAN room for himself. TR 393. In his view, he "had no reason to believe anyone" *Id.* Around 3PM, Bermeo took Fernandez, Edgar Hernandez ("Hernandez"), and Schaefer to the LAN room site. TR 141, 1128. When the group arrived, Newman let them into the LAN room. TR 434, 1111, 1414-16.

The descriptions of the state of the LAN room vary considerably.[7] Bermeo testified that when he arrived on April 3, "the entire grid was destroyed" and "ceiling tiles were removed." TR 67-69. He explained that portions of the grid had been cut such that the ceiling tiles could no longer be put back. TR 284. Hernandez described the scene upon entering the LAN room:

> We walked into the telco room and immediately we saw the damage. We understood at that moment that there was damage done. Didn't know who took the stuff that was there. . . . I do know that it's a room where a lot of wiring from Cat5 computers, servers, were, and I don't know where they went. Our concern was that if there was a $40,000 change order, we wanted to know who created that, because I believe that that part was not within the scope of work. And the damage that they did, there were lights, you know, barely hanging, and it looked like a safety issue more than a job that was started and completed.

TR 1115. Fernandez testified that the "[c]eiling grid was torn off. All the wire was gone." TR 1416-17.

On the other hand, Chludzinski explained that the grid had been "pretty beat up over the years", TR 695, but "it certainly had not fallen down." TR 743. Grosso, the person most familiar

---

[7] Because I find Complainants failed to show they engaged in protected activity by a preponderance of the evidence, I find it unnecessary to resolve what the LAN room condition was like in April 2017. Although the diverging descriptions of the LAN room are puzzling, I believe, like the many factual disputes in this case, it is a red herring that only serves to further obfuscate the analysis.

# SPA-37

with the project, testified at hearing that the grid that was there in 2017 remains today with some structural and aesthetic updates. TR 2125.

When asked by Bermeo about who created the damage, Newman responded that he should speak with Grosso because he coordinated the work. TR 67-68, 434, 1112, 1115, 1140. Newman also made a joke that "If you give me an hour, I could have a guy here and we'll give you a million dollars." TR 141, 1118, 1419; *cf.* TR 1693. After the visit Schaefer, Bermeo, Fernandez, and Hernandez returned to Schaefer's car. On the way, Schaefer indicated he "was going to put Mr. Robert Wann on notice" as to what they observed in the LAN room. TR 1119

Upon his return to NYCB headquarters later that afternoon, Bermeo reported his findings to Curran. TR 141-43. Bermeo testified about his conversation with Curran:

> I told Mr. Curran that as per his instructions, I had taken Freddy Fernandez and also Mr. Edgar Hernandez to the site. I told Mr. Curran that we met with the property manager, Mr. Gerry Newman, at the site, and that's when we discovered all of the damages. I told Mr. Curran that Mr. Newman had indicated that all of the work had been coordinated by Rich Grosso, and all of the work was done during a three-day weekend after hours by NYCB personnel. Next, Mr. Newman made a joke. He indicated, "If you give me an hour, I could have a guy here and we'll give you a million dollars." Since nobody laughed, he completely shut down afterwards and he refused to answer any other questions. All he said was, "If you need to follow up further, you need to talk to Mr. Grosso" – "talk to Rich when he gets back from vacation."

*Id.* Curran proceeded to pull out an envelope of cash. TR 143. He explained that he received the envelope from Fred Whittaker and was waiting to speak with Grosso before doing anything with it. *Id.* Curran then directed Bermeo to "stay out of it." *Id.*

At 8:50PM,[8] Grosso responded to Schaefer's earlier email with the following:[9]

> [W]e rejected this [CO 16] because there is not 40,000 dollar[']s worth of damage[.] . . . [W]e were asked from IT to remove ceiling tiles so AppTel can generate SOW and proposal for IT[.] . . . [W]e removed in house and we are installing in house this SOW.

RX 202 at 9. At the direction of Grosso, Whittaker also responded at 9:39PM and attached the original purchase order for the work Apptel was to complete. *Id.*; *see* TR 2108. Grosso testified that he asked Whittaker "to pull out the proposal from AppTel, to provide to it to Gene Schaefer to show him [the] exact scope of work and the list of names that were on there that approved the scope of work." TR 2108.

---

[8] Grosso was on vacation in Mexico when he sent this email. It is unclear whether the time zone difference affected the time stamp on the email. What is clear, is that both Schaefer and Bermeo had received and read Grosso's response by April 4.

[9] At some point during the day, Newman called Grosso to inform him that a group of five people including Schaefer and Bermeo had walked through the LAN room. TR 2103-04.

### G. April 4, 2017

Complainants decided to visit 100 Duffy again the next morning. *See* TR 1131. Schaefer, Bermeo, Hernandez, and Chludzinski met at the garage level of 100 Duffy and entered the LAN room around 9:20AM. TR 711, 1131. When asked what happened to the LAN room, Chludzinski stated he was not "responsible for any of it" and the removal of the wire "was all done by NYCB employees." TR 1426; *see* TR 428, 629. He also told Schaefer about his experience at 102 Duffy where "someone cut the cable . . . before we even got there to rewire it." TR 711-12. According to Schaefer, Chludzinski told him the amount of wire in the LAN room would be measured by the ton and was worth a significant amount. TR 629.

While there, Schaefer and Bermeo also spoke with Lou Moreno, an employee of TMG, the general contractor. *See* TR 1428. Moreno supposedly told them that he received an envelope of cash from an unknown NYCB employee from the sale of cold water piping taken from the third floor of 100 Duffy. TR 277-78, 420-27. "[Moreno] didn't know what it was for, why it was being given to him. He was caught off guard. And he said what he did was he logged it in the job book because he didn't know who the employee was." TR 421. Contrarily, Bermeo testified that the TMG vendor identified Curran as the employee who returned the envelope and told him the money was from the sale of a cold-water pipe removed from the third floor of 100 Duffy. TR 278-79; *see* TR 1428.

Fernandez summarized: "Bottom line, . . . there's materials that are missing. There was envelopes being handed out with cash. So there's a series of events that happened" that senior NYCB management needed to be made aware of. TR 1429.

Schaefer replied at 10:33AM to Grosso and Whittaker's emails from the previous night with the following:

Nobody should be moving forward with the ceiling repairs until we get to the bottom of this damage. I have read the IT request, and even viewed the photos where IT instructed what was to be removed and there was NO INDICATION TO TOUCH THE CEILING TILE.

I walked the location and there is (sic) only two penetrations where Apptel came into the room. There is no justification to remove ANYTHING above the ceiling tiles, let alone the entire ceiling be removed! I have yet to see any proof IT requested anything like what was done to the room.

\*\*\*

If Apptel removed the wires, I need to see who gave the instructions, what SOW was provided and what we were charged.

- 12 -

RX 202 at 7 (emphasis in original).

Whittaker replied at 11:44AM directing Schaefer to the signed purchase order where Apptel "called for a container to get rid of debris and removal of un-needed wiring, [and] ceiling tiles." RX 202 at 7. He went on, "NYCB signing and issuing a Purchase order gives the vendor authorization to do so. . . . I also believe [Grosso] is *rejecting/not approving the Change order* from the Martin Group." *Id.* (emphasis added).

Later that same day, a meeting to discuss the LAN room was convened. TR 2128; *see* TR 140, 144. Schaefer, Bermeo, Whittaker, and Grosso (via telephone) participated in the meeting. Grosso testified of that meeting as follows:

> We went through the chain of events. We went through, you know, some of the timelines. . . . We got to the end of the meeting, and here I thought was going to be the bombshell of this change order, was going to be crazy, and then Fred Whittaker [says], "Anybody got anything to say? Luis? No? Gene? No."
>
> So I thought they were embarrassed that when they found out that they were asking about the $40,000 damage when Gene Schaefer, Luis Bermeo, Bill Curran, myself were the approvers of the scope of work. . . . I said, "Okay. Maybe everyone realized that I did the right thing. I denied the change order because there was no damage to the ceiling." And at that point, it (sic) was *never a word about copper, scrap, anything missing from the basement*.

TR 2128 (emphasis added).

### H. April 5, 2017

On April 5, 2017, Bermeo confirmed to the architect that NYCB was not proceeding with TMG's CO 16. JX 103. "I was instructed by my boss because *Gene Schaefer had denied the work*, and the person that actually approved the money, *Mr. Curran, he denied it as well* and he told me to send the email" to the architect. TR 291 (emphasis added).

### I. April 6, 2017

At 10:44AM on April 6, 2017, Schaefer sent his second email to Wann ("April 6 email"). Though the email is lengthy, it is reproduced in its entirety below because it forms the basis of both Complainants' purported protected activity.

> As I inquired further about the damage to the Lower Level B telephone and Data room [LAN room], I received information regarding an envelope from a vendor directly. The vendor was given an envelope from an employee and told he was "returning it to the company that should have received it." Unfortunately, for that employee, the vendor didn't even know about the envelope or the job that generated the envelope.

# SPA-40

The employee was William Curran. He returned the envelope to The Martin Group on the day after I asked if he was "aware of an incident at 100 Duffy where employees were receiving envelopes for salvage work?" His response to me at that moment was "Yea, I heard that." To which I replied that "I told the vendor that if our management is aware of this, I am sure an investigation is under way to identify what happened, and when it happened, and will connect all the dots. This is the first I heard about this, and I don't know who is involved. Either as a recipient of an envelope or in the taking of copper." This was on last Monday. On Tuesday he gave the envelope to The Martin Group who didn't know what to do with it. According to what he told me The Martin Group, he apparently received the envelope for "the removal of an abandoned solid copper cold water pipe on the 3rd floor of 100 Duffy. Which Was done at night without the Martin Group knowing."

Mike the owner of App-Tel, our communications vendor, and I had a conversation. He told me he didn't know anything about the removal of other wiring in the room, but did acknowledge the room had been worked on at night by someone other than his company. He said they were aggressive and left only what was still connected to the equipment he was directed to remove. The rest of the room was cleared of the 15-20 years of copper wiring that had been abandoned by Manufacturers Hanover and Chase Bank. In a conversation with Gerry Newman, he told me "there was ton's upon ton's of wire removed from this (Lower Level B telephone Communications) room. I assume it was done by AppTel." He said "There was so much wire here that you couldn't fit a single wire on the ceiling anymore. On the ceiling, under the floor, there was so much here."

App-Tel also told me about how when we purchased 102 Duffy, whoever the bank allowed to salvage copper wire removed the telephone "24 pair copper risers" after he had flagged them, tagged them and covered them saying "Do not touch, needed for NYCB." They were removed and he had to charge the bank to install new ones. He said those guys were so aggressive they actually cut the wires at 100 Duffy to pull them back to 102 and salvage there. There is a box in the parking garage where they were so aggressive they actually cut the 100 Duffy tenant phone lines and had to quickly reconnect them, leaving them as they are now, all twisted up and hanging from the open box.

If you want to confirm this and verify who was directly involved, you might wish to review the building security videos of all afterhours work at 100 Duffy between 9/27/16 through 11/01/16.

RX 203.

Schaefer testified that shortly after sending this email, Wann called him. During the conversation, Wann told Schaefer to "Do no more." TR 418.

At 3:49PM, Wann replied to Schaefer's email: "[A]gain, you are not tasked or trained as an investigator, and please stand down." JX 44. Then, at 4:31PM, Schaefer responded: "I have

stood down. I actually stood down when I received the information." *Id.* He continued, "I was only looking to find out who damaged the room and why. The rest was not anticipated, and ethically I couldn't ignore what I was told." *Id.*

This was the last time the 100 Duffy LAN room was discussed until after Schaefer and Bermeo were terminated.

### J. CRES Audit[10]

On March 1, 2017, NYCB's internal audit department announced it would be auditing CRES. JX 54. The audit, which was regularly scheduled to occur every three years, focused on "key controls and procedures" within CRES. *Id.*; *see* JX 38 ("The regularly scheduled audit of Corporate Real Estate Services (CRES) will begin the week of March 6, 2017."). CRES had received a satisfactory rating in the prior audit in 2014.

Throughout March, the auditors met with members of CRES, including Schaefer and Bermeo, and requested various documentation. JX 38, 39. In completing their audit testing of various processes and procedures it quickly became clear to the audit team that CRES was operating poorly and creating significant risk to NYCB. On April 6, 2017, the same day Schaefer sent his second email, Chief Audit Executive Joyce Larson met with Wann to discuss her growing concerns about the functioning of CRES.

On May 1, 2017, a draft audit report was circulated to Wann and Curran. JX 57. The draft audit outlined five "High Risk" deficiencies within the areas of "Policy and Procedures", "Budget Coordination", "Project Management Unit", "New York/New Jersey Facilities Management", and "Review of Expenditures over $25,000." *Id.* Specifically, it noted policies and procedures were not reviewed timely, a lack of documentation to support budgetary controls, a weak control environment within the project management unit, and a dearth of tracking and monitoring of expenditures. *See id.* The draft audit identified the following employees as responsible for these functions: Gene Schaefer, Luis Bermeo, Fred Whittaker, Jon Liszewski, Fred Fernandez, and William Curran.

The draft audit report painted Schaefer and Bermeo in particular as less than exacting in fulfilling their respective job duties. The auditors found that Schaefer "could not provide documentation to support the . . . responsibilities in relation to budgetary controls, the monitoring of the budget versus actual spend[ing], vendor non-performance, reporting of operational and financial analyses, contract performance and periodic management reporting." JX 57. Auditors also identified numerous areas in which Bermeo was coming up short including "not properly scop[ing] the overall project," job estimates being prepared by CRES-East members instead of someone independent of the project team, lack of appropriate leveling procedures, and limited change order procedures. *Id.*

---

[10] The particulars of the audit spanned numerous witnesses and several days of testimony. As I find Complainants failed to prove they engaged in protected activity, I will only briefly describe the audit and its findings.

After Wann reviewed the draft audit[11] which identified the egregious nature of the deficiencies, he decided to terminate Schaefer, Bermeo, and Curran on May 3, 2017. *See* JX 60, JX 61.

### K. Post-Termination

On May 4, 2017, Bermeo, concerned that his responses to the draft audit were not reviewed, forwarded his responses to both Wann and Ficalora. CX 39. The next day, Bermeo emailed Wann again. CX 37. After he expressed gratitude to NYCB for extending his insurance coverage, he wrote: "As I move forward, I leave one regret, the regret of not following my gut and bringing you up to speed on everything that was going on in the [CRES] Department." *Id.* He also denied involvement in Schaefer's probe into 100 Duffy, stating "I had *no knowledge* regarding all of Gene[ Schaefer]'s investigations and accusations." *Id.* (emphasis added).

On May 5, 2017, two days after Schaefer was terminated, he sent an email to Ficalora. The email reads in relevant part:

> I . . . need to raise several concerns regarding the circumstances surrounding my termination, as well as the terminations of Luis Bermeo and William Curran. It is my strong belief that the three of us were separated to prevent us  from bringing to anyone's attention a fraudulent scheme we began to uncover in February of 2017.

> Last February I began making inquiries regarding "Change Orders" for supposed repairs needing to made at 100 Duffy, which to me appeared somewhat suspect. What I discovered is that metal fixtures were being stripped from the buildings in massive quantities and sold as scrap; and that the cash proceeds were being distributed among some of our employees. . . .

> I believe my attempt to blow the whistle on this scheme is the true reason I was separated, and that it perhaps runs higher through the company than I initially suspected. . . . [W]hat I saw and heard is that our shareholders are being defrauded by this scheme, which is in no way limited to the 100 Duffy location. Tax free cash sales of bank property for individual personal gain should not be tolerated.

CX 41.

Fifty-one days after his termination, Bermeo emailed Ficalora. CX 40. The email is lengthy and served to dispel various rumors Bermeo claims were spread about him and Schaefer prior to their dismissal. He does not mention the destruction of the LAN room or stolen copper wire. At the end, Bermeo requests his job back stating, "I am here in NY hoping that once again you take a chance on this humble and loyal employee." *Id.*

On June 29, 2017, and July 14, 2017, Schaefer and Bermeo, respectively, timely filed whistleblower complaints with the U.S. Department of Labor, Occupations Safety and Health Administration ("OSHA"), alleging they were terminated by NYCB in violation of SOX.

---

[11] Schaefer and Bermeo were terminated prior to responding to the draft audit findings.

### III. Credibility

Because Complainants and Respondent disagree on the bulk of the factual issues, credibility is critical in this case. Though I will not address the credibility of each witness, there are a few whose credibility is of note. In weighing the testimony in this matter, I considered the relationship of the witnesses to the parties, the interest of any witness in the outcome of these proceedings, and each witness's demeanor when testifying. I also considered the extent to which other credible evidence supports or contradicts the testimony of each witness.

Over the course of the ten-day trial, I was able to observe Schaefer's demeanor both during his testimony and while he listened to other witnesses. Though I discuss Schaefer's credibility in greater detail with respect to his alleged protected activity below, I will make a few general comments here.

First, his work history evinced a desire for involving himself in matters that did not concern him and magnifying his limited role at NYCB. For example, shortly after returning to NYCB in 2014, Schaefer decided to interview all the employees in the corporate support department. Mary Allen, NYCB's Chief Human Resources Officer, described Schaefer as having "gone off on a quest to interview all the employees in the area and produced a report that represented his opinion of the way the area was run, and was very subjective in nature." TR 2016; *see* CX 38.

More recently, Schaefer "usurp[ed] the role of human resources by conducting his own investigation" into a personnel matter. TR 1983. Specifically, an employee made a harassment complaint to Schaefer. Instead of referring the complaint directly to human resources, Schaefer, who has no relevant training or experience, conducted his own investigation. TR 1897, 1900. Finally, in reviewing numerous email correspondence, Schaefer was reminded to focus on his budgetary role in CRES and not involve himself in human resources matters. *See, e.g.*, RX 208, 210; TR 1983 ("Mr. Wann's instructions . . . to Mr. Schaefer . . . to not get involved in employee issues and to refer them to human resources."). When directions were axiomatic, such as to refer personnel issues to human resources immediately, he claimed the instruction was "vague, broad and not something [he was] comfortable with conforming to in general." RX 208. From this, it follows that the present case is another instance of Schaefer overstepping and jumping to conclusions.

Next, when going through the CO 16 email string on cross-examination, Schaefer was discussing Grosso's email sent at 8:50PM on April 3. TR 653. In that email, Grosso informed Schaefer that CO 16 was rejected "because there's not $40,000 worth of damage." *Id.*; *see* RX 202. Then, the following colloquy between Attorney Schissel and Schaefer occurred:

> Q.  And so you understood Mr. Grosso telling you is that the change order was rejected, right?
>
> A.  Wrong.
>
> Q.  Sorry?

A.  That is not correct.

Q.  Okay.  That's not what he says here?

A.  The email that I would have received from Rich Grosso before that was that he was telling Luis [Bermeo] to go ahead with option two, white out the ceiling, which is change order 16.

\*\*\*

Q.  [A]s of April 4th, you know that . . . Mr. Grosso was rejecting that change order, right?

A.  At that point I had already spoken to Gerry Newman and I had seen the room, and Luis [Bermeo] had seen the room.

Q.  I'm asking you as of April 4th, you knew that Mr. Grosso was rejecting the change order, right?

A.  He [Grosso] does not have the power to reject a change order.

TR 653-55.  Rather than acknowledge what is clear from the sequence of events and the documentary evidence—that he knew Grosso was rejecting CO 16 by April 4—Schaefer tried to obscure this conclusion with irrelevant information.

This testimony is illustrative of Schaefer's intransigence during cross-examination and his desire to explain around unhelpful facts, undermining his credibility.  *See, e.g.*, TR 634-35, 640-41, 644-45, 648, 658-60, 663, 665-66, 674-75.  Moreover, Schaefer was comfortable and talkative in response to questions on direct examination, often providing significantly more detail than the question contemplated.  When his musings were challenged, however, Schaefer became evasive and reticent.

Schaefer also testified of a strange encounter in the parking lot at the Westbury headquarters.  TR 781.  Bermeo was sitting in his car, and Fred Whittaker and another NYCB employee, Daniel Georgi, asked Bermeo why he was waiting.  *Id.*  Bermeo responded that he was expecting Schaefer.  Georgi then replied: "Oh, he . . . is fraternizing with the enemy."  *Id.* (internal quotation marks omitted); *see* RX 204.  Schaefer overheard this conversation, and as a result made a human resources complaint.  At the end of the email complaint, after detailing the above incident, he wrote the following: "I am concerned and offended over this disrespectful and threatening comment.  These individuals have been involved in past efforts that may have in fact ended with people being fired, and I do not like the thought that I am their current target."  RX 204.

Schaefer felt so concerned about the statement that he also brought it to the attention of Wann.  RX 213.  He proclaimed that "[s]omeone has been perpetuating an attack on my character and making false statements . . . in an attempt to . . . damage my relationships with executive

management and the vendors." *Id.* Unhappy with the human resources department's response, Schaefer emailed Wann again. He reiterated that he was being "targeted" and described the incident as a "Second Vice President[] *conspiring* with a First Vice President in their targeting of me, a Senior Vice President." *Id.* (emphasis added).

I find it difficult to imagine how a reasonable person would feel threatened when referred to by a subordinate as the "enemy." The statement, while certainly not advisable to say about one's superior, strikes me as harmless banter common to many workplaces. To describe the statement as conspiratorial belies reality.

For those reasons and as explained in greater detail below, I do not find Schaefer to be a credible witness and I discount much of his version of events.

I did not find Bermeo much more credible. Though he does not have the same litany of problems undermining his credibility as Schaefer, his testimony was less than enlightening. His description of what occurred in the LAN room was at times both vague and oblique. Also, Bermeo admitted to falsely stating in an affidavit submitted in this proceeding that he never received a verbal or written warning. TR 311-14. He conceded that he was aware the statement was false when he signed the affidavit. *Id.*

I would like to make clear that I do not think Bermeo was being intentionally dishonest. While his responses were often unsatisfying, I believe he was answering questions to the best of his ability. The fact that he was unable to clearly explain his part in the 100 Duffy incident is indicative more of his minor role in Schaefer's maelstrom than deception. Nevertheless, I afford little weight to Bermeo's testimony.

Next, I found Grosso to be a moderately credible witness. Though he at times became frustrated with Attorney Johnson's line of questioning, I think his defensiveness was due to personality differences rather than deceit. I say this in large part because the documentary evidence, namely the CO 16 email correspondence, closely matches Grosso's testimony. His explanations relative to the documentary evidence were consistent and significantly more plausible than that of Schaefer and Bermeo. While the speculation around his alleged unethical behavior is troublesome, I did not perceive him as trying to conceal any malfeasance on his part. Therefore, I afford modest weight to his testimony.

The last witness whose credibility I will comment on is Michael Chudlinksi. Chudlinski appeared at trial voluntarily after being contacted by Respondent's counsel. He had no interest in the outcome of the case and answered the questions asked of him in a clear and consistent manner. As the person in charge of the work done in the LAN room, he was in the best position to know how much copper wire was present before and after the work was completed, and what happened to it once removed. I therefore give substantial weight to his testimony overall.

One final note on credibility. After reviewing the extensive record, I am still unable to reconcile the vastly different descriptions of the LAN room in April 2017. While the description of the room as completely demolished with lights and wire hanging down, and the ceiling grid destroyed strikes me as far-fetched, I am not convinced the room was in pristine condition. I am

thus left to conclude that the truth lies somewhere between the individual recollections of each witness.

## IV. Analysis

"After a series of celebrated accounting debacles," *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010), Congress passed SOX in 2002 "[t]o safeguard investors in public companies and restore trust in the financial markets." *Lawson v. FMR LLC*, 571 U.S. 429, 432 (2014). To that end, SOX prohibits public companies from engaging in retaliation against an employee who makes certain whistleblower disclosures. Under section 1514A, SOX provides whistleblower protection to:

> [A]ny lawful act done by [an] employee to provide information . . . which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by . . . a person with supervisory authority over the employee.

18 U.S.C. § 1514A.

To prevail on a claim of retaliation pursuant to section 1514A, the complainant must prove by a preponderance of the evidence that: (1) he or she engaged in a protected activity; (2) the employer knew that he or she engaged in the protected activity; (3) he or she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 219 (2d Cir. 2014) (quotation marks and citation omitted); *see Day v. Staples, Inc.*, 555 F.3d 42, 53 (1st Cir. 2009); *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 441 (S.D.N.Y. 2013). An employee engages in protected activity when he provides information regarding an activity that he "reasonably believes constitutes a violation of" the enumerated statutory and regulatory provisions in section 1514A. 18 U.S.C. § 1514A(a)(1)(C); *see Wallace v. Tesoro Corp.*, 796 F.3d 468, 474 (5th Cir. 2015) ("Essentially, the employee has to provide information or assist in an investigation that he reasonably believes relates to one or more of six categories of laws and regulations: four specific types of fraud, a federal offense that relates to fraud against shareholders, or a rule or regulation of the SEC.).

Even if the complainant can establish each of these four elements, "the employer may avoid liability if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior." *Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 447 (2d Cir. 2013) (quoting *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009)).

**L.  Protected Activity**

As noted above, an employee engages in protected activity when he provides information regarding conduct that he reasonably believes constitutes a violation of certain statutes and regulations identified in section 1514A. "A reasonable belief contains both subjective and objective components." *Nielsen*, 762 F.3d at 221. That is, a complainant must show that: (1) he had a subjective belief that the complained-of conduct constitutes a violation of relevant law; and (2) that the belief was objectively reasonable.

**1.  Subjective Belief**

To satisfy the subjective component, the complainant must have "actually believed the conduct complained of constituted a violation of pertinent law." *Day*, 555 F.3d at 54. A complainant's "particular educational background and sophistication [is] relevant to the subjective component." *Id.* at 54 n.10.

**i.  Schaefer**

Schaefer's alleged protected activity rests entirely on his April 6 email to Wann.[12]   He argues his subjective and objective belief was formed "between April 3 and April 6" culminating in the sending of the April 6 email.  Compl. Initial at 41.

In that email, Schaefer makes a number of allegations which supposedly led him to conclude an aggressive salvage operation of copper wire was undertaken by NYCB employees resulting in envelopes of cash being distributed.  Schaefer detailed the information he gathered from conversations with the general contractor, the telecommunications vendor, and other NYCB employees with knowledge of the LAN room in the lengthy email, at points directly quoting from those conversations.

Schaefer described the contents of the email as showing that "under cover of documented scopes of work . . ., Bank employees and third-party vendors were obtaining money from the removal and sale of material they were not authorized to take . . ., at a cost to the Bank."  Compl. Initial at 39.  Contrary to this characterization, the April 6 email does not actually say this.  Instead, Schaefer detailed the envelope of cash from the sale of a copper pipe that was returned to The Martin Group by Curran and his conversation with Chudlinksi from Apptel.  RX 203.  The email fails to mention the potential for false scopes of work being submitted to cover-up an unauthorized removal and sale of copper wiring.

Given the thoroughness of the April 6 email, it is curious that Schaefer neglected to mention SOX or bank fraud.  This omission is repeated when he emails Wann again on April 7.  His reference here to what he uncovered in the LAN room as something he "ethically . . . couldn't ignore" is telling.  JX 44.  While Schaefer was not required to specifically state the violation of

---

[12] In his initial brief, Schaefer concedes the April 3 email to Wann was not protected activity.  Compl. Initial at 41.  The April 3 email, which was sent prior to Schaefer ever visiting the LAN room and contains little information about what precisely Schaefer believed occurred at 100 Duffy.  Perhaps for that reason, Schaefer no longer relies on it.

law he was reporting, his consistent failure to link the conduct to SOX lends itself to the conclusion that he did not actually think he was reporting bank fraud or even a SOX violation more generally when he sent the April 6 email, but instead unethical behavior.[13]

Take the District Court for the Eastern District of Wisconsin's decision in *Verfuerth v. Orion Energy Sys.*, No. 14-C-352, 2016 U.S. Dist. LEXIS 114751 (E.D. Wis. Aug. 25, 2016).[14] A chief executive officer ("CEO") reported "unethical and inappropriate conduct" and "a violation of the Board Members' fiduciary duties." *Verfuerth*, 2016 U.S. Dist. LEXIS 114751, at *4. The court described the CEO's allegations of fraud as a "litany of sometimes vague and almost off-handed observations and seemingly unrelated anecdotes about various events or issues that apparently made him uncomfortable." *Id.* at *18. It further noted that the CEO "might have been perfectly reasonable in 'airing his concerns,' but airing concerns is not whistleblowing." *Id.* at *22. In the instant case, taking Schaefer's April 6 email at face value, he was merely "airing his concerns" to Wann about potential wrongdoing at 100 Duffy. Without more, Schaefer's claimed SOX violation mirrors the "vague . . . observations" and "unrelated anecdotes" the *Verfuerth* court found was not SOX whistleblowing.

Schaefer also points to his May 5, 2017, email to Ficalora as evincing his subjective belief of fraud. In that email, sent almost one month after his email to Wann and two days after his termination, Schaefer wrote that it was his "strong belief" that he was terminated to prevent him from bringing to light "a fraudulent scheme" he "began to uncover in February of 2017." CX 41. He went on to say, "what I saw and heard is that our shareholders are being defrauded by this scheme." *Id.* This is the first reference Schaefer makes to a fraudulent scheme or the defrauding of shareholders. And while Schaefer may have genuinely concluded on May 5 that he uncovered a fraudulent scheme, that post-termination belief[15] cannot be imputed to him on April 6.

Accordingly, I find Schaefer has failed to prove by a preponderance of the evidence that he subjectively believed the conduct he reported in the April 6 email constituted bank fraud.

### ii. Bermeo

Bermeo first argues he engaged in protected activity on April 3 when he reported his findings to Curran after visiting the LAN room. He maintains that after visiting the LAN room and observing the damage to the ceiling and missing copper wire, it was his "actual belief that this damage and removal was connected to a scheme in which Bank employees and vendors improperly

---

[13] Schaefer also argues that "he could have said a lot more in the April 6 email" but decided to only include "what he and Bermeo agreed to report and the information he considered to be most useful to Wann." Compl. Rebuttal at 9. He went on to say that "Wann did not need reminding that Bank policy defined the theft of and individual profiting from Bank property as fraud." *Id.* at 9 n.6. Schaefer's point here is well taken—he was not required to outline the policy or statute he was reporting under. But Schaefer's argument falters because the April 6 email does not contain any information that a reasonable person would interpret as a whistleblower report.

[14] The Seventh Circuit later upheld the District Court's dismissal stating the CEO's "theory stretches the language and purpose of Sarbanes-Oxley beyond what the statute can bear." *Verfuerth v. Orion Energy Sys.*, 879 F.3d 789, 794 (7th Cir. 2018). Specifically, the Seventh Circuit held that the practices and managerial decisions the CEO complained about were not "fraud" within the meaning of SOX, and it admonished him for a theory of liability that "rest[ed] on feet of clay." *Verfuerth*, 879 F.3d at 794.

[15] The timing of Schaefer's first mention of fraud after he was terminated also brings into question whether it was raised in good faith or only as a last-ditch effort to be reinstated.

received cash proceeds from the sale of stolen material." Compl. Initial at 51. Bermeo relayed to Curran the damage he observed to the ceiling, that the work done in the LAN room was coordinated by Grosso, and a joke Newman told. Contrary to Bermeo's claims, his conversation with Curran is bereft of any mention of bank fraud, fraud generally, or anything remotely within the realm of SOX. *See* TR 141-43. The conversation, as described by Bermeo, appears to merely be a discussion about potential wrongdoing or mismanagement by other NYCB employees.

Curiously, Bermeo discussed the damage to the ceiling, but did not tell Curran that he believed material had been taken from the LAN room or that copper wire was missing. *See* TR 279-81. If Bermeo actually believed fraud had occurred, it follows that he would have at least mentioned the missing copper wire which is the foundation of his allegation of bank fraud. All I can glean from his testimony was that Bermeo *may* have thought something untoward had occurred but failed to explain that to Curran. Bermeo's reliance on his unsaid beliefs and post-hoc explanations as evincing his subjective belief does not amount to a preponderance of the evidence.

Bermeo also claims Curran's directive to "stay out of it" further buttressed his belief that something was wrong at 100 Duffy. He stated:

> I was being told, 'Stay out of it.' And I didn't want to stay out of it because at the end of the day, it was my job on the line. It was my job, my obligation, my responsibility, and I didn't want to be part of a cover-up because then I would have been accused of having a part in this.

TR 150-51. Contrary to his characterization, this suggests Bermeo was concerned not with bank fraud, but of being implicated in the alleged wrongdoing.

As for the April 6 email, Bermeo's claim fails for much the same reason as Schaefer,[16] *see supra* Part IV.A.1.i, but his reliance on the April 6 email is misplaced for two other reasons. First, on April 5, prior to the email being sent, Bermeo confirmed to the architect that they were not moving forward with CO 16. JX 103. He explained that he was instructed by Curran to "tell The Martin Group not to do any work" because "*Gene Schaefer had denied the work*, and the person that actually approved the money, *Mr. Curran*, . . . *denied it as well*." TR 291 (emphasis added). This email and testimony directly contradict the underlying facts upon which the April 6 email was based—that a $40,000 change order was generated due to damage to the LAN room. In other words, by April 5, Bermeo no longer subjectively believed NYCB was proceeding with the change order that spawned the entire investigation into the LAN room. And without CO 16, the April 6 email falls apart.

Second, the April 6 email was sent by Schaefer to Wann. Bermeo was not copied on the email nor was he named in the body of the email. While Bermeo assisted Schaefer in the investigation into CO 16, and may have seen a draft of the email,[17] the fact that he appears nowhere on this email is significant. Even Bermeo's self-serving testimony at hearing that he reviewed and

---

[16] Bermeo's claim as it relates to the April 6 email is almost entirely derivative of Shaefer's.

[17] At hearing, Bermeo contradicted his deposition testimony when he stated he saw a draft of the April 6 email before Schaefer sent it. At deposition, he indicated he only saw the April 6 email after Schaefer already sent it to Wann. TR 205-06.

approved a draft of the April 6 email does not help his case. As a general matter, a person cannot *engage* in protected activity if there is no evidence to indicate they took some overt action. Reviewing the draft email shows, at most, that Bermeo played an ancillary role in the alleged protected activity. And, to the extent Bermeo thought he was an integral part of the reporting, it is clear that Schaefer, in failing to mention Bermeo's name, did not share in this belief. As Respondent aptly questions: "[I]f this was supposed to be a joint communication[,]" why was Bermeo "neither copied on nor mentioned in [the email?]" Resp't Rebuttal at 11. Bermeo does not offer a satisfactory answer.

Bermeo opines that he "cause[d] information to be provided" and "assist[ed] in an investigation" with respect to the April 6 email. Compl. Rebuttal at 12 (citing 18 U.S.C. § 1514A(1)). The statutory language "cause . . . to be provided" contemplates an action undertaken by a complainant. This is made pellucidly clear with the use of the verb "cause", which is defined as: "to make something happen." *Cause*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/cause. The evidence reveals that Bermeo may have reviewed the email prior to Schaefer sending it, but "reviewing" an email does not amount to making something (e.g., the provision of information) happen. As for "assist[ing] in an investigation," Bermeo ignores the rest of the statutory text which clarifies that the investigation must be conducted by a federal regulatory or law enforcement agency, a member of Congress, or "a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate)." *See* 18 U.S.C. § 1514A(1)(A)-(C). Bermeo's looking into CO 16 and the LAN room, and providing that information to Schaefer to include in the April 6 email does not fall within any of those categories. Most importantly, Schaefer was not Bermeo's direct supervisor, and to the extent Schaefer had supervisory authority over Bermeo, the investigation he initiated was explicitly unauthorized by Wann.

The conclusion that Bermeo did not actually believe he was reporting bank fraud is bolstered by his initial attempt to distance himself from Schaefer after termination. Contrast Bermeo's testimony at hearing with his denial of any knowledge of Schaefer's "investigations and accusations" when he was asking for his job back on May 5, 2017. CX 37. This marked change in his story and willingness to mold facts to fit a beneficial narrative leads me to doubt Bermeo actually believed he was reporting bank fraud before his termination.

Toward the end of Bermeo's testimony, he stated: "Theft is fraud. . . . Stealing is fraud," TR 320, and explained that NYCB corporate policy indicated "any theft in the bank will be considered fraud," TR 370. This is probably the strongest, if not the only, evidence in support of his subjective belief that he was reporting bank fraud. I note that Bermeo made these statements when discussing bank policies. NYCB's definition of fraud as inclusive of theft and stealing is not synonymous with a violation of the bank fraud statute. The pertinent question is whether Bermeo believed the reported conduct violated the bank fraud statute not NYCB corporate policy. This testimony merely reveals that Bermeo understood the conduct in the LAN room to be violative of NYCB policy. Further, I am not convinced he held this particular belief at the time he spoke with Curran or when the April 6 email was sent. It was only after the fact that Bermeo realized he had to link the potential theft to fraud.

Accordingly, I find Bermeo has failed to prove by a preponderance of the evidence that he subjectively believed the conduct he reported to Curran on April 3 and the April 6 email constituted bank fraud.

### 2. Objectively Reasonable Belief

Even assuming *arguendo* that Complainants subjectively believed they were reporting bank fraud, I find that belief was unreasonable.

Section 1514A is not a general compliance statute—it does not provide whistleblower protection for any reported company misconduct. "The plain language of SOX does not provide protection for any type of information provided by an employee but restricts the employee's protection to information only about certain types of conduct" enumerated in the statute. *Day*, 555 F.3d at 54. "The objective prong of the reasonable belief test focuses on the 'basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience.'" *Nielsen*, 762 F.3d at 221 (quoting *Sharkey v. J.P. Morgan Chase & Co.*, 805 F. Supp. 2d 45, 55 (S.D.N.Y. 2011)).

Of course, "[m]any employees are unlikely to be trained to recognize legally actionable conduct by their employers" so a complainant need not plead each element of an anti-fraud law. *Id.*; *see Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 589 (S.D.N.Y. 2019) ("Although the plaintiff is not required to prove that the defendants violated a law or cite a particular provision that he believes the defendants violated, 'general inquiries do not constitute protected activity.'") (quoting *O'Mahony v. Accenture Ltd.*, 537 F. Supp. 2d 506, 516 (S.D.N.Y. 2008)). Nonetheless, a complainant must still "have an objectively reasonable belief of *a violation of one of the listed federal laws*." *Wiest v. Lynch* (*Wiest I*), 710 F.3d 121, 132 (3d Cir. 2013) (emphasis added).

Complainants argue, in a conclusory fashion, that an "illegal salvage operation" of copper wire fits within the purview of bank fraud. In a footnote, they claim that "ineffectively monitored transactions and close dealings with vendors create financial and operational risk because the Bank could get cheated out of money." Compl. Initial at 39 n.1. As I will explain in more detail below, other than these assertions, Complainants offer nothing to substantiate how that is so.

At the outset, it is helpful to have a basic understanding of the bank fraud statute and its history. The bank fraud statute, 18 U.S.C. § 1344, provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice--

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

- 25 -

18 U.S.C. § 1344. A review of the legislative history reveals that Congress intended section 1344 to cover a crime distinct from "embezzlement, robbery, larceny, burglary, and false statement directed at a federally insured bank." S. Rep. No. 98-225 at 377 (1984), reprinted in 1984 U.S Code Cong. & Admin. News 3182, 3517.[18] Notably, Congress specifically distinguished bank fraud from the general bank theft statute, 18 U.S.C § 2113:[19]

> There appears to be an absence of coverage with respect to some types of fraud in the general bank theft statute. . . . [The Supreme Court has noted] that, by its clear terms, section 2113 does not apply to a case of false pretenses in which there is not a *taking and carrying away of the property*.

*Id.* (emphasis added). From this, it can be inferred that the bank fraud statute is intended to cover a crime different from the theft of a tangible good. That is, the bank fraud statute criminalizes the deception or misrepresentation itself as opposed to the actual taking and carrying away of property proscribed by traditional offenses against property such as theft or embezzlement.

The text of section 1344 further clarifies its intended reach. As the Supreme Court explained in *Loughrin*, the "by means of false or fraudulent pretenses" language in section 1344 functions to avert "federalizing frauds that are only tangentially related to the banking system." *Loughrin v. United States*, 573 U.S. 351, 362-63 (2014). Consequently, the false statement must be the "mechanism naturally inducing a bank . . . to part with money in its control." *Id.* at 363.

The allegations, as described by Complainants, more closely resemble a taking and carrying away of property than a false statement inducing a bank to part with property. Complainants aver that they discovered that "metal fixtures were being stripped from the building in massive quantities and sold as scrap" with the cash proceeds from the sale distributed among NYCB employees. TR 609. What is missing from these allegations is any assertion that a false statement was made to NYCB that induced it to part with the copper wire. As noted above, Complainants contend for the first time in their Initial Brief that the "illegal salvage operation" was being done under the guise of legitimate scopes of work. I can find nowhere in the substantial record that either Complainant argued before that a fictitious scope of work was submitted to shroud this money-for-copper-scheme in secrecy.

Complainants also failed to cite any case in which courts have applied the protections of this statute to similar types of disclosures. Indeed, my review of the case law under the bank fraud statute revealed no prosecutions relating to physical property owned by the bank; instead, the cases involved various financial instruments and the property they secure such as mortgages or bank accounts. *See, e.g., Shaw v. United States*, 580 U.S. 63 (2016) (deposit accounts);[20] *Loughrin* 573

---

[18] Congress also expressed a more general intent to "protect[] the financial integrity of these institutions." S. Rep. No. 225, 98th Cong., 2d Sess. 377 (1983), reprinted in, 1984 U.S. Code Cong. & Admin. News 3517; *see* H.R. Rep. No. 901, 98th Cong., 2d Sess. 2-6 (1984). Complainants also make no attempt to explain how their interpretation aids in this goal.

[19] 18 U.S.C § 2113 outlaws bank robbery and incidental crimes.

[20] In a footnote, Complainants cite to the Supreme Court's decision in Shaw as supporting their position that the reported conduct falls under section 1344. *Shaw* confirms that in order to be found guilty of bank fraud the scheme to defraud must "deceive the bank and deprive it of something of value." *Shaw v. United States*, 580 U.S. 63, 137 S.

U.S. 351 (stolen checks and forged checks); *United States v. Nicoletti*, 849 F. App'x 574 (6th Cir. 2021) (mortgage); *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) (deposit accounts); *United States v. Ely*, 142 F.3d 1113 (9th Cir. 1997) (loans and interest); *United States v. Weigand*, 482 F. Supp. 3d 224 (S.D.N.Y. 2020) (deposit accounts); *United States v. Sinclair*, No. 4:15CR155, 2016 U.S. Dist. LEXIS 5629 (N.D. Ohio Jan. 18, 2016) (mortgage). Here, Complainants claim that copper wires within a bank-owned building constitute "other property" under the bank fraud statute. This interpretation strikes me as far removed from the statute's admittedly broad scope and the intent of Congress.

Other courts have found that not all reporting is actionable under SOX. Consider the First Circuit's decision in *Day v. Staples, Inc.*, 555 F.3d 42 (1st Cir. 2009).[21] In *Day*, the plaintiff claimed he disclosed that his employer was using an inadequate internal tracking system resulting in "a needless loss of revenue" that "detrimentally affected . . . shareholders." *Day*, 555 F.3d at 56. The First Circuit found that the plaintiff's disclosures were unrelated to SOX, stating he "may have made a complaint related to consumer protection, but he does not have an objectively reasonable belief there was shareholder fraud under [section] 1514A." *Id.* In finding that the "plain language of SOX does not provide protection for any type of information provided by an employee," the court reasoned that allegations must be "coupled with evidence of 'corresponding fraudulent intent.'" *Id.* at 57 (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)).[22] Additionally, in evaluating the employer's reaction to the disclosure, the First Circuit determined that the plaintiff's beliefs of shareholder fraud "became less reasonable as he was given explanations [by company employees]." *Id.* at 58.

In *Safarian v. Am. DG Energy Inc.*, 622 F. App'x 149 (3d Cir. 2015), the Third Circuit affirmed the District Court's holding that the employee's report of "overbilling, improper construction, and the failure to obtain proper permits" was not protected under the Dodd-Frank whistleblower provision[23]. *Safarian v. Am. DG Energy Inc.*, No. 10-6082, 2014 U.S. Dist. LEXIS 59684 at *12 (D.N.J. Apr. 29, 2014). The employee argued that "he reasonably believed that the fraudulent billing of customers 'result[s] in misstatement[s] of accounting records to . . . shareholders and fraudulent tax submissions to [the] Internal Revenue Service.'" *Id.* To the contrary, the District Court held "[t]hough overbilling might eventually lead to incorrect accounting records and tax submissions, these kinds of disclosures were not contemplated by the

---

Ct. 462, 469 (2016) (emphasis omitted). Apart from this citation, however, Complainants do not point to, nor can I find in the record, evidence of deception or deprivation.

[21] While *Day* was decided before the ARB clarified the standard for evaluating alleged protected activity, the reasoning remains germane to the issue at hand.

[22] The court added that SOX

> restricts the employee's protection to information only about certain types of conduct. Those types of conduct fall into three broad categories: (1) a violation of specified federal criminal fraud statutes: 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1344 (bank fraud), § 1348 (securities fraud); (2) a violation of any rule or regulation of the SEC; and/or (3) a violation of any provision of federal law relating to fraud against shareholders. The first and third categories share a common denominator: that the conduct involves "fraud," and many of the second category claims (violations of SEC rules or regulations) will also involve fraud.

*Day*, 555 F.3d at 54 (emphasis added).

[23] The Dodd-Frank whistleblower provisions closely follow that found in SOX at issue here.

statute, have not been protected by other courts, and should fall outside the scope of the Sarbanes-Oxley Act." *Id.*

At best, Complainants' allegations seem to relate to the theft of bank property. An analogy here would be instructive. Assume for the sake of this example that I work as a bank teller at XYZ Bank. One day, I decide to start taking home boxes of ball point pens intended for use by bank employees and customers. I then sell those pens at a premium and distribute my earnings to other coworkers who I have included in this venture. There is no doubt that I am stealing from my employer and the scheme between myself and the involved co-workers is unethical. But does the fact that I work at a bank, instead of, say, a restaurant or a clothing store, transform my conduct from theft into bank fraud? I think not.

In the present case, something similar allegedly occurred. Instead of pens being taken, it is copper wire, which was supposedly sold, with a portion of that profit distributed among those who were a part of the construction job at 100 Duffy, including some NYCB employees. Is this theft? Perhaps. But theft does not become bank fraud because it occurred in a building owned by a bank. It is simply property theft[24]—a crime separate and distinct from bank fraud and not contemplated by SOX. *See Fuqua v. SVOX AG*, No. 14 C 00216, 2016 U.S. Dist. LEXIS 67661, at *8 (N.D. Ill. May 24, 2016) ("What [the complainant] alleges is an effort to steal property of the bank that he possessed; in that regard, he is the equivalent of an armored truck carrying the bank's cash. When robbers hold up the driver and take the cash, they commit theft, not fraud."). So, while worthy of opprobrium if true, the conduct Complainants allege does not amount to bank fraud.

Additionally, the ARB has previously held that an allegation of some sort of illegal conduct not enumerated in section 1514A does not, in and of itself, constitute protected activity under the Act. *Dietz v. Cypress Semiconductor Corp.*, ARB No. 15-017, slip op. at 8-11 (ARB Mar. 30, 2016). By way of example, the ARB held that an allegation that an employer has violated state or federal wage laws, is not protected activity under the Act. *Id.*; *see id.* at 10 ("[L]arceny is not the same as fraud."). The ARB explained that a complainant must allege something more than illegal activity. *Id.* It held that "some form of trickery, of deception, a knowing misrepresentation or knowing concealment of a material fact" must also be alleged. *Id.* at 10 (citing BLACK'S LAW DICTIONARY (10th ed. 2014) (internal quotations removed); *see Harvey v. Home Depot*, ARB No. 04-115, slip op. at 14 (ARB June 2, 2006) ("Providing information to management about questionable personnel actions, racially discriminatory practices, executive decisions or corporate expenditures with which the employee disagrees, or even possible violations of other federal laws . . ., standing alone, is not protected conduct under the SOX.").

Again, Complainants failed to explain how the allegation of copper wire theft involves any trickery, deception or knowing concealment of a material fact. Even assuming Grosso coordinated the removal and sale of copper wire from the LAN room, Complainants failed to offer any evidence that he did so by deceiving the bank. To the contrary, they merely state Grosso took the copper wire, sold it, and distributed the proceeds, all conspicuously within the view and with the knowledge, of numerous NYCB employees. It strains credulity to see how any of this alleged

---

[24] I note that I am not finding that what occurred at NYCB actually constitutes theft. I am merely following the logical end of Complainants' theory to show that, even assuming their version of events is true, the alleged conduct is not bank fraud.

conduct amounts to fraud. *See Puffenbarger v. Engility Corp.*, 151 F. Supp. 3d 651, 660 (E.D. Va. 2015) (finding improper paid time off cash outs did not "amount[] to a false statement."). Accordingly, I find Complainants' allegations do not reasonably constitute bank fraud and thus SOX was not intended to reach the conduct at issue in this case.

Complainants' claim faces yet another issue: in April 2017, at the time of the incident, NYCB did not have a scrap metal policy in place.[25]  TR 2122.  Meaning, it was not clear that NYCB owned the scrap metal recovered from the LAN room.  Further, as outlined in more detail below, the scope of work governing the LAN room project specified that it was Apptel, and not NYCB, that was responsible for the removal of the scrap metal.  That is, Apptel owned the scrap metal as soon as it was removed from the LAN room.  What happened to the scrap metal after Apptel removed it was not the worry of NYCB—because it was no longer NYCB's property.  That Complainants believed NYCB personnel removed the scrap metal does not change the analysis.  Without a policy stating otherwise,[26] any material left in the LAN room when Apptel began its work was no longer NYCB's property.  Who actually removed the scrap metal is immaterial.[27]

The argument Complainants proffer is complex and requires me to stack inference on top of inference to arrive at a conclusion that is supported by neither the facts nor logic.[28] Complainants no doubt could have reasonably believed they exposed unethical behavior or project mismanagement given their account of the events.  But that conduct does not relate, in any meaningful way, to bank fraud.  Nor does it relate to any SOX-related violation.  Put simply, Complainants' allegations lack "some amount of 'tethering,' however minimal . . . required to connect [their] beliefs about wrongdoing to the fraud-prevention purpose of SOX." *Lamb v. Rockwell Automation, Inc.*, 249 F. Supp. 3d 904, 912 (E.D. Wis. 2017).  Accordingly, it was not objectively reasonable for Complainants to believe bank fraud or anything that might implicate fraud occurred.

I also find Schaefer and Bermeo's belief objectively unreasonable for reasons specific to each complainant.  I will now address each Complainant separately.

---

[25] In a footnote, Complainants aver that while "vendors are free to take scrap from construction sites," they instead "reported the removal of material they believed was not authorized to be taken."  Compl. Br. at 42 n.5 (emphasis omitted).  This, however, does not explain how that belief was reasonable.  Instead, Complainants appear to assume as a given that their belief was reasonable, failing to point to testimony or other evidence that demonstrates reasonableness.

[26] I note that I am not sure a scrap metal policy would have changed the outcome of this decision because even that conduct likely does not fall under SOX; however, it would eliminate all confusion about who owned what.  It is my understanding that NYCB has since implemented a scrap metal policy to avert these issues in the future.

[27] Again, as I noted above, if NYCB employees did remove the scrap metal from the LAN room, that is likely something the bank would not take lightly.  But unethical behavior, even when that behavior results in some financial loss, does not reasonably equate to bank fraud.

[28] I alerted Complainants to the novelty of their theory of the case in my summary decision order.  Throughout the hearing and in the post-hearing briefing, Complainants neglected to explain in any meaningful way how their claims fit within the confines of the bank fraud statute.  Though Complainants are not required to plead each element of bank fraud, they must show some relation to the statute.  Complainants failed to do so.

### iii.    Schaefer

To begin, the background knowledge Schaefer relies on to support his claim is based entirely on unsubstantiated information.  With respect to the 102 Duffy incident, which occurred in 2013, Fernandez relayed the story of Grosso's alleged misdeeds to Schaefer a year before the events giving rise to this case.  At that time, Schaefer did not report Grosso nor did he seek to corroborate Fernandez's story.  The other key event was Grosso's assistant, Yesenia Baez, quitting after receiving an envelope containing $5,000 intended for Grosso.  Schaefer was not told this by Baez herself, but instead relied on a story told by Rosario Levy.  Again, Schaefer did not report this to anyone.  He also misremembered or fabricated this conversation because Baez left NYCB nine months before he testified he became aware of the envelope.

In his Rebuttal Brief, Schaefer now claims "Levy's conversation . . . regarding the envelope of cash Baez received for Grosso is a relatively minor aspect of [his]reasonable belief."  Compl. Rebuttal at 6.  However, when asked how he came to believe that wiring had been removed from the LAN room for cash, the first thing he mentioned was his conversation was Levy about Baez.  TR 395-97.  Schaefer's highlighting of this conversation in his testimony suggests it was not just a "minor aspect" of his belief.  Schaefer's reliance on these unconfirmed reports to underpin his belief of a SOX violation was not reasonable.

Notwithstanding the unreliable sources of this flimsy information, Schaefer somehow linked his knowledge of Grosso's supposed scheme at 102 Duffy and Levy's story about Baez, to CO 16.  He did this despite his own testimony that he "looked to see if there was anything where there could be cash. . . .  And there was nothing that matched it.  I couldn't connect that [Baez] envelope to anything within the [100 Duffy] project at that time."  TR 397.  This connection, Schaefer argues, was confirmed during his visits to the LAN room on April 3 and April 4, and the conversations he had with Michael Chludzinski and The Martin Group.  The problem for Schaefer, however, is that the record does not support his portrayal.  I do not dispute that the numerous allegations Schaefer makes, if true, do not paint NYCB in a positive light and warranted further inspection.  But mere wrongdoing on the part of NYCB or its employees does not reasonably suggest bank fraud.  Schaefer took these seemingly unrelated and unsubstantiated events and arrived at a hasty conclusion without much evidence.

On April 3, 2017, when Schaefer first became aware of CO 16, it was entirely reasonable for him to question its origin and request further documentation.  He was rightly concerned about the $40,000 cost to repair damage to the LAN room.  This concern was probably confirmed when he visited the LAN room and saw the "destroyed" ceiling and missing wire.  Even so, any confusion as to the status of CO 16 was allayed by 8:50PM that night, when Grosso emailed Schaefer to say he rejected CO 16.  Grosso also explained that the work would be completed in-house.  CX 33 at 9; *see* TR 2125-26, 2131.

Not satisfied,[29] Schaefer responded on April 4 asking for "proof that IT requested anything like what was done to the [LAN] room" referencing the purported state of disrepair of the room.  Shortly thereafter, Fred Whittaker sent the September 2016 purchase order and explained it was

---

[29] Seemingly admitting he saw Grosso's email, Schaefer now claims he believed the email was "incorrect or irrelevant."  Compl. Rebuttal at 9.

# SPA-57

this work that prompted CO 16. Schaefer signed this original purchase order which called for the removal of "any and all unused or obsolete equipment and cabling." It also required that NYCB remove the ceiling tiles and "any materials" it wanted to keep prior the start of the project. RX 202. A reasonable person reading the purchase order would interpret this language as explicitly authorizing the very conduct Schaefer claims was illegal. The lack of ceiling tiles he and Bermeo observed was because the tiles were removed for Apptel to complete its work. And if any copper wiring was still in the LAN room upon Apptel's arrival, it can be assumed NYCB no longer "wish[ed] to keep" that wiring and would thus be removed by Apptel. That this is precisely what occurred seems of no import to Schaefer.

Even if Schaefer's belief was reasonable on April 3, that belief became unreasonable by April 5, when it was clear to everyone that Curran, who needed to provide the final signature before moving forward with a change order, was rejecting CO 16. With this context, it is difficult for me to understand how Schaefer concluded that he uncovered a fraudulent scheme. Phrased differently, based on the information available to Schaefer as of April 5, no reasonable person could understand the LAN room incident to be evidence of bank fraud. Like the plaintiff in *Day*, Schaefer's belief "became less reasonable as he was given explanations" and thus his continued belief of illegality in the face of these explanations was objectively unreasonable. Instead of relying on the information provided to him by more knowledgeable employees, he locked into an intractable position and repeatedly ignored relevant evidence that contradicted his narrative.

I also do not believe Schaefer's retelling of his conversation with Michael Chludzinski on April 4, which forms the basis for much of the April 6 email. Remember that Schaefer testified Chludzinski told him Apptel was not responsible for the removal of the copper wire and that it was done by NYCB employees. *See* TR 428-29, 629.[30] He claimed Chludzinski explained that

> whoever did the work would have done the work in October on a three-day weekend, and that the reason he knows this is because his work order was issued to him at the end of September, but they refused to give it to him saying that "the room was not ready for him."

TR 429; *see* RX 203 ("He told me he didn't know anything about the removal of other wiring in the room, but did acknowledge the room had been worked on at night by someone other than his company."). Chludzinski also apparently told him that the NYCB employees were so aggressive in the removal resulting in the broken ceiling grid, and that the LAN room contained "15 to 20 years of copper wiring" and "tons upon tons of wire" were removed. TR 431-33; *see* RX 203 ("He said they were aggressive and left only what was still connected to the equipment he was directed to remove. The rest of the room was cleared of the 15-20 years of copper wiring.").

For his part, Chludzinski, who I found very credible, contradicted much of this testimony. Chludzinski confirmed that he told Schaefer he believed someone had cut wires at *102 Duffy* "years and years ago" but that is where the support ends. TR 711-12; *see* RX 203 ("App-Tel also told me about how when we purchased 102 Duffy, whoever the bank allowed to salvage copper wire

---

[30] As Respondent points out in its Initial Brief, Schaefer's testimony changed significantly since the summary decision stage, particularly with respect to the amount of copper he believed was removed, further damaging his credibility. Resp't Initial at 12-13, 18.

removed the telephone '24 pair copper risers.'"). Chludzinski stated he did not tell Schaefer there was "tons of wire" in the LAN room because that amount of wiring would "require many dumpsters" and only one was ordered for the entire job. TR 712. He added that removing "tons of wire" would have required significantly more workers and time to complete—the job was completed with three workers over 110 man-hours. *Id.* Chludzinski also firmly denied telling Schaefer that NYCB employees took copper wire from the LAN room and that there were several tons of copper in the room. TR 713. Based on this version of the conversation, the story Schaefer tells in the April 6 email is questionable if not completely fabricated.[31]

Further, Schaefer admitted Chludzinski was in the best position to know how much copper wiring was in the LAN room prior to April 3. TR 626. Prior to submitting the scope of work, Chludzinski visited the LAN room to evaluate the project. TR 695-96; *see* RX 3 (diagram of work IT requested Apptel complete). He looked above the ceiling grid, and with the assistance of a flashlight, did not see "a whole lot up there." TR 696. Under the floor tiles he observed "[m]ostly dirt and paperclips and cigarette butts' but "[n]ot a whole lot" of wiring. TR 697. It was based on this walk-through that Chludzinski submitted the proposal totaling $9,200.

All told, Apptel filled one dumpster with material removed from the building, "three or four black plastic garbage bags" of which were wiring, TR 702. Chludzinski testified that he received a total of $1,179.60 from the sale of that scrap metal and wiring, which he gave to a former employee who was out on disability. TR 708, 735, Trial Exh. C. The four garbage bags of wire worth less than $1,200 is vastly different from the "massive quantities" of wire worth at least $40,000 Schaefer alleged. *Contrast* TR 696-702 (Chludzinski: three to four garbage bags of wire) *with* TR 428-33, 609 (Schaefer: "[M]etal fixtures were being stripped . . . in massive quantities.").

Lastly, I note that the legal distinction between theft and fraud may not be patently obvious to a layman. But Schaefer is admittedly not a layman. By 2016, he had "more than 10 years" of "progressive management experience," as well as "experience in facilities/maintenance, building/construction, and real estate leasing management." TR 672. He considered himself to have "a more than general understanding" of banking laws and regulations. TR 790. He also believed he had a better understanding of NYCB corporate policies and procedures, and of SEC rules and regulations, than the average employee at NYCB. *Id.* With this relevant background knowledge, in conjunction with an extensive career with NYCB, it was unreasonable for Schaefer to believe that theft, and in particular the theft of copper wire, constituted bank fraud.

### iv. Bermeo

Bermeo argues that after visiting the LAN room on April 3 had had "specific information" of the following: (1) "who owned the copper and who damaged the room in removing the copper"; (2) "gutting the ceiling of all the copper wiring it had amassed over the years was not part of Apptel's relatively minor scope of work"; (3) Apptel and/or CRES could not freely take that

---

[31] I find no value in flattening Schaefer's motivations in maintaining his story of an intense salvage operation in the LAN room. I will only mention that Schaefer, and Bermeo for that matter, were highly resistant to changing their stories even when their initial inclinations were flimsy and exposed to new information that should have led them to a different conclusion.

material, meaning it still belonged to the Bank"; and (4) Grosso "coordinated" the removal of the copper wire. Compl. Rebuttal at 10-11.

While the lead up to the April 6 email was convoluted, what is clear is that Bermeo was aware Curran was not signing CO 16 as of April 5. Curran asked Bermeo to communicate this to The Martin Group further evidencing the unequivocal status of the change order. As Bermeo explained, "[o]nly Bill Curran is the one that will make a business decision and reject the work." TR 59. So even assuming Grosso did not have the authority to reject the change order, Bermeo knew on April 5 that Curran made the decision to reject the work. Also, by that time, Bermeo had been provided ample evidence refuting the "specific information" undergirding his belief. He was copied on the same emails as Schaefer explaining Apptel's scope of work and had even explained to Schaefer that the IT department requested the wiring be removed. *See* RX 203. Given this knowledge, it was not reasonable for Bermeo to believe something illegal occurred in the LAN room.

The decision in *Verfuerth* is relevant here as well. Recall that the court distinguished "whistleblowing" activity from merely "airing . . . concerns" about "run-of-the-mill corporate problems." In the instant case, Bermeo discussed with Curran the work "coordinated by Rich Grosso" over a "three-day weekend" that resulted in substantial damage to the LAN room. TR 141. He also mentioned to Curran "Newman's joke" about removing wire for money. *Id.* This conversation with Curran more closely reflects an airing of concerns about the conduct of certain NYCB employees at 100 Duffy than fraud. And to the extent Bermeo's belief of fraud rested on the joke Newman told ("give me an hour [in the LAN room, and] . . . we'll give you a million dollars"), I find that belief was wholly unreasonable. A reasonable person would understand Newman's joke as a hyperbolic statement, not an admission of wrongdoing or guilt. To put a finer point on it, a reasonable person would interpret Newman's joke as just that, a joke. For Bermeo, or Schaefer for that matter, to believe Newman was somehow revealing a fraudulent scheme strains credulity.[32]

The record also suggests that the practice of selling excess or discarded materials is common in the construction industry. Trash or abandoned material from a construction site that has some value, such as copper wire and electrical wire, is referred to as "mongo." TR 275, 2106. Typically, the trade that removes the "mongo" will sell the material for cash. TR 276. In the instant case, it follows that Apptel, as the company in charge of the LAN room wiring project, would remove and sell any "mongo." On cross-examination, Bermeo attempted to make a distinction between contractors selling "mongo" and NYCB personnel selling "mongo." TR 375-76; *see* Compl. Br. at 42 n.5. It is not entirely clear to me that such a distinction is warranted. While it may be against NYCB policy to receive cash proceeds from discarded construction material, and even unethical, this practice is not the illegal enterprise Bermeo makes it out to be.

Bermeo, a 19-year veteran of the construction industry, TR 275, should have been able to identify that the copper wiring taken from the LAN room was "mongo" and not part of a grand bank fraud scheme. Likewise, he should have recognized that the envelope of cash Curran showed him was cash derived from the sale of "mongo." Bermeo may have thought this was an unsavory practice, one that NYCB prohibited, but it was not reasonable for him to think it was bank fraud.

---

[32] This also forecloses any argument Bermeo may have that he had a reasonable but mistaken belief.

# SPA-60

### M. Conclusion

In reaching this decision, I have taken great care to evaluate Complainants' arguments consistent with the broad fraud-prevention purposes of SOX. Nonetheless, it is far from self-evident how the alleged misconduct fits within the purview of section 1514A. To mask the utter lack of evidentiary support, Complainants attempted to muddy the waters with myriad contested facts that ultimately bore little relevance to their case other than to depict NYCB as a bad actor. This tactic did not aid them in proving their case. Faced with serious credibility concerns that undermined much of their testimony and documentary evidence contradicting their version of events, Complainants came well short of proving by a preponderance of the evidence that they engaged in protected activity. Schaefer and Bermeo seem to have at best misunderstood, and at worst vastly exaggerated what occurred in the LAN room.

Because Complainants cannot prove they engaged in protected activity, they have failed to establish a *prima facie* case of SOX retaliation.[33]

### ORDER

Accordingly, it is **ORDERED** that the SOX complaints filed by Gene Schaefer and Luis Bermeo against NYCB are **DENIED**.[34]

**SO ORDERED**.



Digitally signed by TIMOTHY
MCGRATH
DN: CN=TIMOTHY MCGRATH,
OU=ADMINISTRATIVE LAW JUDGE,
O=US DOL Office of Administrative Law
Judges, L=Boston, S=MA, C=US
Location: Boston MA

**TIMOTHY J. McGRATH**
Administrative Law Judge

Boston, Massachusetts

---

[33] As Complainants have failed to establish a necessary element of their *prima facie* case, I will not address the remaining elements of the claim.

[34] Prior to the hearing, I bifurcated the liability and damages portion of the claims. Because I am denying the complaints, there is no need to hold a damages hearing.

# SPA-61

**NOTICE OF APPEAL RIGHTS**: To appeal, you must file a Petition for Review ("Petition") with the Administrative Review Board ("Board") within **fourteen (14) days** of the date of the administrative law judge's decision.

Your Petition is considered filed on the date of its postmark, facsimile transmittal, or e-filing; but if you file it in person, by hand-delivery or other means, it is filed when the Board receives it. *See* 29 C.F.R. § 1980.110(a). Your Petition should identify the legal conclusions or orders to which you object. You may be found to have waived any objections you do not raise specifically. *See* 29 C.F.R. § 1980.110(a).

When you file the Petition with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges. You must also serve the Assistant Secretary, Occupational Safety and Health Administration and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor. *See* 29 C.F.R. § 1980.110(a).

If no Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 29 C.F.R. §§ 1980.109(e) and 1980.110(b). Even if a Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor unless the Board issues an order within thirty (30) days of the date the Petition is filed notifying the parties that it has accepted the case for review. *See* 29 C.F.R. § 1980.110(b).

## IMPORTANT NOTICE ABOUT FILING APPEALS:
**The Notice of Appeal Rights has changed because the system for online filing has become mandatory for parties represented by counsel. Parties represented by counsel must file an appeal by accessing the eFile/eServe system (EFS) at https://efile.dol.gov/ EFILE.DOL.GOV.**

*Filing Your Appeal Online*

Information regarding registration for access to the new EFS, as well as user guides, video tutorials, and answers to FAQs are found at https://efile.dol.gov/support/.

Registration with EFS is a two-step process. First, all users, including those who are registered users of the former EFSR system, will need first create an account at login.gov (if they do not have one already). Second, if you have not previously registered with the EFSR system, you will then have to create an account with EFS using your login.gov username and password. Once you have set up your EFS account, you can learn how to file an appeal to the Board using the written guide at https://efile.dol.gov/system/files/2020-10/file-new-appeal-arb.pdf and/or the video tutorial at https://efile.dol.gov/support/boards/new-appeal-arb. Existing EFSR system users will not have to create a new EFS profile.

Establishing an EFS account should take less than an hour, but you will need additional time to review the user guides and training materials. If you experience difficulty establishing your account, you can find contact information for login.gov and EFS at https://efile.dol.gov/contact. If you file your appeal online, no paper copies need be filed with the Board.

**You are still responsible for serving the notice of appeal on the other parties to the case and for attaching a certificate of service to your filing. If the other parties are registered in the EFS system, then the filing of your document through EFS will constitute filing of your document on those registered parties. Non-registered parties must be served using other means. Include a certificate of service showing how you have completed service whether through the EFS system or otherwise.**

*Filing Your Appeal by Mail*
Self-represented (pro se) litigants may, in the alternative, file appeals using regular mail to this address:

Administrative Review Board
U.S. Department of Labor
200 Constitution Avenue, N.W., Room S-5220,
Washington, D.C., 20210
*Access to EFS for Other Parties*
If you are a party other than the party that is appealing, you may request access to the appeal by obtaining a login.gov account and EFS account, and then following the written directions and/or via the video tutorial located at:

https://efile.dol.gov/support/boards/request-access-an-appeal

*After An Appeal Is Filed*

After an appeal is filed, all inquiries and correspondence should be directed to the Board.

*Service by the Board*

Registered e-filers will be e-served with Board-issued documents via EFS; they will not be served by regular mail. If you file your appeal by regular mail, you will be served with Board-issued documents by regular mail; however, you may opt into e-service by establishing an EFS account, even if you initially filed your appeal by regular mail.

# SPA-63

## SERVICE SHEET

Case Name: **SHAFFER GENE v. NEW YORK COMMUNITY BANCORP., INC.**

Case Number: **2018SOX00048**

Document Title: **DECISION AND ORDER DENYING COMPLAINTS**

I hereby certify that a copy of the above-referenced document was sent to the following this 29th day of June, 2022:

 Digitally signed by Matthew M. Schmall
DN: CN=Matthew M. Schmall,
OU=PARALEGAL SPECIALIST, O=US DOL
Office of Administrative Law Judges,
L=Washington, S=DC, C=US
Location: Boston MA

**Matthew M. Schmall**
PARALEGAL SPECIALIST

OSHA-Region 2 Regional Administrator
Region 2
Room 670
201 Varick St.
NEW YORK NY 10014
*{Electronic - Regular Email}*

New York Regional Solicitor
Regional Solicitor
U. S. Department of Labor
Room 983
201 Varick Street
NEW YORK NY 10014
*{Electronic - Regular Email}*

FLS-Filings@dol.gov
Associate Solicitor
Division of Fair Labor Standards
U. S. Department of Labor
Room N-2716, FPB
200 Constitution Ave., N.W.
WASHINGTON DC 20210
*{Electronic - Regular Email}*

OSHA.DWPP@dol.gov
Director
Directorate of Whistleblower Protection Programs
U S Department of Labor, OSHA
Room N 4618 FPB
200 CONSTITUTION AVE NW
WASHINGTON DC 20210
*{Electronic - Regular Email}*

Patrick Johnson, Esq.
The Johnson Law Office
9118 Third Avenue
BROOKLYN NY 11209
*{Electronic - Regular Email}*

Michael D Schissel, Esq.
Arnold & Porter Kaye Scholer, LLP.
250 West 55th Street
NEW YORK NY 10019-9710
*{Electronic - Regular Email}*

Kathleen A Reilly, Esq.
Arnold & Porter Kaye Scholer, LLP.
250 West 55th Street
NEW YORK NY 10019-9710
*{Electronic - Regular Email}*